UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
LADONNA POWELL,

                               Plaintiff,

           against-

ALLIED UNIVERSAL SECURITY SERVICES,
ALLIED BARTON SECURITY SERVICES, LLC,
THOMAS TARANTOLA, CHRISTOPHER
TIMBERLAKE, OSVALDO ORTIZ, KEITH REED,
ALBERTO DIAZ, KEVIN MCNAMARA, and
MARTIN FEENEY,

                              Defendants.
--------------------------------------------------------------------X

17 Civ. 6133

**COMPLAINT**

**JURY TRIAL
DEMANDED**

        Plaintiff LaDonna Powell, by and through her attorneys Emery Celli Brinckerhoff & Abady LLP, as and for her Complaint against Defendants alleges the following:

<u>**PRELIMINARY STATEMENT**</u>

        1.      This case is about a company overrun with misogyny, racism, and harassment, and the brave woman, Plaintiff LaDonna Powell, who was fired for speaking up about it.

        2.      During her four years working for Allied at John F. Kennedy International Airport ("JFK"), Ms. Powell was presented with a choice: have sex with male supervisors and get ahead, or refuse and be relentlessly harassed and retaliated against.

        3.      Ms. Powell chose the latter.  As a result, she was subjected to a shocking campaign of hazing, abuse, and discrimination as a result of her gender and race, and then fired for reporting her discriminatory treatment.

4.      This is not a case of a few bad apples, or a couple of discrete instances of harassment.  The culture of Allied at JFK is one of discrimination and harassment.  Instead of providing security services pursuant to Allied's contract with the Port Authority of New York and New Jersey ("Port Authority"), Allied supervisors wasted taxpayers' dollars by, for example, spending their work hours circulating pornographic videos and propositioning female employees for sex.

5.      Ms. Powell repeatedly reported the harassment to Allied supervisors and top managers (including two who are ex-NYPD police officers), but they did nothing to stop it.  Rather, these individuals perpetuated and participated in the illegal conduct.

6.      The severity of the discrimination and harassment that Ms. Powell experienced at Allied is harrowing.  Among other things, Ms. Powell was:

- repeatedly forced to stand by as her supervisors watched her colleagues have sex in security booths via closed circuit television cameras,

- repeatedly present while her supervisors watched videos of female security guards performing oral sex on male supervisors and made comments like "do you know how to give head like that?,"

- repeatedly forced by her supervisors to watch online videos of women pole dancing and asked if she could "dance like that,"

- subjected to countless lewd comments about her body, including observations about her breasts and remarks that "back in the day" she would be "bent over in the [security] booths,"

- repeatedly propositioned by her supervisors for sex, including in exchange for promotions and better shifts,

- told she should only hire "cute girls" to work as security guards, regardless of their qualifications,

- ignored when she reported to her supervisors that black security guards were being referred to with the n-word,

- ignored when she reported that a female employee had been raped by two other employees following a work event, and

- denied overtime pay and denied access to food, water, and bathroom breaks while working as a security guard—to the point where, on multiple occasions, she had to urinate in a cup in the middle of her shift.

7.      Despite this treatment, Ms. Powell refused to submit to her supervisors' harassment.  She refused to have sex with her supervisors in exchange for better shifts and days off.  She spoke up in response to reports by her black supervisees that they were being called the n-word and treated worse than white employees.  She complained about widespread wage and hour violations affecting her and her fellow employees.  And she did not ignore being leered at, screamed at, and touched inappropriately by her colleagues and supervisors.

8.      In response, Allied fired Ms. Powell.  The firing took place just one week after Ms. Powell complained to a supervisor at the Port Authority about the harassment and discrimination at Allied, and it had nothing to do with Ms. Powell's job performance.  Just days before her termination, Defendant Martin Feeney—Allied's Vice President for the Region—said that if he had "a hundred LaDonnas," Allied would be a much better-run organization.

9.      The only reason Defendant Thomas Tarantola could think of when he fired Ms. Powell in May 2016 was "I don't like the type of person you are."  It was not the first time that the company fired an employee for speaking up.

10.     Defendants' persistent harassment and retaliation against Ms. Powell devastated her.  Ms. Powell dreaded going to work each day, not knowing what horrible conduct awaited her.  She often left the office in tears, disgusted and frustrated with the treatment she received and her inability to improve her situation.  The harassment took an enormous toll on Ms. Powell, and her termination was emotionally and financially shattering.

11.     Defendants' conduct is shocking, illegal, and gives rise to Ms. Powell's claims for race discrimination, sex discrimination, retaliation, and wage and hour violations under federal, state, and local law.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over Plaintiff's federal law claims under 28 U.S.C. §§ 1331, 1343, 42 U.S.C. § 1981, and 29 U.S.C. § 201 *et seq.* The Court has supplemental jurisdiction over Plaintiff's New York State and New York City law claims under 28 U.S.C. § 1367(a).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

14.     Plaintiff demands a trial by jury in this action.

## PARTIES

15.     Plaintiff LaDonna Powell is a 32-year-old black woman who was employed by Allied from 2012 to 2016.

16.     Defendant Allied Universal Security Services is a Delaware corporation that maintains corporate headquarters at 229 West 36th Street, New York, New York 10018 and 199 Water Street, New York, New York 10038 and maintains at office at JFK.  Allied Universal Security Services was formed in or around August 2016 as the result of a merger between

4

Defendant Allied Barton Security Services, LLC and Universal Services of America.  On information and belief, Allied Universal Security Services is the parent company of and/or successor-in-interest to Allied Barton Security Services LLC.  Allied Universal Security Services contracts with the Port Authority to provide security services at JFK.

17.     Defendant Allied Barton Security Services, LLC is a Delaware corporation with offices in New York, New York.  In 2016, Defendant Allied Barton Security Services, LLC merged with Universal Services of America to become Defendant Allied Universal Security Services.  Defendant Allied Barton Security Services contracted with the Port Authority to provide security services at JFK from 2013 until the 2016 merger, when the new entity, Defendant Allied Universal Security Services, assumed the contract.  Defendant Allied Barton Security Services, LLC employed Plaintiff from 2013 until her termination in the spring of 2016.

18.     In this Complaint, Defendants Allied Universal Security Services and Defendant Allied Barton Security Services, LLC are referred to collectively as "Allied."  Despite the name changes and merger, the same supervisors managed Allied's contract with Port Authority during Ms. Powell's term of employment.

19.     Defendant Thomas Tarantola is the project manager for Allied at JFK.  Tarantola is one of Allied's most senior managers at JFK and responsible for overseeing Allied employees at that site.  Upon information and belief, Tarantola is a resident of New York.

20.     Defendant Christopher Timberlake is an assistant project manager at Allied at JFK.  Upon information and belief, Timberlake is a resident of New York.

21.     Defendant Osvaldo Ortiz is a security supervisor at Allied at JFK.  Upon information and belief, Ortiz is a resident of New York.

22.     Defendant Keith Reed is a security supervisor at Allied at JFK.  Upon information and belief, Reed is a resident of New York.

23.     Defendant Alberto Diaz is a security supervisor at Allied at JFK.  Upon information and belief, Diaz is a resident of New York.

24.     Defendant Kevin McNamara is a security supervisor at Allied at JFK.  Upon information and belief, McNamara is a resident of New York.

25.     Defendant Martin Feeney is a Regional Vice President at Allied.  Prior to that, Feeney serviced as the project manager for Allied at JFK.  During the term of Ms. Powell's employment, Feeney was the top supervisor in charge of Allied's contract with Port Authority at JFK, and he was responsible for overseeing that Allied employees at that site.  Upon information and belief, Feeney is a resident of New York.

26.     Collectively, the individual named Defendants are referred to in this Complaint as the "Supervisor Defendants."  At all relevant times, the Supervisor Defendants were Allied supervisors and upper managers at JFK responsible for carrying out the contract between Allied and Port Authority and overseeing Allied employees at that site.

## FACTS

### Overview of Employment and Promotions

27.     In 2012, Ms. Powell began working at JFK as a part-time security officer employed by FJC Security, Inc. ("FJC").

28.     At that time, FJC had a contract with the Port Authority to provide security services at JFK.

29.     As a part-time security officer, Ms. Powell was paid approximately $14 to $15 per hour, and her primary job responsibility was to screen vehicles bringing cargo to airplanes.

30.     In mid-late 2013, Allied took over FJC's contract with Port Authority and became Ms. Powell's employer.

31.     Around the same time, in September 2013, Ms. Powell was promoted to operations assistant.  Her salary increased to approximately $19 to $20 per hour, and she began working in Allied's office to carry out its contract with Port Authority, including by working on payroll, scheduling, and assisting with technology repairs.

32.     In early 2014, Ms. Powell was promoted to office specialist.  Her salary increased to approximately $21 to $22 per hour, and her primary job responsibilities were to conduct fingerprinting, process identification cards, and oversee background checks for new Allied employees.

33.     In June 2014, Ms. Powell was promoted to supervisor within the security division. As a supervisor, Ms. Powell's salary increased to $32.50 per hour.  Her primary job responsibility was to drive around in the field to supervise the security officers.  She was also responsible for communicating with Port Authority regarding any security issues.

34.     Ms. Powell's promotion to supervisor was due to Port Authority's support for her. Recognizing Ms. Powell's strength as an employee, Port Authority supervisor Caleb Chu had told then-Project Manager (now Allied Vice President) Feeney that he wanted to recruit Ms. Powell to join Port Authority.  Not wanting to lose Ms. Powell as an employee, Feeney promoted her to supervisor.

35.     Shortly after her promotion to supervisor, Ms. Powell was promoted again to supervisor/trainer.  This promotion was not accompanied by a pay increase.  As supervisor/trainer, Ms. Powell was responsible for training new classes of security officers and conducting refresher trainings for current security officers.

36.     Ms. Powell took a several-month hiatus in the summer of 2015 to attend training for a part-time position with U.S. Customs and Border Protection ("U.S. Customs"), but she returned to her position as supervisor/trainer at Allied after the training in August 2015.

37.     Starting in August 2015, Ms. Powell worked part-time for U.S. Customs in addition to her work as a supervisor/trainer at Allied.

38.     Ms. Powell remained a supervisor/trainer at Allied from 2014 until she was terminated in May 2016.

**Ms. Powell is Sexually Harassed and Subjected to a
Hostile Work Environment**

39.     The sexual harassment, intimidation, and violence that Ms. Powell experienced during her employment at Allied is chilling.  Worse yet is the fact that the culture was perpetuated and protected by Allied senior management, including the Supervisor Defendants.

40.     Although Ms. Powell reported several particularly egregious incidents of sexual harassment to her superiors or to human resources, there were simply too many to report, and she (rightfully) feared retaliation because the perpetrators of the harassment were often her supervisors or top managers.

41.     The following incidents are just several of many examples of the harassment that Ms. Powell was subjected to every day of her employment.

_Ms. Powell Was Exposed to Photos and Videos
of Supervisors Having Sex With Female Employees_

42.     On more than one occasion, Ms. Powell was present while several of the Supervisor Defendants looked at videos and photos of male Allied employees (including supervisors) engaging in sex acts with female Allied employees.

43.     For example, in early 2015, Ms. Powell was present in the office while Supervisors Defendants Reed, Ortiz, and Diaz watched two videos of a female Allied employee performing oral sex on two different male Allied employees.  One of them had recorded the video from the female employee's phone and was sharing it with the others.

44.     While watching the videos, Reed, Ortiz, and Diaz made crude and inappropriate remarks in front of Ms. Powell and another female Allied employee.  They said things like: "look how she's doing that" and "she's so good."  They kept repeating that they were "turned on" by the videos and that it made their "toes curl."  One even remarked that if he were the male employee in the video, he would have already ejaculated.

45.     This was not the only time that the Supervisor Defendants watched or shared pornographic videos or images that showed female employees.  It happened all the time.  Once, while several of the Supervisor Defendants were watching such a video in front of Ms. Powell, Reed asked her: "Do you know how to give head like that?"

46.     Also in or around May 2015, when Ms. Powell was checking on a security guard at a field post, the guard took out her cell phone and showed Ms. Powell multiple photographs of her performing oral and manual sex on Ortiz.  The security guard also showed Ms. Powell a graph she had made comparing the size of Ortiz's penis to the penis of another Allied employee.

47.     On another occasion, in the spring of 2016, a security guard made a FaceTime call to the on-duty supervisor's cell phone and Ms. Powell answered.  Ms. Powell saw that the female security guard was topless, and she told Ms. Powell that she had removed her uniform because she thought that Ortiz was on-duty and using the supervisor's cell phone, not Ms. Powell.

48.     During all of these incidents, Ms. Powell was shocked, distressed, and uncomfortable about the fact that sex between Allied employees was being openly shared and

bragged about.  In each instance, she ignored the conduct and tried to continue her work without engaging with the inappropriate behavior.

*Ms. Powell Was Present While Her Colleagues Orchestrated
and Watched Allied Employees Have Sex on Security Cameras*

49.     On more than one occasion, Ms. Powell was present while several of the Supervisor Defendants watched security guards have sex via the closed-circuit cameras that were placed in security booths in the field.

50.     For example, in September 2013, while Powell was serving as an operations assistant, she was in the office with Diaz and Ortiz when they began watching a live video of two security officers having sex in a security booth (via the closed-circuit cameras that allow supervisors in the office to view the booths).  Ms. Powell was present as Diaz and Ortiz watched the two officers for several minutes, laughing and making crude comments like "What is he doing with that old pussy?", "Don't they live together?", and "Why can't he wait?"

51.     Some of the Supervisor Defendants also regularly assigned security guards to certain posts together to see whether they would have sex with each other.

52.     For example, in June or July 2015, Ortiz assigned a female security guard with whom he was having sex to the same post as a certain male security guard for the purpose of determining whether she would "cheat" on him.  When he observed the two having sex via the closed-circuit cameras, Ortiz made a video recording of the screen.  The video showed pairs of pants lying on the ground and it was clear that the two were having sex off-screen.  Ortiz shared the video with numerous security guards and supervisors, including Ms. Powell.

53.     As a result of this behavior, Ms. Powell felt disgusted, humiliated, extremely uncomfortable, and extremely distressed and unsafe at work.

*Ms. Powell Was Forced to Watch Pole-Dancing Videos*

54.    On more than one occasion, Ms. Powell was forced to watch sexually explicit

videos and then harassed by several of the Supervisor Defendants.

55.    In 2014, while Ms. Powell was working as an operations assistant, Timberlake

and Ortiz called her into Timberlake's office.  They showed Ms. Powell a video of women pole

dancing that was playing on Timberlake's computer.  The women in the video were wearing

little clothing and dancing in sexually explicit manner.  Ortiz and Timberlake then asked Ms.

Powell if she knew how to dance like that.  Shocked and humiliated, Ms. Powell did not respond

and simply walked out of the office.

56.    In early 2016, Timberlake, Ortiz, and Diaz called Ms. Powell into Timberlake's

office and again showed her a similar video of women pole dancing in a sexual manner.  They

again asked Ms. Powell if she knew how to dance like the women in the video, and Ms. Powell

again felt too shocked and humiliated to even respond.

57.    Timberlake, Ortiz, and Diaz then proceeded to tell Ms. Powell that they used to

regularly have sex with women security guards while in the security booths and on duty.

58.    Timberlake, Ortiz, and Diaz told Ms. Powell that they would have had sex with

her too, remarking that "back in the day" she would be "bent over in the booths"—a crude

reference to penetrating her from behind.

59.    Timberlake then told Ms. Powell that he met the woman with whom he fathered

his first child at work, implying that the child had been conceived at work with a female security

guard.

60.    Ms. Powell was extremely humiliated and distraught as a result of this interaction.

She felt like her supervisors were pressuring her to have sex with them by saying that it was part

11

of the office culture, and she felt like was treated worse than other employees because she refused.

*Timberlake Directly Suggested That Ms. Powell*
*Should Have Sex With Supervisors*

61.     In late 2014 or early 2015, Timberlake called Ms. Powell into his office.  A supervisor from Port Authority was also present.  Ms. Powell was wearing a white sweater dress. Timberlake remarked to the Port Authority supervisor: "Doesn't she look good?"

62.     Timberlake then asked Ms. Powell: "How much further do you want to go [at Allied]?"  When Ms. Powell responded that she wanted to remain a supervisor and develop her career with the federal government through her position with U.S. Customs, Timberlake told her: "There are things you can do to get where you want to go."

63.     Timberlake's clear implication to Ms. Powell was that she could engage in sex acts to advance her career.

64.     Ms. Powell had seen firsthand that other female employees who had sex with supervisors were given promotions, better shifts, more breaks, and better days off.  On occasion, she thought to herself that if she wanted even a lunch break, she should have sex with supervisors.

65.     On another occasion, Timberlake told Ms. Powell something akin to: "Since everyone already thinks we had sex, let's bend you over the table."

66.     Ms. Powell was extremely embarrassed and distraught following this situation. She again felt pressure to have sex with her supervisors in order to advance her career and fit in with the culture at Allied.

*Timberlake Commented On Ms. Powell's*
*Breasts and Inappropriately Touched Her Body*

67.     On or around November 12 or 13, 2015, after Ms. Powell returned from U.S.

Customs training, Timberlake called Ms. Powell into his office.  He said to her: "Your breasts

got smaller, you really lost weight."

68.     Timberlake constantly made comments about Ms. Powell's body, as well as the

bodies of many other women employed by Allied.

69.     Timberlake also repeatedly and deliberately brushed up against Ms. Powell's

body when walking past her and made unnecessary contact with her body, including her legs and

her butt.  Timberlake would make such inappropriate and unnecessary contact on a weekly—if

not daily—basis.

70.     Timberlake's comments and inappropriate touching were extremely distressing to

Ms. Powell and made her feel uncomfortable and unsafe at work.  The comments and touching

also made her feel like she should acquiesce to having sex with Timberlake in order to fit in at

work.

*Ms. Powell Was Told Only to Hire "Cute Girls"*

71.     In November 2015, when Ms. Powell was bringing in candidates to interview for

security guard positions, Timberlake told Ms. Powell: "We don't want too many men and no fat

women."

72.     A Port Authority supervisor who was present agreed and told Ms. Powell: "You

brought some cute girls last time but you only hired one."  Ortiz and Reed were present for this

conversation.

73.     Ortiz, Timberlake, and Feeney also took affirmative steps to make sure that

women they perceived as attractive were hired, regardless of their qualifications.  These

13

Defendants regularly brought in women applicants who did not meet the job requirements for security guard and sought to have them hired due to their appearances. On one occasion, they caused a woman to be hired even though she did not have either a High School diploma or a New York driver's license—two mandatory job requirements for every security guard.

*Ms. Powell Was Sexually Harassed by Kevin McNamara*

74.     In September 2013, while Ms. Powell was serving as a security officer, she was sexually harassed by Defendant Supervisor McNamara.

75.     McNamara, an older white man, approached Ms. Powell in the security booth where she was stationed and told her that he needed to photograph her. McNamara demanded that Ms. Powell take off her uniform jacket and spin around so that he could photograph her. Ms. Powell knew that McNamara only needed to photograph the outside of her jacket, and she refused to take her jacket off for him.

76.     Ms. Powell later learned that McNamara had made the same demand of other female security guards.

77.     Ms. Powell felt extremely upset and uncomfortable at McNamara's demand that she take off her jacket and spin around for him.

78.     Ms. Powell reported McNamara's harassment in the security booth to Timberlake. On information and belief, Timberlake did not investigate or take any action in response to the Ms. Powell's complaint.

79.     McNamara also repeatedly called Ms. Powell a "kid," despite her asking him to stop. He once asked her, "how old are you, twelve?"

14

## Ms. Powell is Discriminated Against and Subjected
## to Harassment on the Basis of her Race

80.     Ms. Powell and the other black Allied employees were discriminated against and received inferior treatment from white male supervisors managers, particularly McNamara and Tarantola, because of their race.

81.     Black security guards were regularly referred to using the n-word and other racial slurs by white supervisors and management.

82.     In or around 2015, Ms. Powell and McNamara were in the supervisor's office, along with a female office assistant (who is Hispanic).  The female assistant was upset because paperwork had been filled out incorrectly by a supervisor on the previous shift.  In response, McNamara lashed out against Ms. Powell, saying "I'm tired of all of you niggers" and "I'm tired of seeing your nigger faces."

83.     On or around March 5, 2016, Ms. Powell was pulled aside by a security officer trainee following a refresher training session.  The trainee told Ms. Powell that he is referred to using the n-word all the time, including on three specific occasions by Kevin McNamara.

84.     Ms. Powell reported the trainee's complaint to McNamara directly, as well as Timberlake, Diaz, and Ortiz together in Timberlake's office.  When she reported the complaint to Timberlake, Diaz, and Ortiz, Ms. Powell also reported the 2015 incident where McNamara used the n-word in front of her.

85.     On information and belief, no action was taken in response to Ms. Powell's complaint.

86.     Ms. Powell was extremely upset and distressed by the rampant use of n-word and other racial slurs by Allied employees and by the failure by management to respond or investigate.

87.     In addition, in or around 2013, right after Ms. Powell was promoted to operations assistant, McNamara stormed into the area where Ms. Powell was seated and started screaming at her about filing something.  McNamara threw paper in Ms. Powell's face.  When Ms. Powell asked McNamara to stop screaming at her, he muttered that she was a "bitch."

88.     Ms. Powell then told McNamara that she was going to write a complaint about his harassment, and McNamara told Ms. Powell that "your kind of people don't understand"  before walking out of Ms. Powell's space and slammed the door behind him.

89.     Ms. Powell reported McNamara's harassment of her to human resources.  She wrote a written complaint and gave it to Eve Monroe, who worked in the human resources department at the time.  She also gave copies to Feeney, Diaz, and Timberlake.

90.     On information and belief, there was no investigation of the incident and no action was taken in response to Ms. Powell's complaint.

91.      When Feeney saw Ms. Powell's complaint about McNamara, he told Ms. Powell: "You know how Kevin is.  Next time he does it, kick him in the balls."

92.     On another occasion, when Ms. Powell was promoted to supervisor in 2014, she overheard McNamara tell others that Ms. Powell is "disgusting" and that Allied was "digging at the bottom of the barrel" by promoting Ms. Powell.

93.     In addition to experiencing racial epithets and discriminatory comments, black Allied employees, including Ms. Powell, were given worse assignments and shifts, and fewer responsibilities, than white employees.

94.     Black employees were penalized more harshly than white employees for the same mistakes, and they were required to do extra work that white employees were not asked to do, including writing extra reports, sending extra emails, and filling out extra paperwork.

95.     Black employees were berated and harassed with greater frequency than white employees, and there was a sense among black employees that they had less job security than white employees and could be fired at any time.

96.     The culture of racial discrimination and harassment went all the way to the top. When Ms. Powell first met Tarantola in November 2015 after returning from leave for U.S. Customs training, he was visibly shocked to learn that Ms. Powell—a well-regarded supervisor—was black.  He said to her: "You're LaDonna Powell?  Your name sounds Italian."

97.     In or around January or February of 2016, Tarantola asked Ms. Powell how long she planned to continue to work with both Allied and U.S. Customs.  Ms. Powell responded that she planned to "for as long as I can."  Tarantola then said: "I guess since you are Jamaican you are nice to the security guards who are West Indian."  When Ms. Powell responded that she is nice to everyone, Tarantola said: "I don't know whose side you are on."

98.     It was extremely stressful and emotionally distressing for Ms. Powell, a black woman, to work in an environment where black employees were called the n-word and were regularly treated worse than white employees.

### Ms. Powell is Subjected to Abusive Work Conditions and Denied Overtime Pay

99.     During her four years of employment with Allied, Ms. Powell was illegally deprived of overtime pay and was subjected to abusive work conditions.

100.     Wage and hour violations were widespread at Allied, and they affected numerous employees from security guards to supervisors.  *See generally Douglas v. Allied Universal Security Services, et al.*, No. 17 Civ. 06093 (E.D.N.Y.).

101.     Throughout her tenure at Allied, Ms. Powell was always paid hourly and was never salaried.

102.    Throughout her tenure at Allied, Ms. Powell was required to sign in and sign out for each shift using a daily attendance log; however, she was not permitted to enter her actual start and end time.  Instead, her start and end times were pre-printed on the sheet and could not be altered.

103.    Although shifts were supposed to be eight hours, Ms. Powell was forced to work for many hours beyond her designated shift.  But because she was never allowed to report her extra hours, she was not compensated for her additional time.

104.    Ms. Powell frequently tried to write in her extra time and seek compensation for it, but she was told by Timberlake and other Supervisor Defendants that her actions were not permitted.

105.    On average, throughout her employment at Allied, Ms. Powell worked an additional three hours per day over her assigned eight-hour shift and she was never compensated for any of this time.

106.    Throughout her time at Allied, Ms. Powell was required to report for work thirty minutes before her shift began for a "roll call" or attendance drill.  She was not compensated for this time either.

*Ms. Powell Was Denied Overtime and*
*Breaks as a Security Officer*

107.    As a security officer from 2012 to September 2013, Ms. Powell was forced to work long shifts outside and was not given any breaks to eat or use the bathroom.  She was never paid overtime or compensated in any way for the extra hours of work.

108.    Although Ms. Powell was supposed to receive one fifty-minute unpaid lunch break per shift as a security officer, she was denied her lunch break at least once per week because no one came to relieve her and she was not permitted to eat or drink while at her post.

18

109.    Even when Ms. Powell was relieved for lunch, it took ten to twenty minutes to drive to the meal area and the same amount of time to return, leaving little time to take an actual lunch break.

110.    In addition, Ms. Powell was frequently not given bathroom breaks when she worked as a security officer.  When she asked to use the bathroom during a shift as a security officer, she was regularly told to urinate in a cup, which she was forced to do on numerous occasions.

111.    Ms. Powell would often work 8 to 12 hours as a security officer without receiving a single break.

112.    Ms. Powell repeatedly complained about not receiving lunch or bathroom breaks as a security officer to Timberlake and other Supervisor Defendants.

113.    In response, Ms. Powell was occasionally told that she would be compensated for an additional 30 minutes of time, but she did not receive any such compensation.

*Ms. Powell Was Denied Overtime and Breaks*
*as an Operations Assistant and Office Specialist*

114.    As an operations assistant and office specialist from September 2013 through June 2014, Ms. Powell continued to be denied overtime and breaks.

115.    Ms. Powell was not permitted to leave her desk for lunch and she was required to answer phones at all times during her shifts, even when she was supposed to be on a lunch break.

116.    Even on the rare occasion that Ms. Powell tried to eat at her desk, she was unable to take an actual lunch break because she was required to answer phones and requests from her supervisors.

117.    Ms. Powell was not paid for her lunch breaks when she served as an operations assistant and office specialist, even though she regularly worked through them.

118.   Ms. Powell regularly complained to the Supervisor Defendants, including Timberlake, about her denial of breaks and overtime as an operations assistant and office specialist.

*Ms. Powell Was Denied Overtime and*
*Breaks as a Supervisor*

119.   Ms. Powell continued to be subjected to Allied's illegal wage and hour practices as a supervisor from June 2014 to May 2016.

120.   During her employment as a supervisor, Ms. Powell was regularly forced to work through her unpaid lunch breaks.

121.   Although Ms. Powell was supposed to receive a one-hour lunch break per shift, she was unable to take her lunch break at least four days per week because she was busy driving between posts to supervise security officers.

122.   Diaz once told Ms. Powell that supervisors were not permitted to eat where anyone could "see them," rendering it nearly impossible for her to take a lunch break.

123.   Furthermore, as a supervisor, Ms. Powell was expected to be "on duty" and report any traffic infractions any time she was using an Allied vehicle—even if she was supposed to be on a break.

124.   On at least one occasion, Ms. Powell witnessed a vehicle accident on her way to her lunch break and was required to stop at the accident to assist, alert the proper authorities, and write a witness incident report.  The process took over an hour, requiring Ms. Powell to work through her entire lunch break.  Ms. Powell was never paid for this time.

125.   In addition, as a supervisor, Ms. Powell was forced to attend weekly supervisor calls every Tuesday even though Tuesday was Ms. Powell's day off.  The calls often lasted for

three to four hours.  Ms. Powell was never compensated for any of the time she spent participating in supervisor's calls during her days off.

126.   And as was the case throughout her employment at Allied, Ms. Powell was regularly forced to work for hours after her supervisory shift technically ended, including to write incident reports and complete other paperwork.

127.   Ms. Powell regularly complained to Timberlake that she was never paid overtime as a supervisor.  In response, Timberlake told her that it was part of the job.

128.   Finally, when Ms. Powell was a supervisor, she was instructed by senior managers, including Timberlake, not to give certain security guards lunch breaks because the managers did not like them.

### Allied Turned a Blind Eye to Race Discrimination, Gender Discrimination, Sexual Harassment and Assault, Including Rape Allegations

129.   Allied was repeatedly made aware of the ongoing sexual harassment, violence against women, gender discrimination, race discrimination, and wage and hour violations, and Allied and the Supervisor Defendants did nothing to stop it.

130.   As described above, Ms. Powell alone made regular complaints about the discrimination she faced.  In addition to filing a formal complaint to human resources about McNamara, Ms. Powell made repeated oral complaints to the Supervisor Defendants and Port Authority about racial discrimination (including use of the n-word) and sexual harassment.  She also regularly complained to the Supervisor Defendants about not receiving breaks and not being paid overtime.

131.   On information and belief, other female and black Allied employees were also subjected to discriminatory treatment and complained about that treatment to the Supervisor Defendants.  Like Ms. Powell, these employees' complaints were ignored and they were

retaliated against by, among other things, receiving worse shifts and fewer breaks and being forced to urinate in cups during shifts.

132.    In addition to the regular complaints by Ms. Powell and numerous others, in late June or early July 2015, a letter was placed in the locker of every Allied employee at JFK complaining about the pervasive harassment and mistreatment of employees, including sexual harassment and discrimination on the basis of race and sex.

133.    On information and belief, Allied investigated the complaint and fired the employee who circulated the letter, but did not discipline any other employees or supervisors, including those who were named for engaging in harassing and discriminatory conduct.

134.    After the letter came out, Ms. Powell was threatened by another female supervisor, who told Ms. Powell not to have sex with certain male supervisors because that female supervisor needed the good shifts and breaks that came as perks for having sex with particular male supervisors such as Ortiz.

135.    Allied also failed to respond to a credible complaint of a sexual assault by two employees against a female employee.  In mid-2015, after a work event celebrating Ms. Powell's departure for U.S. Customs training, a security guard was allegedly sexually assaulted by two other Allied employees.  They were driving her home, and one of the employees allegedly held her down while the other employee assaulted her without consent.

136.    After the assault, the security guard told Ms. Powell what happened, and Ms. Powell immediately reported the incident to Ortiz, Reed, and Diaz.  All three told Ms. Powell that there was nothing that they could do to investigate the alleged sexual assault of an employee after a work-sanctioned event.

137. On the female employee's behalf, Ms. Powell requested that—at a minimum—the female employee not have to be assigned to work directly with the individuals she asserted assaulted her.  This request was also ignored.

138. Defendants also specifically discouraged reporting incidents of harassment and disciplined Ms. Powell for encouraging others to come forward.  Specifically, in November 2015, when Ms. Powell was conducting training sessions, many Allied employees came forward to her with complaints of race and gender discrimination.  Ms. Powell told her trainees that they should take notes about the treatment that they were experiencing.

139. After one of the trainees reported Ms. Powell's advice to Allied management, Tarantola, Timberlake, and Diaz called Ms. Powell into a meeting in Timberlake's office where they told her that she was supposed to be giving only a "light training," that she should not "ruffle any feathers," and that she should not advise any employees to take notes about discriminatory treatment.

140. Not only were Defendants aware of the egregious sexual harassment taking place at Allied, they encouraged it and boasted about it.  For example, Ms. Powell's supervisors bragged to her that the reason JFK removed the security towers that used to be utilized by security guards was because there was too much sexual activity taking place in them.

141. Finally, Allied was aware of a history of discrimination against women not just at JFK, but also at LaGuardia Airport and possibly at other sites.  For example, in 2014, two Allied employees at LaGuardia filed a sexual harassment and gender discrimination lawsuit with allegations strikingly similar to those alleged here.  *See Lloyd, et al. v. FJC Security Services, Inc., et al.*, No. 14 Civ. 5548 (E.D.N.Y. 2014).

142.     On information and belief, Allied has privately settled multiple claims on behalf of women like Ms. Powell who were harassed and discriminated against by Allied and its employees.

143.     Since Ms. Powell publicly disclosed her allegations several weeks ago, numerous other Allied employees—particularly women—have come forward complaining of the same discriminatory treatment and harassment by Defendants.

### Defendants Retaliate Against Ms. Powell

144.     In addition to the written and oral complaints described above, in or around late 2015 (after she returned from leave for U.S. Customs training), Ms. Powell began complaining regularly to supervisors at Port Authority about the mistreatment, harassment, and discrimination taking place at Allied.

145.     On information and belief, Port Authority supervisors told Tarantola and other Allied supervisors about Ms. Powell's complaints.  In response, Tarantola told all of the supervisors that they should not communicate complaints directly to Port Authority.

146.     Ms. Powell's complaints about Allied and its culture of harassment and mistreatment, including on the basis of race and gender, triggered a campaign of retaliation against Ms. Powell—spearheaded by Tarantola—that ultimately ended in her termination.

147.     Starting in March 2016, Ms. Powell learned that her hours had been reduced and she was told that there was not enough room for her to continue to work as a supervisor, even though she was the only supervisor who was told that she would receive fewer shifts.

148.     In response, Ms. Powell asked about returning to the position of operations assistant because there was a position open, but Tarantola told her that she had to apply for the job and she might not be qualified (even though she had *written the manual for that position*

24

after she held it several years earlier).  Ultimately, the position was given to a white woman who had less experience than Ms. Powell.

149.  Allied's efforts to push Ms. Powell out continued for months.  For example, she took a coffee break once while covering for another supervisor, and was called and told never to leave the airport again—even though all other supervisors regularly took breaks.  From then on, Ms. Powell specifically asked permission from Feeney before taking a coffee break.

150.  On another occasion in the spring of 2016, Ms. Powell was in a car between shifts with another supervisor, Kirk Douglas, when Tarantola approached the vehicle and tried to grab Ms. Powell and physically pull her out of the car.  Tarantola screamed at Ms. Powell that she was not allowed to be in a vehicle when she was technically not on duty, even though it was a common practice among supervisors.

151.  After this incident, Ms. Powell sent a text message to Feeney, via his assistant, stating that she was afraid of Tarantola and did not want to work with him anymore.  On information and belief, no action was taken in response to Ms. Powell's complaint.

152.  In May 2016, Ms. Powell was screamed at by Feeney for refusing to issue a write-up for a security guard who was handicapped for parking in the handicapped parking spot.

153.  Approximately one to two weeks before she was terminated, Ms. Powell became so fed up with Allied and its horrific work environment that she broke down crying at work.  A Port Authority official saw Ms. Powell and asked her what was wrong.  Ms. Powell expressed that she was so disappointed by the toxic culture, harassment, and race- and gender-based discrimination that she experienced at Allied.  She specifically explained that she had tried to address these issues with her Allied supervisors, but none of them did anything in response to her complaints.  Ms. Powell told the Port Authority supervisor everything that she could remember

25

about the discrimination she experienced, including the use of the n-word and her sexual and racial harassment by the Supervisor Defendants. An Allied security guard was also present for this conversation.

154. The Port Authority supervisor that Ms. Powell complained to during this conversation promised her that he would address her concerns with Allied management.

155. After months of retaliation against Ms. Powell for speaking up and complaining about Allied, including to Port Authority supervisors, Ms. Powell was fired.

156. In May 2016, Ms. Powell was called and asked to meet with management and human resources. When Ms. Powell asked what the meeting was about, she was told that it was about an investigation into Kirk Douglas, another supervisor.

157. Ms. Powell went to Tarantola's office for the meeting. When she arrived, Tarantola was present, along with Timberlake and Ana Tovar (a representative from human resources).

158. Tarantola questioned Ms. Powell about where she was the previous Thursday night. When Ms. Powell explained that she was working, Tarantola responded that Ms. Powell was not in the supervisor's vehicle that she was supposed to be in.

159. Ms. Powell responded that she had taken a different vehicle because the supervisor on the prior shift (Diaz) had accidentally taken the keys to the supervisor's car home.

160. Tarantola lept out of his seat, and started yelling that Ms. Powell should have let him know if she was using a different car. Tarantola was loud and abrasive and stood in very close proximity to Ms. Powell's face. Although Ms. Powell stated that she felt uncomfortable, Tarantola continued berating her.

161.    Tarantola yelled at Ms. Powell that he "does not like the type of person" that she is.  When Ms. Powell asked what that meant, Tarantola told Ms. Powell that she does not issue enough write-ups of the security guards and that she is too nice to them.

162.    Tarantola also yelled at Ms. Powell that it was "not her place" to talk to supervisors at Port Authority about conditions at Allied.

163.    He continued to scream at her that he does not want her to wear an Allied badge and tried to grab the badge off of her body.

164.    Extremely shaken, Ms. Powell then left the room to call Feeney, but was able to reach only his assistant, who told her that she was on vacation.

165.    When she re-entered the room, Timberlake told Ms. Powell that she was going to be suspended.  When she asked why, she was not given an answer.

166.    Ms. Powell asked whether she was being fired, and Timberlake only answered "we'll call you."

167.    After she learned of her suspension, Ms. Powell left the Allied premises.

168.    Three weeks later, Ms. Powell was called asked to come to Allied for a meeting. Ms. Powell was working at U.S. Customs at the time and said that she could meet after 4 p.m. She was told that 4 p.m. was too late, and she would be called back about another meeting time. Ms. Powell was called back.

169.    Two days later, Ms. Powell logged onto Allied's online portal to get employment information to apply for a mortgage.  She saw that she was no longer an employee and had been terminated.

170.    Ms. Powell was never given any performance-related reasons for her termination and she never received anything but outstanding performance reviews.  Several days before Ms.

Powell was terminated, Feeney commented that "if we had a hundred LaDonnas," Allied would be a much better run organization.

171.    On information and belief, Ms. Powell's termination was retaliation in response to her race and gender discrimination complaints to Port Authority about Allied.

### Ms. Powell Suffers Extraordinary Damages
### Following Her Retaliatory Termination

172.    Ms. Powell experienced severe emotional distress as a result of Defendants' discriminatory conduct.  During her employment with Allied, Ms. Powell felt extremely stressed, distressed, and embarrassed about the discrimination that she was experiencing.  She dreaded coming to work, feared interacting with her supervisors, and felt sick to her stomach about continuing to work in a place where she was treated so horribly.  She often left work in tears, frustrated and exasperated at the discrimination she experienced and the lack of any response by Allied or the Supervisor Defendants.

173.    The severe emotional distress that Ms. Powell suffered throughout her employment was compounded as a result of her unlawful retaliatory termination.

174.    Ms. Powell was extremely embarrassed and emotionally distraught after she was screamed at and terminated for no legitimate reason.  She was devastated about losing income that she needed to support her family, including her mother and another family member suffering from a disability.  She was worried that she would no longer be able to provide for her family members in need.

175.    At the time of her termination, Ms. Powell was also seeking to buy a home for herself and several family members whom she supports.  Ms. Powell was relying on her income from Port Authority to secure a mortgage, which she was almost unable to receive as a result of

her unlawful termination.  This too caused Ms. Powell extreme stress and worry in the aftermath of her termination.

176.    To this day, Ms. Powell feels embarrassed and distressed about her treatment at Allied and her unlawful termination.  She also continues to feel the financial implications of her unlawful termination.  Although she immediately sought more shifts with U.S. Customs, she makes approximately $20K less per year now than she did when she worked for both U.S. Customs and Allied.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1981 – Intentional Discrimination and Hostile Work Environment**
**(Against Defendants Allied, Tarantola, Feeney, and McNamara)**

177.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

178.    By the conduct described above, Defendants Allied, Tarantola, Feeney, and McNamara intentionally deprived Plaintiff, a black woman of West Indian descent, of the same rights enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of her contractual relationship with Allied, in violation of 42 U.S.C. § 1981.

179.    Plaintiff was also subjected to harassment by Defendants Allied, Tarantola, Feeney, and McNamara that was motivated by Plaintiff's race and protected status as a black woman of West Indian descent in violation of Plaintiff's rights afforded by 42 U.S.C. § 1981.

180.    The race-based discriminatory conduct by Defendants Allied, Tarantola, Feeney, and McNamara was so severe and pervasive as to create a hostile and abusive work environment for Plaintiff.

181.    Defendant Allied knew or reasonably should have known about the hostile work environment within the company and failed to take appropriate remedial actions.

182.    Defendants Tarantola, Feeney, and McNamara directly created or participated in the creation of the hostile and abusive work environment, exhibited gross negligence in supervising subordinates who directly created or participated in the creation of the hostile and abusive work environment, and/or failed to take action upon receiving information about a hostile and abusive work environment that was occurring in violation of 42 U.S.C. § 1981.

183.    As a result of the discrimination in violation of 42 U.S.C. § 1981 by Defendants Allied, Tarantola, Feeney, and McNamara, Plaintiff has been denied employment opportunities providing substantial compensation and benefits and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, entitling her to compensatory damages.

184.    In their race-based discrimination in violation of 42 U.S.C. § 1981, Defendants Allied, Tarantola, Feeney, and McNamara have acted with malice or deliberate indifference to the rights of Plaintiff, entitling her to an award of punitive damages.

185.    Pursuant to 42 U.S.C. §§ 1981 and 1988, Plaintiffs is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1981 – Retaliation**
**(Against Defendants Allied, Tarantola, Feeney, and McNamara)**

186.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though fully set forth herein.

187.    Plaintiff engaged in activity protected by 42 U.S.C. § 1981 by making written and oral reports regarding race-based discriminatory conduct that she experienced at Allied to her supervisors and human resources.

188.   Defendants Allied, Tarantola, Feeney, and McNamara subjected Plaintiff to adverse employment actions, including by reducing the hours that she was eligible to work, terminating her, and subjecting her to a hostile work environment.

189.   Plaintiff's adverse employment actions were a direct and proximate result of Plaintiff's protected complaints and reports regarding Defendants' race-based discriminatory conduct.

190.   As a result of the retaliation by Defendants Allied, Tarantola, Feeney, and McNamara in violation of 42 U.S.C. § 1981, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to their actions, entitling her to compensatory damages.

191.    In their retaliatory actions alleged in violation of 42 U.S.C. § 1981, Defendants Allied, Tarantola, Feeney, and McNamara have acted with malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

192.   Pursuant to 42 U.S.C. §§ 1981 and 1988, Plaintiffs is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* – Overtime Violations**
**(Against Defendants Allied, Timberlake, Tarantola, and Feeney)**

193.   Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

194.   At all relevant times, Defendants Allied, Timberlake, Tarantola, and Feeney were an employers and Plaintiff was an employee employed by these Defendants within the meaning of 29 U.S.C. § 203.

195.    Defendants Allied, Timberlake, Tarantola, and Feeney knowingly, willfully, and intentionally failed to pay Plaintiff overtime and failed to give her overtime pay at a rate one and one-half times the regular rate for hours worked in excess of forty hours per week, in violation of 29 U.S.C. § 207(a)(1).

196.    As a result of the willful violation of the Fair Labor Standards Act by Defendants Allied, Timberlake, Tarantola, and Feeney, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, entitling her to compensatory damages.

197.    As a result of the willful violation of the Fair Labor Standards Act by Defendants Allied, Timberlake, Tarantola, and Feeney, Plaintiff is entitled to recover from these Defendants, jointly and severally, unpaid overtime compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre-judgment interest, pursuant to the Fair Labor Standards Act, all in an amount to be determined at trial, pursuant to 29 U.S.C. § 216(b).

### FOURTH CLAIM FOR RELIEF
**N.Y. State Labor Law – Overtime Violations**
**(Against Defendants Allied, Timberlake, Tarantola, and Feeney)**

198.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though fully set forth herein.

199.    Defendants Allied, Timberlake, Tarantola, and Feeney knowingly, willfully, and intentionally failed to pay overtime pay for hours Plaintiff worked in excess of forty hours per week at a rate one and one-half times the regular hourly rate, which must be equal to or greater

than the minimum wage as set forth in the N.Y. Labor Law § 652, in violation of N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.2.

200.    In addition, Defendants Allied, Timberlake, Tarantola, and Feeney knowingly, willfully, and intentionally required Plaintiff to be at work in excess of ten hours per day, and knowingly, willfully, and intentionally failed to pay Plaintiff one extra hour's pay at a minimum wage for every day in which the interval between Plaintiff's start and end times exceeded ten hours, in violation of N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4.

201.    Pursuant to N.Y. Labor Law §§ 198.1-a and 663, an employer who willfully fails to pay overtime required by the Minimum Wage Act shall be liable for liquidated damages in addition to the amount of any under-payments.

202.    Because of the willful violation of the N.Y. Labor Law by Allied, Timberlake, Tarantola, and Feeney, Plaintiff is entitled to recover from Defendants, jointly and severally, her unpaid overtime compensation, and an amount equal to twenty-five percent of their unpaid wages in the form of liquidated damages.

203.    Pursuant to the N.Y. Labor Law § 663, Plaintiff is entitled to recover reasonable attorneys' fees and costs of the action, including pre-judgment interest.

### FIFTH CLAIM FOR RELIEF
**N.Y.C. Admin. Code §§ 8-107(1) – Intentional Race Discrimination in
Violation of the New York City Human Rights Law
(Against Defendants Allied, Tarantola, Feeney, and McNamara)**

204.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

205.    Plaintiff is a black woman of West Indian descent who falls within a protected class of individuals.

206.    Plaintiff performed satisfactorily since her job performance met or exceeded expectations.

207.    Defendants Allied, Tarantola, Feeney, and McNamara engaged in conduct, as alleged herein, that constituted unlawful discriminatory practices and unlawful discrimination on the basis of race and national origin in violation of the New York City Human Rights Law, N.Y.C. Admin. Code. § 8-107 *et seq.*

208.    Defendants Allied, Tarantola, Feeney, and McNamara subjected Plaintiff to adverse employment actions on account of her protected status and denied her equal opportunity and treatment in the conditions of employment.

209.    By the acts and practices described above, Defendants Allied, Tarantola, Feeney, and McNamara, directly and/or through employees and/or agents, subjected Plaintiff to discrimination in violation of the New York City Human Rights Law.

210.    Individual Defendants Tarantola, Feeney, and McNamara exercised managerial and/or supervisory control over Plaintiff and failed to take correction action and/or participated directly in the discriminatory acts.

211.    As a result of the discrimination by Allied, Tarantola, Feeney, and McNamara in violation of the New York City Human Rights Law, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to their actions, entitling her to compensatory damages.

212.    In their race-based discriminatory actions alleged in violation of New York City Human Rights Law Defendants Allied, Tarantola, Feeney, and McNamara have acted with

34

malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

213.    Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiff is entitled to recover reasonable attorneys' fees and costs of this action.

## SIXTH CLAIM FOR RELIEF
### N.Y.C. Admin. Code §§ 8-107(1) – Gender Discrimination, Sexual Harassment, and Hostile Work Environment in Violation of the New York City Human Rights Law
### (Against All Defendants)

214.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

215.    Defendants discriminated against Plaintiff on the basis of her gender, sexually harassed Plaintiff, and/or caused Plaintiff to experience a hostile work environment in violation of the New York City Human Rights Law by treating Plaintiff less favorably than her male colleagues, making harassing or discriminatory comments to Plaintiff based on her gender, and/or by sexually harassing and assaulting Plaintiff.

216.    Defendants knew of the general discrimination and sexual harassment perpetrated against Plaintiff, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of sexual harassment of female employees that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

217.    The sexual harassment perpetrated against Plaintiff by Defendants affected a term, condition, and the privileges of her employment.

218.    As a result of Defendants' gender discrimination and sexual harassment of Plaintiff in violation of the New York City Human Rights Law, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress,

inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling her to compensatory damages.

219.     In their gender-based discriminatory actions alleged in violation of the New York City Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

220.     Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiff is entitled to recover reasonable attorneys' fees and costs of this action.

### SEVENTH CLAIM FOR RELIEF
### N.Y.C. Admin. Code §§ 8-107(1) – Retaliation in Violation of the New York City Human Rights Law
### (Against All Defendants)

221.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

222.     Plaintiff engaged in protected activity by making written and oral complaints about the sexual harassment, race discrimination, and gender discrimination that Defendants subjected her to on account of her race and her gender, and by seeking to be protected against those same discriminatory acts.

223.     Defendants knew that Plaintiff had engaged in protected activity.

224.     Defendants subjected Plaintiff to adverse employment actions, including by reducing the hours that she was eligible to work, terminating her, and subjecting her to a hostile work environment.

225.     Plaintiff's adverse employment actions were a direct and proximate result of Plaintiff's protected complaints and reports to Defendants regarding their discriminatory conduct.

226.     As a result of the illegal conduct perpetrated by Defendants, Plaintiff has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, as well as lost wages and work opportunities, entitling her to compensatory damages.

227.     In their retaliatory acts in violation of the New York City Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

228.     Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiff is entitled to recover reasonable attorneys' fees and costs of this action.

229.     Pursuant to N.Y.C. Admin. Code § 8-502(c), Plaintiff is providing the New York City Human Rights Commission of notice of her claims under the New York City Human Rights Law.

**EIGHTH CLAIM FOR RELIEF**
**N.Y. Exec. Law § 296 – Race Discrimination in Violation of the**
**New York State Human Rights Law**
**(Against Defendants Allied, Tarantola, Feeney, and McNamara)**

230.     Plaintiff is a black woman of West Indian descent who falls within a protected class of individuals.

231.     Plaintiff performed satisfactorily since her job performance met or exceeded the Defendants' expectations.

232.     The conduct by Defendants Allied, Tarantola, Feeney, and McNamara, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race and national origin in violation of the New York State Human Rights Law § 296 *et seq.*

233.     Defendants Allied, Tarantola, Feeney, and McNamara subjected Plaintiff to adverse employment actions on account of her protected status and denied her equal opportunity and treatment in the conditions of employment.

37

234.     By the acts and practices described above, Defendants Allied, Tarantola, Feeney, and McNamara, directly and/or through employees and/or agents, subjected Plaintiff to discrimination in violation of the New York State Human Rights Law.

235.     Defendants Allied, Tarantola, Feeney, and McNamara exercised managerial and/or supervisory control over Plaintiff, participated in the discriminatory acts, and failed to take correction action.

236.     As a result of Defendants' discrimination in violation of the New York State Human Rights Law, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling her to compensatory damages.

237.     In their race-based discriminatory actions alleged in violation of New York State Human Rights Law Defendants Allied, Tarantola, Feeney, and McNamara have acted with malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

### NINTH CLAIM FOR RELIEF
**N.Y. Exec. Law § 296 – Gender Discrimination, Sexual Harassment, and Hostile Work Environment in Violation of the New York State Human Rights Law**
**(Against All Defendants)**

238.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

239.     Defendants discriminated against Plaintiff on the basis of her gender, sexually harassed Plaintiff, and subjected Plaintiff to a hostile work environment in violation of the New York State Human Rights Law by treating Plaintiff less favorably than her male colleagues, by

sexually harassing and assaulting Plaintiff, and by subjecting Plaintiff to a hostile work environment.

240.     Defendants knew of the sexual harassment perpetrated against Plaintiff, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of sexual harassment of female employees that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

241.     The sexual harassment perpetrated against Plaintiff by Defendants affected a term, condition, and the privileges of her employment.

242.     As a result of Defendants' discrimination in violation of the New York State Human Rights Law, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling her to compensatory damages.

243.     In their gender-based discriminatory actions and sexual harassment alleged in violation of the New York State Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

244.     Under the New York State Human Rights Law, N.Y. Exec. Law § 297.10, Plaintiff is entitled to recover reasonable attorneys' fees and costs of this action.

### TENTH CLAIM FOR RELIEF
**N.Y. Exec. Law § 296  – Retaliation in Violation of the
New York State Human Rights Law
(Against All Defendants)**

245.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

246.    Plaintiff engaged in protected activity by making written and oral complaints about the sexual harassment, race discrimination, and gender discrimination that Defendants subjected her to on account of her race and her gender, and by seeking to be protected against those same discriminatory acts.

247.    Defendants knew that Plaintiff had engaged in protected activity.

248.    Defendants subjected Plaintiff to adverse employment actions, including by reducing the hours that she was eligible to work, terminating her, and subjecting her to a hostile work environment.

249.    Plaintiff's adverse employment actions were a direct and proximate result of Plaintiff's protected complaints and reports to Defendants regarding their discriminatory conduct.

250.    As a result of the illegal conduct perpetrated by Defendants, Plaintiff has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, as well as lost wages and work opportunities, entitling her to compensatory damages.

251.    In their retaliatory acts in violation of the New York State Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages.

252.    Under the New York State Human Rights Law, N.Y. Exec. Law § 297.10, Plaintiff is entitled to recover reasonable attorneys' fees and costs of this action.

253.    Pursuant to New York Civil Rights Law § 40-d, Plaintiff is notifying the Office of the Attorney General of her claims under the New York State Human Rights Law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

40

a) Awarding compensatory damages to Plaintiff;

b) Awarding punitive damages to Plaintiff;

c) Declaring Defendants have violated Plaintiff's rights in violation of 42 U.S.C. § 1981, the New York City Human Rights Law, and the New York State Human Rights Law;

d) Awarding Plaintiff any and all under-payments that she is entitled to as a result of Defendants' failure to comply with the Federal Fair Labor Standards Act and the N.Y. Labor Law;

e) Awarding liquidated damages equal found to be due to Plaintiff either the Fair Labor Standards Act and the N.Y. Labor Law;

f) Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

g) Granting Plaintiff all such other relief as may be just and proper.


Dated: October 20, 2017
       New York, New York

                                        Respectfully submitted,

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP


                                        By:    /s/ Elizabeth Saylor
                                               Elizabeth Saylor
                                               Alanna Kaufman

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        Telephone: 212.763.5000
                                        Facsimile: 212.763.5001

                                        *Attorneys for LaDonna Powell*

41