UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LADONNA POWELL, MARSHA-NIQUE IRVING,
SHEILA WALTON, and ROY FIELDS,

                              Plaintiffs,

              against-

ALLIED UNIVERSAL SECURITY SERVICES,
ALLIED BARTON SECURITY SERVICES, LLC,
THOMAS TARANTOLA, CHRISTOPHER
TIMBERLAKE, OSVALDO ORTIZ, KEITH REID,
ALBERTO DIAZ, KEVIN MCNAMARA, and
MARTIN FEENEY,

                              Defendants.
------------------------------------------------------------------------X

**17 Civ. 6133**

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

        Plaintiffs LaDonna Powell, Marsha-Nique Irving, Sheila Walton, and Roy Fields,

by and through their attorneys Emery Celli Brinckerhoff & Abady LLP, as and for their

Complaint against Defendants, allege the following:

<u>**PRELIMINARY STATEMENT**</u>

        1.     This case is about a company overrun with misogyny, racism, and harassment,

and the brave employees who were retaliated against for speaking up about it.

        2.     Women employed by Defendants at John F. Kennedy International Airport

("JFK") face a choice: have sex with male supervisors and get ahead, or refuse and be

relentlessly harassed and retaliated against.

        3.     Defendant Allied Universal Security Services (referred to herein collectively with

Defendant Allied Barton Security Services, LLC as "Allied") contracts with the Port Authority

of New York and New Jersey to provide security services at JFK, LaGuardia Airport, and the World Trade Center.

4. Plaintiffs LaDonna Powell, Marsha-Nique Irving, and Sheila Walton are a few of the women who rejected the advances of their supervisors and, as a result, were subjected to a shocking campaign of discrimination, hazing, and abuse. When they reported this mistreatment, it worsened—to the point where all three women were fired or forced to leave the company.

5. Even male security guards at Allied were not allowed to interfere with the sordid arrangement in which male supervisors controlled certain female security guards. Plaintiff Roy Fields was given undesirable shifts and lower pay after an Allied supervisor found out that Mr. Fields was in a romantic relationship with a female security guard with whom the supervisor was also having sex. When Mr. Fields reported this mistreatment to human resources, he was fired for it.

6. This is not a case of a few bad apples or a couple of discrete instances of misconduct. The culture of Allied at JFK is one of ubiquitous discrimination and harassment. Instead of providing security services as required by their taxpayer-funded contract with Port Authority, Defendants spent their work hours circulating pornographic videos and propositioning female employees for sex, among other things.

7. Plaintiffs repeatedly reported the harassment to Human Resources and Allied's supervisors and top managers (including two ex-NYPD police officers), but they did nothing to stop it, choosing instead to perpetuate and participate in the illegal conduct. Plaintiffs also repeatedly complained to Port Authority, but nothing was resolved, and the Supervisor Defendants told Plaintiffs not to involve "the client" (Port Authority) in Allied issues.

8.     The severity of the discrimination and harassment that Plaintiffs experienced at Allied is harrowing.  For example:

- Ms. Powell was repeatedly forced to watch her supervisors video-record her colleagues having sex in security booths via closed-circuit security cameras (they then shared and circulated the recordings).

- Ms. Irving was told that she was on a "list" of women security guards that Allied supervisors wanted to have sex with and asked when she would give in to sexual demands.

- Ms. Walton was subjected to repeated comments about oral sex by her Allied supervisor, who regularly told her that "you gotta make sure you know how to suck a dick" and would talk to her about how to "do it right."

- Ms. Powell was repeatedly forced by her supervisors to watch online videos of women pole dancing and asked if she could "dance like that," and was further subjected to countless lewd comments about her body, including observations about her breasts and remarks that "back in the day" she would be "bent over in the [security] booths."

- Plaintiffs were denied overtime pay and denied access to food, water, and bathroom breaks while working as a security guard—to the point where, on multiple occasions, Plaintiffs had to urinate in a cup or outside in the middle of their shift.  The denial of breaks often followed Plaintiffs' complaints for harassment.

9. Despite this treatment, Plaintiffs refused to submit to their supervisors' harassment. Ms. Powell, Ms. Irving, and Ms. Walton refused to engage in sex acts with Allied supervisors in exchange for better shifts and days off.

10. Ms. Powell spoke up in response to reports by black security guards that they were being called the n-word and treated worse than white employees.

11. Ms. Irving complained about widespread wage-and-hour violations affecting her and her fellow employees.

12. Mr. Fields told Human Resources about the culture of sexual harassment at Allied and the unfair treatment that he had received.

13. In response, Defendants fired Ms. Powell. They fired Ms. Walton. And they fired Mr. Fields. They forced Ms. Irving to resign under the threat of imminent termination. Each Plaintiff's departure occurred shortly after—or simultaneously with—complaints that he or she made about discrimination at Allied.

14. Defendants' persistent harassment and retaliation against Plaintiffs devastated them. Plaintiffs dreaded going to work each day, not knowing what horrible conduct awaited them. Ms. Powell often left the office in tears, disgusted and frustrated with the treatment she received and her inability to improve her situation. The harassment took an enormous toll on Plaintiffs, and their departures from Allied were emotionally and financially shattering.

15. Defendants' conduct is shocking, illegal, and gives rise to Plaintiffs' claims for race discrimination, sex discrimination, pregnancy discrimination, retaliation, and wage and hour violations under federal, state, and local law.

**JURISDICTION AND VENUE**

16.     This Court has original jurisdiction over Plaintiffs' federal law claims under 28

U.S.C. §§ 1331, 1343, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and 29 U.S.C. § 201 *et seq.* The

Court has supplemental jurisdiction over Plaintiffs' New York State and New York City law

claims under 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**JURY DEMAND**

18.     Plaintiffs demand a trial by jury in this action.

**PARTIES**

19.     Plaintiff LaDonna Powell is a black woman who was employed by Allied from

September 2013 (when it assumed the Port Authority contract) to May 2016.  She was previously

employed beginning in 2012 by FJC Security, Inc. ("FJC") at JFK and was supervised by the

Supervisor Defendants.  She currently resides in Long Island, New York.

20.     Plaintiff Marsha-Nique Irving is a black woman who was employed by Allied

from September 2013 (when it assumed the Port Authority contract) to March 2017.  She

currently resides in Queens, New York.

21.     Plaintiff Sheila Walton is a black woman who was employed by Allied from

February 2015 until November 2016.  She currently resides in Brooklyn, New York.

22.     Plaintiff Roy Fields is a black man who was employed by Allied from the summer

of 2013 until April 2015.  He currently resides in Allentown, Pennsylvania.

23.     Defendant Allied Universal Security Services is a Delaware corporation that

maintains corporate headquarters at 229 West 36th Street, New York, New York 10018 and 199

Water Street, New York, New York 10038 and maintains an office at JFK.  Allied Universal

Security Services was formed in or around August 2016 as the result of a merger between Defendant Allied Barton Security Services, LLC and Universal Services of America. On information and belief, Allied Universal Security Services is the parent company of and/or successor-in-interest to Allied Barton Security Services LLC. Allied Universal Security Services contracts with the Port Authority to provide security services at JFK, LaGuardia Airport, and the World Trade Center.

24.     Defendant Allied Barton Security Services, LLC is a Delaware corporation with offices in New York, New York. In 2016, Defendant Allied Barton Security Services, LLC merged with Universal Services of America to become Defendant Allied Universal Security Services. Defendant Allied Barton Security Services contracted with the Port Authority to provide security services at JFK from 2013 until the 2016 merger, when the new entity, Defendant Allied Universal Security Services, assumed the contract.

25.     In this Complaint, Defendants Allied Universal Security Services and Defendant Allied Barton Security Services, LLC are referred to collectively as "Allied." Despite the name changes and merger, the same supervisors oversaw Plaintiffs' work and managed Allied's contract with Port Authority at all relevant times.

26.     Defendant Thomas Tarantola is the project manager for Allied at JFK. Tarantola is one of Allied's most senior managers at JFK and is responsible for overseeing Allied employees at that site. Tarantola is a resident of New York.

27.     Defendant Christopher Timberlake is an assistant project manager at Allied at JFK. Timberlake is a resident of New York.

28.     Defendant Osvaldo Ortiz is a security supervisor at Allied at JFK. Ortiz is a resident of New York.

29.     Defendant Keith Reid is a security supervisor at Allied at JFK.  Reid is a resident of New York.

30.     Defendant Alberto Diaz is a security supervisor at Allied at JFK.  Diaz is a resident of New York.

31.     Defendant Kevin McNamara is a security supervisor at Allied at JFK.  McNamara is a resident of New York.

32.     Defendant Martin Feeney is a Regional Vice President at Allied.  Prior to that, Feeney serviced as the project manager for Allied at JFK.  As project manager, Feeney was a senior supervisor in charge of Allied's contract with Port Authority at JFK, and he was responsible for overseeing that Allied employees at that site.  Feeney is a resident of New York.

33.     Collectively, the individual named Defendants are referred to in this Complaint as the "Supervisor Defendants."  At all relevant times, the Supervisor Defendants were Allied supervisors and upper managers at JFK responsible for carrying out the contract between Allied and Port Authority and overseeing Allied employees at that site.

## FACTS

## THE CULTURE AT ALLIED

34.     The culture at Allied is one of discrimination and harassment on the basis of gender and race.

35.     Male supervisors regularly sexually harass female Allied employees, including by soliciting them for sex acts, showing them sexual videos, and talking to them about sex at work.

36.     Supervisors also regularly harass Allied employees based on their race, including by using racial slurs, making racially charged comments, and treating black security guards worse than security guards of other races.

37.     When Allied employees refuse to acquiesce to their supervisors' advances, or when they report discrimination of any kind, they are retaliated against, including by receiving pretextual write-ups, fewer shifts, and worse schedules and posts.  They are also denied breaks, including bathroom breaks and lunch breaks, to the point where they are forced to urinate without a bathroom.

38.     Many employees who speak up are ultimately fired or forced to resign.

39.     Defendants' willingness to engage in unlawful behavior is not limited to acts of discrimination.  They are also engaged in flagrant violations of federal and local wage and hour laws, and they regularly deny Allied employees at JFK earned overtime and other wages.

40.     Allied and the Supervisor Defendants have been aware of the discriminatory culture and unlawful conduct at Allied for years.  Instead of addressing it, they have perpetuated it.  On information and belief, even after the first Complaint in this action was filed, Defendants have continued to engage in the same type of harassment, retaliation, and threatening behavior that is the subject of his action.

## LADONNA POWELL

41.     In 2012, Ms. Powell began working at JFK as a part-time security officer employed by FJC.

42.     At that time, FJC had a contract with the Port Authority to provide security services at JFK.

43.     As a part-time security officer, Ms. Powell was paid approximately $14 to $15 per hour, and her primary job responsibility was to screen vehicles bringing cargo to airplanes.

44.     On or about September 1, 2013, Allied took over FJC's contract with Port Authority and became Ms. Powell's employer.

45.     Around the same time, in September 2013, Ms. Powell was promoted to operations assistant.  Her salary increased to approximately $19 to $20 per hour, and she began working in Allied's office to carry out its contract with Port Authority, including by working on payroll, scheduling, and assisting with technology repairs.

46.     In early 2014, Ms. Powell was promoted to office specialist.  Her salary increased to approximately $21 to $22 per hour, and her primary job responsibilities were to conduct fingerprinting, process identification cards, and oversee background checks for new Allied employees.

47.     In June 2014, Ms. Powell was promoted to supervisor within the security division. As a supervisor, Ms. Powell's salary increased to $32.50 per hour.  Her primary job responsibility was to drive around in the field to supervise the security officers.  She was also responsible for communicating with Port Authority regarding any security issues.

48.     Ms. Powell's promotion to supervisor was due to Port Authority's support for her. Recognizing Ms. Powell's strength as an employee, Port Authority supervisor Caleb Chu had told then-Project Manager (now Allied Vice President) and Defendant Martin Feeney that he wanted to recruit Ms. Powell to join Port Authority.  Not wanting to lose Ms. Powell as an employee, Feeney promoted her to supervisor.

49.     Shortly after her promotion to supervisor, Ms. Powell was promoted again to supervisor/trainer.  This promotion was not accompanied by a pay increase.  As supervisor/trainer, Ms. Powell was responsible for training new classes of security officers and conducting refresher trainings for current security officers.

50.     Ms. Powell took a several-month hiatus in the summer of 2015 to attend training for a part-time position with U.S. Customs and Border Protection ("U.S. Customs"), but she returned to her position as supervisor/trainer at Allied after the training in August 2015.

51.     Starting in August 2015, Ms. Powell worked part-time for U.S. Customs in addition to her work as a supervisor/trainer at Allied.

52.     Ms. Powell remained a supervisor/trainer at Allied from 2014 until she was terminated in May 2016.

**Ms. Powell Is Sexually Harassed and Subjected to a
Hostile Work Environment**

53.     The following incidents are just several of many examples of the harassment that Ms. Powell was subjected to every day of her employment.

*Ms. Powell Was Exposed to Photos and Videos
of Supervisors Having Sex with Female Employees*

54.     On more than one occasion, Ms. Powell was present while several of the Supervisor Defendants looked at videos and photos of male Allied employees (including supervisors) engaging in sex acts with female Allied employees.

55.     For example, in early 2015, Ms. Powell was present in the office while Defendants Reid, Ortiz, and Diaz watched two videos of a female Allied employee performing oral sex on two different male Allied employees.  One of them had recorded the video from the female employee's phone and was sharing it with the others.

56.     While watching the videos, Reid, Ortiz, and Diaz made crude and inappropriate remarks in front of Ms. Powell and another female Allied employee.  They said things like: "look how she's doing that" and "she's so good."  They kept repeating that they were "turned on" by

the videos and that it made their "toes curl." One even remarked that if he were the male employee in the video, he would have already ejaculated.

57. This was not the only time that the Supervisor Defendants watched or shared pornographic videos or images that showed female employees. It happened all the time. Once, while several of the Supervisor Defendants were watching such a video in front of Ms. Powell, Reid asked her: "Do you know how to give head like that?"

58. Also in or around May 2015, when Ms. Powell was checking on a security guard at a field post, the guard took out her cell phone and showed Ms. Powell multiple photographs of her performing oral and manual sex on Ortiz. The security guard also showed Ms. Powell a graph she had made comparing the size of Ortiz's penis to the penis of another Allied employee.

59. On another occasion, in the spring of 2016, a security guard made a FaceTime call to the on-duty supervisor's cell phone, and Ms. Powell answered. Ms. Powell saw that the female security guard was topless, and she told Ms. Powell that she had removed her uniform because she thought that Ortiz was on-duty and using the supervisor's cell phone, not Ms. Powell.

60. During all of these incidents, Ms. Powell was shocked, distressed, and uncomfortable about the fact that sex between Allied employees was being openly shared and bragged about. In each instance, she ignored the conduct and tried to continue her work without engaging with the inappropriate behavior.

*Ms. Powell Was Present While Her Colleagues Orchestrated*
*and Watched Allied Employees Having Sex on Security Cameras*

61. On more than one occasion, Ms. Powell was present while several of the Supervisor Defendants watched security guards have sex via the closed-circuit cameras that were placed in security booths in the field.

11

62.     For example, in September 2013, while Ms. Powell was serving as an operations assistant, she was in the office with Diaz and Ortiz when they began watching a live video of two security officers having sex in a security booth (via the closed-circuit cameras that allow supervisors in the office to view the booths). Ms. Powell was present as Diaz and Ortiz watched the two officers for several minutes, laughing and making crude comments like "What is he doing with that old pussy?", "Don't they live together?", and "Why can't he wait?"

63.     Some of the Supervisor Defendants regularly assigned security guards to certain posts together to see whether they would have sex with each other.

64.     For example, in June or July 2015, Ortiz assigned a female security guard with whom he was having sex to the same post as a certain male security guard for the purpose of determining whether she would "cheat" on him. When he observed the two having sex via the closed-circuit cameras, Ortiz made a video recording of the screen. The video showed pairs of pants lying on the ground and it was clear that the two were having sex off-screen. Ortiz shared the video with numerous security guards and supervisors, including Ms. Powell.

65.     As a result of this behavior, Ms. Powell felt disgusted, humiliated, extremely uncomfortable, and extremely distressed and unsafe at work.

_Ms. Powell Was Forced to Watch Pole-Dancing Videos_

66.     On more than one occasion, Ms. Powell was forced to watch sexually explicit videos and then harassed by several of the Supervisor Defendants.

67.     In 2014, while Ms. Powell was working as an operations assistant, Timberlake and Ortiz called her into Timberlake's office. They showed Ms. Powell a video of women pole dancing that was playing on Timberlake's computer. The women in the video were wearing little clothing and dancing in a sexually explicit manner. Ortiz and Timberlake then asked Ms.

Powell if she knew how to dance like that. Shocked and humiliated, Ms. Powell did not respond and simply walked out of the office.

68.     In early 2016, Timberlake, Ortiz, and Diaz called Ms. Powell into Timberlake's office and again showed her a similar video of women pole dancing in a sexual manner. They again asked Ms. Powell if she knew how to dance like the women in the video, and Ms. Powell again felt too shocked and humiliated to even respond.

69.     Timberlake, Ortiz, and Diaz then proceeded to tell Ms. Powell that they used to regularly have sex with women security guards while in the security booths and on duty.

70.     Timberlake, Ortiz, and Diaz told Ms. Powell that they would have had sex with her too, remarking that "back in the day" she would be "bent over in the booths"—a crude reference to penetrating her from behind.

71.     Timberlake then told Ms. Powell that he met the woman with whom he fathered his first child at work, implying that the child had been conceived at work with a female security guard.

72.     Ms. Powell was extremely humiliated and distraught as a result of this interaction. She felt like her supervisors were pressuring her to have sex with them by saying that it was part of the office culture, and she felt like was treated worse than other employees because she refused.

*Timberlake Directly Suggested That Ms. Powell*
*Should Have Sex With Supervisors*

73.     In late 2014 or early 2015, Timberlake called Ms. Powell into his office. A supervisor from Port Authority was also present. Ms. Powell was wearing a white sweater dress. The Port Authority Supervisor remarked to Timberlake: "Doesn't she look good?"

74.     The Port Authority Supervisor then asked Ms. Powell: "How much further do you want to go [at Allied]?"  When Ms. Powell responded that she wanted to remain a supervisor and develop her career with the federal government through her position with U.S. Customs, he told her: "There are things you can do to get where you want to go."

75.     Timberlake was laughing and agreeing with the Port Authority Supervisor throughout the conversation.

76.     The clear implication to Ms. Powell was that she could engage in sex acts to advance her career.

77.     Ms. Powell saw firsthand that other female employees who had sex with supervisors were given promotions, better shifts, more breaks, and better days off.  On occasion, she thought to herself that if she wanted even a lunch break, she should have sex with supervisors.

78.     On another occasion, Timberlake told Ms. Powell something akin to: "Since everyone already thinks we had sex, let's bend you over the table."

79.     Ms. Powell was extremely embarrassed and distraught following this situation. She again felt pressure to have sex with her supervisors in order to advance her career and fit in with the culture at Allied.

*Timberlake Commented On Ms. Powell's*
*Breasts and Inappropriately Touched Her Body*

80.     On or around November 12 or 13, 2015, after Ms. Powell returned from U.S. Customs training, Timberlake called Ms. Powell into his office.  He said to her: "Your breasts got smaller, you really lost weight."

81.     Timberlake constantly made comments about Ms. Powell's body, as well as the bodies of many other women employed by Allied.

82.     Timberlake also repeatedly and deliberately brushed up against Ms. Powell's body when walking past her and made unnecessary contact with her body, including her legs and her butt.  Timberlake would make such inappropriate and unnecessary contact on a weekly—if not daily—basis.

83.     Timberlake's comments and inappropriate touching were extremely distressing to Ms. Powell and made her feel uncomfortable and unsafe at work.  The comments and touching also made her feel like she should acquiesce to having sex with Timberlake in order to fit in at work.

*Ms. Powell Was Told Only to Hire "Cute Girls"*

84.     In November 2015, when Ms. Powell was bringing in candidates to interview for security guard positions, Timberlake told Ms. Powell: "We don't want too many men and no fat women."

85.     A Port Authority supervisor who was present agreed and told Ms. Powell: "You brought some cute girls last time but you only hired one."  Ortiz and Reid were present for this conversation.

86.     Ortiz, Timberlake, and Feeney also took affirmative steps to make sure that women they perceived as attractive were hired, regardless of their qualifications.  These Defendants regularly brought in women applicants who did not meet the job requirements for security guard and sought to have them hired due to their appearances.  On one occasion, they caused a woman to be hired even though she did not have either a High School diploma or a New York driver's license—two mandatory job requirements for every security guard.

*Ms. Powell Was Sexually Harassed by Kevin McNamara*

87.     In September 2013, while Ms. Powell was serving as a security officer, she was sexually harassed by Defendant McNamara.

88.     McNamara approached Ms. Powell in the security booth where she was stationed and told her that he needed to photograph her.  McNamara demanded that Ms. Powell take off her uniform jacket and spin around so that he could photograph her.  Ms. Powell knew that McNamara only needed to photograph the outside of her jacket, and she refused to take her jacket off for him.

89.     Ms. Powell later learned that McNamara had made the same demand of other female security guards.

90.     Ms. Powell felt extremely upset and uncomfortable at McNamara's demand that she take off her jacket and spin around for him.

91.     Ms. Powell reported McNamara's harassment in the security booth to Timberlake. On information and belief, Timberlake did not investigate or take any action in response to Ms. Powell's complaint.

92.     McNamara also repeatedly called Ms. Powell a "kid," despite her asking him to stop.  He once asked her, "how old are you, twelve?"

**Ms. Powell Is Discriminated Against and Subjected
to Harassment on the Basis of her Race**

93.     Ms. Powell and the other black Allied employees were discriminated against and received inferior treatment from white male supervisors and managers, particularly McNamara, Feeney, and Tarantola, who are white, because of their race.

94.     Black security guards were regularly referred to using the n-word and other racial slurs by white supervisors and management.

95.     In or around 2015, Ms. Powell and McNamara were in the supervisor's office, along with a female office assistant who is Hispanic. The female assistant was upset because paperwork had been filled out incorrectly by a supervisor on the previous shift. In response, McNamara lashed out against Ms. Powell, saying "I'm tired of all of you niggers" and "I'm tired of seeing your nigger faces."

96.     On or around March 5, 2016, Ms. Powell was pulled aside by a security officer trainee following a refresher training session. The trainee told Ms. Powell that he is referred to using the n-word all the time, including on three specific occasions by McNamara.

97.     Ms. Powell reported the trainee's complaint to McNamara directly, as well as Timberlake, Diaz, and Ortiz together in Timberlake's office. When she reported the complaint to Timberlake, Diaz, and Ortiz, Ms. Powell also reported the 2015 incident where McNamara used the n-word in front of her.

98.     On information and belief, no action was taken in response to Ms. Powell's complaint.

99.     Ms. Powell was extremely upset and distressed by the rampant use of the n-word and other racial slurs by Allied employees and by the failure by management to respond or investigate.

100.     In addition, in or around 2013, right after Ms. Powell was promoted to operations assistant, McNamara stormed into the area where Ms. Powell was seated and started screaming at her about filing something. McNamara threw paper in Ms. Powell's face. When Ms. Powell asked McNamara to stop screaming at her, he muttered that she was a "bitch."

101.    Ms. Powell then told McNamara that she was going to write a complaint about his harassment, and McNamara told Ms. Powell that "your kind of people don't understand" before walking out of Ms. Powell's space and slammed the door behind him.

102.    Ms. Powell reported McNamara's harassment of her to human resources. She wrote a written complaint and gave it to Eve Monroe, who worked in the human resources department at the time. She also gave copies to Feeney, Diaz, and Timberlake.

103.    On information and belief, there was no investigation of the incident, and no action was taken in response to Ms. Powell's complaint.

104.    When Feeney saw Ms. Powell's complaint about McNamara, he told Ms. Powell: "You know how Kevin is. Next time he does it, kick him in the balls."

105.    On another occasion, when Ms. Powell was promoted to supervisor in 2014, she overheard McNamara tell others that Ms. Powell is "disgusting" and that Allied was "digging at the bottom of the barrel" by promoting Ms. Powell.

106.    In addition to experiencing racial epithets and discriminatory comments, black Allied employees, including Ms. Powell, were given worse assignments and shifts, and fewer responsibilities, than white employees.

107.    Black employees were penalized more harshly than white employees for the same mistakes, and they were required to do extra work that white employees were not asked to do, including writing extra reports, sending extra emails, and filling out extra paperwork.

108.    Black employees were berated and harassed with greater frequency than white employees, and there was a sense among black employees that they had less job security than white employees and could be fired at any time.

109.     The culture of racial discrimination and harassment went all the way to the top. When Ms. Powell first met Tarantola in November 2015 after returning from leave for U.S. Customs training, he was visibly shocked to learn that Ms. Powell—a well-regarded supervisor—was black.  He said to her: "You're LaDonna Powell?  Your name sounds Italian."

110.     In or around January or February of 2016, Tarantola asked Ms. Powell how long she planned to continue to work with both Allied and U.S. Customs.  Ms. Powell responded that she planned to "for as long as I can."  Tarantola then said: "I guess since you are Jamaican you are nice to the security guards who are West Indian."  When Ms. Powell responded that she is nice to everyone, Tarantola said: "I don't know whose side you are on."

111.     It was extremely stressful and emotionally distressing for Ms. Powell, a black woman, to work in an environment where black employees were called the n-word and were regularly treated worse than white employees.

**Ms. Powell Is Subjected to Abusive Work Conditions
and Denied Overtime Pay**

112.     During her four years of employment with Allied, Ms. Powell was illegally deprived of overtime pay and was subjected to abusive work conditions.

113.     Wage and hour violations were widespread at Allied, and they affected numerous employees from security guards to supervisors.  *See generally Douglas v. Allied Universal Security Services, et al.*, No. 17 Civ. 06093 (E.D.N.Y.).

114.     Throughout her tenure at Allied, Ms. Powell was always paid hourly and was never salaried.

115.     Throughout her tenure at Allied, Ms. Powell was required to sign in and sign out for each shift using a daily attendance log; however, she was not permitted to enter her actual

start and end time. Instead, her start and end times were pre-printed on the sheet and could not be altered.

116. Although shifts were supposed to be eight hours, Ms. Powell was forced to work for many hours beyond her designated shift. But because she was never allowed to report her extra hours, she was not compensated for her additional time.

117. Ms. Powell frequently tried to write in her extra time and seek compensation for it, but she was told by Timberlake and other Supervisor Defendants that her actions were not permitted.

118. On average, throughout her employment at Allied, Ms. Powell worked an additional three hours per day over her assigned eight-hour shift, and she was never compensated for any of this time.

119. Throughout her time at Allied, Ms. Powell was required to report for work thirty minutes before her shift began for a "roll call" or attendance drill. She was not compensated for this time either.

*Ms. Powell Was Denied Overtime and*
*Breaks as a Security Officer*

120. As a security officer from 2012 to September 2013, Ms. Powell was forced to work long shifts outside and was not given any breaks to eat or use the bathroom. She was never paid overtime or compensated in any way for the extra hours of work.

121. Although Ms. Powell was supposed to receive one fifty-minute unpaid lunch break per shift as a security officer, she was denied her lunch break at least once per week because no one came to relieve her, and she was not permitted to eat or drink while at her post.

122.    Even when Ms. Powell was relieved for lunch, it took ten to twenty minutes to drive to the meal area and the same amount of time to return, leaving little time to take an actual lunch break.

123.    In addition, Ms. Powell was frequently not given bathroom breaks when she worked as a security officer.  When she asked to use the bathroom during a shift as a security officer, she was regularly told to urinate in a cup, which she was forced to do on numerous occasions.

124.    Ms. Powell would often work 8 to 12 hours as a security officer without receiving a single break.

125.    Ms. Powell repeatedly complained about not receiving lunch or bathroom breaks as a security officer to Timberlake and other Supervisor Defendants.

126.    In response, Ms. Powell was occasionally told that she would be compensated for an additional 30 minutes of time, but she did not receive any such compensation.

*Ms. Powell Was Denied Overtime and Breaks*
*as an Operations Assistant and Office Specialist*

127.    As an operations assistant and office specialist from September 2013 through June 2014, Ms. Powell continued to be denied overtime and breaks.

128.    Ms. Powell was not permitted to leave her desk for lunch and she was required to answer phones at all times during her shifts, even when she was supposed to be on a lunch break.

129.    Even on the rare occasion that Ms. Powell tried to eat at her desk, she was unable to take an actual lunch break because she was required to answer phones and requests from her supervisors.

130.    Ms. Powell was not paid for her lunch breaks when she served as an operations assistant and office specialist, even though she regularly worked through them.

131.     Ms. Powell regularly complained to the Supervisor Defendants, including

Timberlake, about her denial of breaks and overtime as an operations assistant and office

specialist.

*Ms. Powell Was Denied Overtime and*
*Breaks as a Supervisor*

132.     Ms. Powell continued to be subjected to Allied's illegal wage and hour practices

as a supervisor from June 2014 to May 2016.

133.     During her employment as a supervisor, Ms. Powell was regularly forced to work

through her unpaid lunch breaks.

134.     Although Ms. Powell was supposed to receive a one-hour lunch break per shift,

she was unable to take her lunch break at least four days per week because she was busy driving

between posts to supervise security officers.

135.     Diaz once told Ms. Powell that supervisors were not permitted to eat where

anyone could "see them," rendering it nearly impossible for her to take a lunch break.

136.     Furthermore, as a supervisor, Ms. Powell was expected to be "on duty" and report

any traffic infractions any time she was using an Allied vehicle—even if she was supposed to be

on a break.

137.     On at least one occasion, Ms. Powell witnessed a vehicle accident on her way to

her lunch break and was required to stop at the accident to assist, alert the proper authorities, and

write a witness incident report.  The process took over an hour, requiring Ms. Powell to work

through her entire lunch break.  Ms. Powell was never paid for this time.

138.     In addition, as a supervisor, Ms. Powell was forced to attend weekly supervisor

calls every Tuesday even though Tuesday was Ms. Powell's day off.  The calls often lasted for

three to four hours.  Ms. Powell was never compensated for any of the time she spent participating in supervisor calls during her days off.

139.    And, as was the case throughout her employment at Allied, Ms. Powell was regularly forced to work for hours after her supervisory shift technically ended, including to write incident reports and complete other paperwork.

140.    Ms. Powell regularly complained to Timberlake that she was never paid overtime as a supervisor.  In response, Timberlake told her that it was part of the job.

141.    Finally, when Ms. Powell was a supervisor, she was instructed by senior managers, including Timberlake, not to give certain security guards lunch breaks because the managers did not like them.

**Allied Turned a Blind Eye to Race Discrimination, Gender Discrimination, Sexual Harassment and Assault, Including Rape Allegations**

142.    Allied was repeatedly made aware of the ongoing sexual harassment, violence against women, gender discrimination, race discrimination, and wage and hour violations, and Allied and the Supervisor Defendants did nothing to stop it.

143.    As described above, Ms. Powell alone made regular complaints about the discrimination she faced.  In addition to filing a formal complaint to human resources about McNamara, Ms. Powell made repeated oral complaints to the Supervisor Defendants and Port Authority about racial discrimination (including use of the n-word) and sexual harassment.  She also regularly complained to the Supervisor Defendants about not receiving breaks and not being paid overtime.

144.    On information and belief, other female and black Allied employees were also subjected to discriminatory treatment and complained about that treatment to the Supervisor Defendants.  Like Ms. Powell, these employees' complaints were ignored, and they were

23

retaliated against by, among other things, receiving worse shifts and fewer breaks and being forced to urinate in cups during shifts.

145. In addition to the regular complaints by Ms. Powell and numerous others, in late June or early July 2015, a letter was placed in the locker of every Allied employee at JFK complaining about the pervasive harassment and mistreatment of employees, including sexual harassment and discrimination on the basis of race and sex.

146. On information and belief, Allied investigated the complaint and fired the employee who circulated the letter, but did not discipline any other employees or supervisors, including those who were named for engaging in harassing and discriminatory conduct.

147. After the letter came out, Ms. Powell was threatened by another female supervisor, who told Ms. Powell not to have sex with certain male supervisors because that female supervisor needed the good shifts and breaks that came as perks for having sex with particular male supervisors such as Ortiz.

148. Allied also failed to respond to a credible complaint of sexual assault of a female employee by two male employees. In mid-2015, after a work event celebrating Ms. Powell's departure for U.S. Customs training, a security guard was allegedly sexually assaulted by two other Allied employees. They were driving her home, and one of the employees allegedly held her down while the other employee assaulted her without consent.

149. After the assault, the security guard told Ms. Powell what happened, and Ms. Powell immediately reported the incident to Ortiz, Reid, and Diaz. All three told Ms. Powell that there was nothing that they could do to investigate the alleged sexual assault of an employee after a work-sanctioned event.

150.     On the female employee's behalf, Ms. Powell requested that—at a minimum—the female employee not have to be assigned to work directly with the individuals she asserted assaulted her.  This request was also ignored.

151.     Defendants also specifically discouraged reporting incidents of harassment and disciplined Ms. Powell for encouraging others to come forward.  Specifically, in November 2015, when Ms. Powell was conducting training sessions, many Allied employees came forward to her with complaints of race and gender discrimination.  Ms. Powell told her trainees that they should take notes about the treatment that they were experiencing.

152.     After one of the trainees reported Ms. Powell's advice to Allied management, Tarantola, Timberlake, and Diaz called Ms. Powell into a meeting in Timberlake's office where they told her that she was supposed to be giving only a "light training," she should not "ruffle any feathers," and she should not advise any employees to take notes about discriminatory treatment.

153.     Not only were Defendants aware of the egregious sexual harassment taking place at Allied, they encouraged it and boasted about it.  For example, Ms. Powell's supervisors bragged to her that the reason JFK removed the security towers that used to be utilized by security guards was because there was too much sexual activity taking place in them.

154.     Finally, Allied was aware of a history of discrimination against women not just at JFK, but also at LaGuardia Airport and possibly at other sites.  For example, in 2014, two Allied employees at LaGuardia filed a sexual harassment and gender discrimination lawsuit with allegations strikingly similar to those alleged here.  *See Lloyd, et al. v. FJC Security Services, Inc., et al.*, No. 14 Civ. 5548 (E.D.N.Y. 2014).

155.     On information and belief, Allied has privately settled multiple claims on behalf of women like Ms. Powell who were harassed and discriminated against by Allied and its employees.

156.     Since Ms. Powell publicly disclosed her allegations several weeks ago, numerous other Allied employees—particularly women—have come forward complaining of the same discriminatory treatment and harassment by Defendants.

**Defendants Retaliate Against Ms. Powell**

157.     In addition to the written and oral complaints described above, in or around late 2015 (after she returned from leave for U.S. Customs training), Ms. Powell began complaining regularly to supervisors at Port Authority about the mistreatment, harassment, and discrimination taking place at Allied.

158.     On information and belief, Port Authority supervisors told Tarantola and other Allied supervisors about Ms. Powell's complaints.  In response, Tarantola told all of the supervisors that they should not communicate complaints directly to Port Authority.

159.     Ms. Powell's complaints about Allied and its culture of harassment and mistreatment, including on the basis of race and gender, triggered a campaign of retaliation against Ms. Powell—spearheaded by Tarantola—that ultimately ended in her termination.

160.     Starting in March 2016, Ms. Powell learned that her hours had been reduced, and she was told that there was not enough room for her to continue to work as a supervisor, even though she was the only supervisor who was told that she would receive fewer shifts.

161.     In response, Ms. Powell asked about returning to the position of operations assistant because there was a position open, but Tarantola told her that she had to apply for the job, and she might not be qualified (even though she had *written the manual for that position*

after she held it several years earlier).  Ultimately, the position was given to a white woman who had less experience than Ms. Powell.

162.     Allied's efforts to push Ms. Powell out continued for months.  For example, she took a coffee break once while covering for another supervisor, and was called and told never to leave the airport again—even though all other supervisors regularly took breaks.  From then on, Ms. Powell specifically asked permission from Feeney before taking a coffee break.

163.     On another occasion in the spring of 2016, Ms. Powell was in a car between shifts with another supervisor, Kirk Douglas, when Tarantola approached the vehicle and tried to grab Ms. Powell and physically pull her out of the car.  Tarantola screamed at Ms. Powell that she was not allowed to be in a vehicle when she was technically not on duty, even though it was a common practice among supervisors.

164.     After this incident, Ms. Powell sent a text message to Feeney, via his assistant, stating that she was afraid of Tarantola and did not want to work with him anymore.  On information and belief, no action was taken in response to Ms. Powell's complaint.

165.     In May 2016, Ms. Powell was screamed at by Feeney for refusing to issue a write-up for a disabled security guard for parking in a handicapped parking spot.

166.     Approximately one to two weeks before she was terminated, Ms. Powell became so fed up with Allied and its horrific work environment that she broke down crying at work.  A Port Authority official saw Ms. Powell and asked her what was wrong.  Ms. Powell expressed that she was very disappointed by the toxic culture, harassment, and race- and gender-based discrimination that she experienced at Allied.  She specifically explained that she had tried to address these issues with her Allied supervisors, but none of them did anything in response to her complaints.  Ms. Powell told the Port Authority supervisor everything that she could remember

about the discrimination she experienced, including the use of the n-word and her sexual and racial harassment by the Supervisor Defendants. An Allied security guard was also present for this conversation.

167. The Port Authority supervisor to whom Ms. Powell complained during this conversation promised her that he would address her concerns with Allied management.

168. After months of retaliation against Ms. Powell for speaking up and complaining about Allied, including to Port Authority supervisors, Ms. Powell was fired.

169. In May 2016, Ms. Powell was called and asked to meet with management and human resources. When Ms. Powell asked what the meeting was about, she was told that it was about an investigation into Kirk Douglas, another supervisor.

170. Ms. Powell went to Tarantola's office for the meeting. When she arrived, Tarantola was present, along with Timberlake and Ana Tovar (a representative from human resources).

171. Tarantola questioned Ms. Powell about where she was the previous Thursday night. When Ms. Powell explained that she was working, Tarantola responded that Ms. Powell was not in the supervisor's vehicle that she was supposed to be in.

172. Ms. Powell responded that she had taken a different vehicle because the supervisor on the prior shift (Diaz) had accidentally taken the keys to the supervisor's car home.

173. Tarantola lept out of his seat, and started yelling that Ms. Powell should have let him know if she was using a different car. Tarantola was loud and abrasive and stood in very close proximity to Ms. Powell's face. Although Ms. Powell stated that she felt uncomfortable, Tarantola continued berating her.

174. Tarantola yelled at Ms. Powell that he "does not like the type of person" that she is. When Ms. Powell asked what that meant, Tarantola told Ms. Powell that she does not issue enough write-ups of the security guards and that she is too nice to them.

175. Tarantola also yelled at Ms. Powell that it was "not her place" to talk to supervisors at Port Authority about conditions at Allied.

176. He continued to scream at her that he does not want her to wear an Allied badge and tried to grab the badge off of her body.

177. Extremely shaken, Ms. Powell then left the room to call Feeney, but was able to reach only his assistant, who told her that Feeney was on vacation.

178. When she re-entered the room, Timberlake told Ms. Powell that she was going to be suspended. When she asked why, she was not given an answer.

179. Ms. Powell asked whether she was being fired, and Timberlake only answered "we'll call you."

180. After she learned of her suspension, Ms. Powell left the Allied premises.

181. Three weeks later, Ms. Powell was asked to come to Allied for a meeting. Ms. Powell was working at U.S. Customs at the time and said that she could meet after 4:00 p.m. She was told that 4:00 p.m. was too late, and she would be called back about another meeting time. Ms. Powell was never called back.

182. Two days later, Ms. Powell logged onto Allied's online portal to get employment information to apply for a mortgage. She saw that she was no longer an employee and had been terminated.

183. Ms. Powell was never given any performance-related reasons for her termination, and she never received anything but outstanding performance reviews. Several days before Ms.

Powell was terminated, Feeney commented that "if we had a hundred LaDonnas," Allied would be a much better run organization.

184.     On information and belief, Ms. Powell's termination was retaliation in response to her race and gender discrimination complaints to Port Authority about Allied.

**Ms. Powell Suffers Extraordinary Damages**
**Following Her Retaliatory Termination**

185.     Ms. Powell experienced severe emotional distress as a result of Defendants' discriminatory conduct.  During her employment with Allied, Ms. Powell felt extremely stressed, distressed, and embarrassed about the discrimination that she was experiencing.  She dreaded coming to work, feared interacting with her supervisors, and felt sick to her stomach about continuing to work in a place where she was treated so horribly.  She often left work in tears, frustrated and exasperated at the discrimination she experienced and the lack of any response by Allied or the Supervisor Defendants.

186.     The severe emotional distress that Ms. Powell suffered throughout her employment was compounded as a result of her unlawful retaliatory termination.

187.     Ms. Powell was extremely embarrassed and emotionally distraught after she was screamed at and terminated for no legitimate reason.  She was devastated about losing income that she needed to support her family, including her mother and another family member suffering from a disability.  She was worried that she would no longer be able to provide for her family members in need.

188.     At the time of her termination, Ms. Powell was also seeking to buy a home for herself and several family members whom she supports.  Ms. Powell was relying on her income from Port Authority to secure a mortgage, which she was almost unable to receive as a result of

her unlawful termination. This too caused Ms. Powell extreme stress and worry in the aftermath of her termination.

189.    To this day, Ms. Powell feels embarrassed and distressed about her treatment at Allied and her unlawful termination. She also continues to feel the financial implications of her unlawful termination. Although she immediately sought more shifts with U.S. Customs, she makes approximately $20,000 less per year now than she did when she worked for both U.S. Customs and Allied.

### MARSHA-NIQUE IRVING

190.    In 2012, Ms. Irving began working at JFK as a security officer employed by FJC Security, Inc. ("FJC").

191.    In September 2013, Allied took over the Port Authority contract at JFK and became Ms. Irving's employer.

192.    Ms. Irving remained a security officer with Allied until she resigned in March 2017.

**Ms. Irving is Subjected to Sexual Harassment,
Gender Discrimination, and Retaliation**

*Ms. Irving is Sexually Harassed By Defendant Reid and
Retaliated Against Because She Declined His Advances*

193.    In October or November of 2012, a couple of months after Ms. Irving began working for FJC, Defendant Keith Reid told Ms. Irving about "The List"—a list of women security guards whom supervisors wanted to have sex with. Reid told Ms. Irving that she and one other female security guard were the only women on The List who had not yet had sex with any supervisors.

194. In the subsequent months, Reid regularly reminded Ms. Irving about The List and propositioned her for dinner and sex. He frequently asked Ms. Irving when he could take her out to dinner and asked her, "When am I going to see you naked?"

195. In early 2013, Ms. Irving was working at a security post when Reid picked Ms. Irving up in a vehicle and drove her to relieve another security officer who needed to use the restroom. While they were in the vehicle, Reid again started harassing Ms. Irving about when she would go out with him. At that point, Ms. Irving firmly told Reid that she was not interested in having a sexual or romantic relationship with him.

196. After Ms. Irving told Reid that she did not want a relationship with him, she was treated differently and unfavorably. For example, Reid began giving Ms. Irving worse shifts and security posts, and he began to ignore her requests for bathroom and lunch breaks.

197. In August 2013, Ms. Irving reported Reid's harassment and retaliation to FJC, her employer at the time. On information and belief, Defendants Reid, Diaz, and Ortiz—who worked for FJC at the time—were made aware of Ms. Irving's complaint against Reid at or around the time that she made it. On information and belief, Defendants Feeney and Timberlake became aware of the complaint at some point in 2014.

198. Instead of investigating the complaint, the Human Resources liaison called Ms. Irving a "rat." The Human Resources liaison also informed other security guards about Ms. Irving's complaint, which resulted in Ms. Irving being teased and isolated by her peer security guards.

199. Ms. Irving's August 2013 complaint against Reid marked the start of a campaign of retaliation that she experienced throughout the rest of her tenure at FJC and Allied. Although

the retaliation worsened as Ms. Irving made additional complaints during the next several years, this first report of harassment put a target on her back.

200. As Ms. Irving documented in a 2015 complaint filed with Allied's Human Resources Department, ever since she reported Reid in 2013, Defendant Feeney referred to her as a "troublemaker."

*Ms. Irving Is Subjected to Videos of Colleagues and Supervisors Having Oral Sex*

201. During Ms. Irving's tenure at Allied, two of the Supervisor Defendants showed Ms. Irving graphic videos depicting sex acts between themselves and female security guards, and they harassed Ms. Irving about those videos.

202. In or around early 2013, Ms. Irving and Reid were together in the Allied break room when Reid showed Ms. Irving a video of him receiving oral sex from a female security guard that Ms. Irving knew and recognized.

203. Several months later, in or around the summer of 2013, Ms. Irving and Reid were in an Allied vehicle when Reid showed Ms. Irving another video of him receiving oral sex from a different female security guard that Ms. Irving knew and recognized.

204. On both of these occasions, Reid bragged to Ms. Irving about his sexual relationships with female security guards. Ms. Irving felt extremely embarrassed and uncomfortable during each of these instances, especially given Reid's ongoing sexual harassment of her. Ms. Irving felt pressure to give in to Reid's harassment and have sex with him in order to fit in at Allied and gain favor with her supervisor.

205. In early January 2015, Reid and Ms. Irving were again in the breakroom when Reid showed Ms. Irving a third video of him receiving oral sex. Ms. Irving did not recognize the woman in the video, but she recognized that the woman was wearing an FJC uniform.

206.     In response to seeing the video, Ms. Irving asked Reid, "Why are you showing me this?"  Reid responded, "It's just head" and asked Ms. Irving "When are you going to give it to me?"  Ms. Irving did not respond and became extremely distressed and uncomfortable.  Reid then proceeded to berate Ms. Irving, telling her, "You think you're better than people" because she refused to engage in sex acts with her supervisors.

207.     Also in early January 2015, about a week after Reid showed her the above-mentioned video, Defendant Ortiz showed Ms. Irving a video on his phone of him receiving oral sex from a female security guard that Ms. Irving knew and recognized.  Ortiz and Ms. Irving were in the Allied break room during this occurrence.

208.     When Ms. Irving started walking away, and Ortiz asked her "when are you going to do it?" (referring to oral sex).  Ms. Irving told him that she was not interested.  As she was walking away, Ortiz yelled after Ms. Irving that she was going to "end up like" another female security guard who had recently been fired after she resisted her supervisors' advances.  The female security guard who Ortiz referred to has since reached a confidential settlement with Allied.

209.     A couple of months later, in March 2015, Ms. Irving was working a shift when Ortiz approached her and told her that she was going to be written up because she forgot to remove one of her earrings.  In response, Ms. Irving noted to Ortiz that another female security guard with whom Ortiz was just speaking was wearing two earrings.  Ortiz told Ms. Irving that he did not have a problem with that security guard, but he had a problem with Ms. Irving.

210.     Ortiz's willingness to berate Ms. Irving—but not others—over minor infractions is an example of the Supervisor Defendants' retaliation against Ms. Irving for refusing to acquiesce to their sexual advances.

211.    Also, in or around 2015, a male Allied "Fence Lead"—a position at Allied that is in between a security guard and a supervisor—showed Ms. Irving a video on his phone that was recorded from Allied's closed-circuit television system.  The video depicted two Allied security guards who were kissing while on duty at a post.  Again, Ms. Irving felt embarrassed and uncomfortable with the sexualized workplace culture at Allied.

*Defendant Timberlake Comments on Ms. Irving's Breasts*

212.    In or around fall of 2016, Defendant Timberlake approached Ms. Irving and told her that she had "nice boobs."  Timberlake told Ms. Irving that he had observed her breasts via Allied security cameras while she was in a vehicle and fixing buttons on her shirt.

213.    Ms. Irving felt extremely embarrassed and uncomfortable that Timberlake had been watching her in this manner.  She also felt angry and distressed that Timberlake had commented to her about her body and her breasts.

*Ms. Irving Observes Supervisors Engaging in Inappropriate Behavior at Allied*

214.    In or around the summer of 2015, Ms. Irving observed Defendant Reid kissing a female security guard inside an Allied vehicle.  It was in the evening, and Ms. Irving was standing in the yard outside of Allied's offices.  Reid and the female security guard saw that Ms. Irving was present and subsequently stopped kissing.

215.    Similarly, in or around 2014, Ms. Irving observed Defendant Ortiz with a female security guard.  Ortiz and the female security guard were at or near the Fuel Farm post, and Ortiz was feeding the female security guard with his mouth.

216.    Ms. Irving felt extremely uncomfortable about this incident, and she complained to Allied's Human Resources department about it.  Specifically, in a written complaint dated January 23, 2015, Ms. Irving wrote that "[s]ince I saw [Ortiz] and another ASA in a very ugly

inappropriate position I felt like he has been challenging me." On information and belief, no action was taken in response to Ms. Irving's complaint. The female security guard whom Ms. Irving observed being fed by Ortiz was later promoted.

*Ms. Irving Is Harassed and Retaliated Against by Defendant Diaz*

217.    In December 2016, Defendant Diaz sent Ms. Irving a "friend request" on Facebook. Ms. Irving did not respond to Diaz's request.

218.    Several weeks after Diaz sent the request and Ms. Irving did not respond, Diaz set off a false alarm at a security post that required Ms. Irving to respond. Ms. Irving, not knowing that the alarm was false, immediately showed up at the site and found Diaz there waiting for her.

219.    Ms. Irving, sensing that Diaz was upset at her, told him that she preferred not to be Facebook friends with her colleagues. In response, Diaz became extremely defensive, and told Ms. Irving that it was "not like he wanted something from her."

220.    Uncomfortable, Ms. Irving proceeded to walk away from Diaz. As she was leaving, Diaz hissed at Ms. Irving through his teeth.

221.    Given Ms. Irving's history of sexual harassment at Allied, her knowledge of the sexualized environment at Allied, and the history of inappropriate sexual relationships between male supervisors and female security guards, Ms. Irving believed in good faith that Diaz's conduct was illegal sexual harassment. Ms. Irving had heard that Diaz had been involved in a sexual relationship with another female security guard, and she knew that Diaz was friends with that guard on Facebook. She was worried that Diaz would try to pursue her sexually as well.

222.    As she wrote in a later complaint to Human Resources, she perceived Diaz's actions as illegal sexual harassment and gender discrimination because "I think making a work environment uncomfortable for a subordinate due to a personal reason can be considered sexual

harassment." In the same complaint, she added that Diaz's actions caused her to experience "a hostile work environment."

223. Immediately after this incident, Ms. Irving ran into another Fence Lead and told him about Diaz's behavior and his hissing at her. The Fence Lead laughed off Ms. Irving's complaint.

224. Just two weeks later, Diaz issued Ms. Irving a write-up for leaving without signing out at the end of her shift, even though her male partner also failed to sign out and did not receive a write-up. As Ms. Irving explained to her supervisors, the reason she did not sign out is that she was experiencing severe pain due to a prior car accident and needed to quickly access her medication, which was located in her car. There was no legitimate reason why Ms. Irving was written up for this incident but her male colleague was not.

225. Following this write-up, Ms. Irving made an oral complaint to Human Resources and she mentioned that she believed that Diaz was retaliating against because she rejected his Facebook friend request. On information and belief, the Human Resources liaison did not take any action in response to Ms. Irving's complaint.

226. At or around the same time, in or around January 2017, Defendant Diaz began regularly assigning Ms. Irving to a security post at the AirTrain—which was considered an undesirable post because it was geographically far from the rest of the posts and required standing in place for the entire shift.

227. Within weeks of assigning Ms. Irving to the AirTrain, Defendant Diaz again issued Ms. Irving another unjustified write-up—this time for allegedly not carrying her radio, even though several witnesses corroborated that she had been on break in the bathroom and given her radio to the security guard who relieved her.

228.     Ms. Irving contested the write-up, but Defendant Tarantola told her that she had to sign and accept it, otherwise she would be fired.

229.     Diaz and Tarantola informed Ms. Irving that if she received any additional write-ups, she would be terminated.

230.     Ms. Irving reasonably believed that Defendants' actions were retaliation for her oral complaint to Human Resources about what she perceived to be sexual harassment by Diaz.

231.     At this point, in February 2017, Ms. Irving filed a written complaint with Human Resources regarding Diaz's Facebook request and the ensuing retaliation that she was experiencing.  As noted above, she reported that she was experiencing "a hostile work environment" and that "I think making a work environment uncomfortable for a subordinate due to a personal reason can be considered sexual harassment."

232.     As demonstrated by her written complaint to Human Resources, Ms. Irving believed that she was reporting illegal sexual harassment and retaliation by her supervisor, Diaz.

233.     Approximately one week following the submission of this complaint, the Human Resources liaison called Ms. Irving to her office and explained that there was no rule against sending a friendship request on Facebook.  Ms. Irving responded that she felt like she was being retaliated against, and that this was not the first time she had experienced retaliation by a supervisor.

234.     Shortly after Ms. Irving's conversation with the Human Resources liaison in March 2017, she resigned.  Ms. Irving understood that Diaz was determined to have her fired, and she felt that she could no longer remain employed at Allied.  She believed that Defendants would continue to retaliate against her and that they would ultimately have her fired regardless of her job performance.

**Ms. Irving is Discriminated Against and Subjected
to Harassment on the Basis of Her Race**

235.    Ms. Irving was discriminated against and berated by white male supervisors,

particularly Defendant Feeney, because of her race.

236.    For example, Ms. Irving repeatedly heard Feeney refer to "dumb black people"

and he would frequently talk down to black employees.  On one occasion in September 2013,

Mr. Feeney was speaking rudely to Ms. Irving and he referred to her using the n-word.  Ms.

Irving asked Feeney to change his tone and, in response, Feeney told Ms. Irving, "I'll talk to you

how I want."  Ms. Irving then asked, "would you talk to me like that if I was white?" and Feeney

screamed at her to "get out" of his sight.

237.    The next night, one of Ms. Irving's supervisors approached Ms. Irving and told

her that if she wanted to keep her job, she had to apologize to Feeney.  Ms. Irving reluctantly

agreed.

238.    On another occasion, Ms. Irving mentioned to Feeney that she was considering

going back to school for nursing.  Feeney responded: "Who would want you to be their nurse?"

Ms. Irving was extremely hurt and distressed by this comment, and she mentioned it in her

January 23, 2015 written complaint to Human Resources.

239.    Ms. Irving also heard Feeney and Defendant McNamara use the n-word in

reference to other security guards in or around 2013 and early 2014.

**Ms. Irving Is Subjected to Abusive Work Conditions**

240.    During her four years of employment with Allied, Ms. Irving was illegally

deprived of overtime pay and was subjected to abusive work conditions, including as retaliation

for refusing to engage in sex acts with the Supervisor Defendants, including Reid and Diaz.

241.     In or around 2014, Ms. Irving was assigned to a security post referred to as "Post Gulf."  There were no bathrooms at the post but Ms. Irving needed to use the restroom, so she called and requested relief so that she could take a bathroom break at around 11:00 a.m.  Allied did not send anyone to relieve Ms. Irving until around 3:30 p.m., and she was forced to urinate on herself.

242.     Defendant Ortiz was the supervisor assigned to Ms. Irving's shift on the day when she urinated on herself.  On information and belief, Ortiz left work that day prior to 3:30 p.m. and without sending anyone to relieve Ms. Irving.  The subsequent supervisor who took over for Ortiz learned of the request and sent someone to relieve her, but it was too late.

243.     Because she had experienced ongoing retaliation since her complaint against Reid in August 2013 and subsequent complaints since, Ms. Irving reasonably believed that Ortiz's decision not to relieve her was an act of retaliation.

244.     On another occasion in or around 2014, Ms. Irving again requested relief to use the restroom and, again, Allied sent no one to relieve her.  Ms. Irving was forced to hold her urine for several hours and was later diagnosed with a urinary tract infection as result of not being able to use the bathroom.  She was prescribed medication for the infection.

245.     On at least one other occasion in or around 2014, Ms. Irving requested relief because she had her menstrual period and, again, Allied sent no one to relieve her.  Ms. Irving bled through to her uniform and soiled it.

246.     After Ms. Irving urinated on herself in 2014, multiple Allied employees, including the Supervisor Defendants, made fun of her.  They asked her how a grown woman could pee on herself.  As Ms. Irving documented in a January 23, 2015 complaint that she filed with Allied's Human Resources department:

> Everyone is aware that I peed on myself a few months ago which I also documented and gave to HR manager and I feel like I have to relive that embarrassment almost every day. I was questioned about my bathroom problem with three males present and I am trying to not say anything because this was spoken about on many occasions and documented. I had to go to the doctor because I held my pee for over an hour and I caught a UTI, was on my period and messed up my clothes on more than one occasion and had to go home which HR eve is also aware of and having documentation. . . . . I cried all the way to classes couldn't concentrate because the fact that a grown woman as myself pee on myself month ago and it keeps being brought up and that is very embarrassing and upsetting.

247. Ms. Irving reasonably believed that Defendants' failure to provide her with bathroom breaks—and their subsequent teasing and berating her for urinating on herself—was retaliation for her complaint against Defendant Reid for sexual harassment and her refusal to give in to his sexual advances.

**Ms. Irving Is Illegally Denied Overtime Pay**

248. Ms. Irving was also regularly denied breaks and overtime pay to which she was entitled.

249. Each day that Ms. Irving worked, she was required to sign-in and sign-out using a daily attendance log that always stated that she worked an 8-hour shift—regardless of the time that she actually worked. Ms. Irving was not permitted to record the actual times that she started and ended work, nor was she allowed to record meal breaks or bathroom breaks.

250. For example, Ms. Irving was required each day to show up twenty to thirty minutes before her shift began for an unpaid pre-shift "roll call." Ms. Irving was never compensated for the time that she was required to spend at Allied for roll call.

251. And at after her shift ended at 4 p.m., Ms. Irving was still required to be at Allied for an additional 20 to 30 minutes to return to the Allied building, change out of her uniform, and sign out. She was not compensated for this time, either.

252. In addition, Ms. Irving was entitled to a 50-minute lunch break every day, but she regularly—approximately once per week—did not receive that break. Other days, she received a shortened lunch break due to time spent driving to and from the lunch location. Ms. Irving was not permitted to record when she did not receive lunch breaks, or when she received shortened lunch breaks.

253. During her full-time employment with Allied from September 2013 to May 2015, Allied's failure to pay Ms. Irving for time outside of her eight-hour shift constituted a failure to pay overtime. From May 2015 to March 2017, when Ms. Irving was employed part-time, Allied's failure to pay Ms. Irving for time outside of her eight-hour shift constituted failure to pay wages.

254. Even when Ms. Irving tried to submit overtime or unpaid hours, she usually was not compensated for this time. When she was working full-time, Ms. Irving worked approximately 8 to 24 hours of unpaid overtime per week.

255. Defendant Timberlake once told Ms. Irving that, as long as she was working at Allied, she would never be paid overtime.

**Ms. Irving Made Numerous Complaints to Allied,**
**and Was Retaliated Against in Response**

256. Ms. Irving repeatedly made Allied and the Supervisor Defendants aware of the ongoing sexual harassment, gender discrimination, race discrimination, and wage and hour violations via oral and written complaints. Instead of stopping it, they simply retaliated against Ms. Irving.

257.     For example, in January 2015, Ms. Irving filed a complaint with Allied's Human Resources Department in which she reported that Ortiz had been retaliating against her ever since she wrote a complaint about witnessing him feeding a female security guard with his mouth in 2014.  She wrote: "It is not the 1st time I have complained and wrote on supervisor Ortiz having a problem with me and I feel like he is out to get me into trouble.  Since I saw him and another ASA in a very ugly inappropriate position, I felt like he has been challenging me . . . . I have made several reports both written and oral to HR Eve Monroe and I feel like things are good for one minute then not so the next."

258.     In the same complaint, Ms. Irving added that she was experiencing retaliation due to her complaint against Reid for making sexual advances toward her.  She noted that Defendants' retaliatory acts included writing her up, failing to provide her with adequate uniforms, and embarrassing her publicly for the time that she urinated on herself because Defendants would not send anyone to relieve her.

259.     In March 2015, Ms. Irving filed another complaint with Human Resources, again complaining of the continuing retaliation in response to her reporting sexual harassment by Reid. She wrote: "Every time I document an issue there is retaliation or the APM/Supervisors try to find a way to get me in trouble or try to get me fired.  I know this time won't be no different. Ever since the APM Timberlake heard about the sexual harassment issue I had with [Reid] he treats me difficult."

260.     In her March 2015 complaint, Ms. Irving detailed how, as part of the retaliation, she was not given replacement uniforms despite that fact that she made repeated requests and her uniforms were ripped and unsuitable to be worn.  Other women security guards who had not filed complaints like Ms. Irving were provided with new uniforms.

261.     Following the incident with Diaz's Facebook request, Ms. Irving filed yet another complaint with Human Resources, complaining of Diaz's retaliation.  She wrote that Diaz was treating her differently since she refused the request, and that the same thing happened "a few years ago with another male supervisor who asked me out to dinner and made other passes," referring to Reid.  Ms. Irving reported that Diaz wrote her up for not having her radio at the AirTrain post even though she had it with her at all times when she was on duty.

**Ms. Irving Has Suffered Extraordinary Damages**

262.     Ms. Irving experienced severe emotional distress as a result of Defendants' discriminatory conduct.

263.     Among other things, Ms. Irving was extremely traumatized and emotionally distressed as a result of Defendants' discrimination against her.  She felt constant pressure to succumb to her supervisors' sexual advances, and she (rightfully) feared retaliation for her refusal to acquiesce.

264.     Ms. Irving lived in perpetual fear at Allied that she would be denied bathroom breaks while on a post, and that she would be forced to urinate on herself or in a cup.  When she had her period, she was constantly afraid that Defendants' denial of bathroom breaks would cause her to bleed on herself.

265.     Ms. Irving wanted to leave Allied for years, but she was unable to do so because she needed the salary she earned from Allied to support her three children.

### SHEILA WALTON

266.     Ms. Walton began working as a security guard for Allied in February 2015.

267.     When she started her employment, she was assigned to the 8 a.m. to 4 p.m. shift.  Her supervisors at the time were Defendants Reid and Ortiz.

**Ms. Walton Is Sexually Harassed by Reid and Ortiz**

268.     In or around June 2015, Reid and Ortiz began sexually harassing Ms. Walton.

269.     For example, beginning in June 2015 and continuing through the summer of 2015, Reid regularly began making crude comments to Ms. Walton about oral sex while he was supervising her on her posts.  He regularly told her that "you gotta make sure you know how to suck a dick" and would talk to her about how to "do it right."  He asked her if she "sucked dick sloppy."  Defendant Reid would make these comments on a weekly, if not daily, basis.

270.     Reid's perverse comments were not just limited to oral sex.  He would also talk to Ms. Walton about his sex life with his wife.  For example, he told her about how he would "eat [his] wife's ass" and how grateful she was for it.

271.     Also beginning in the summer of 2015, Ortiz repeatedly approached Ms. Walton and asked her if she wanted to "hang out" after work.  Ortiz would ask Ms. Walton about her relationship status and her private life.  Ms. Walton was aware at the time that Ortiz had sexual relationships with other women security guards, and she was anxious that he was trying to become sexually involved with her too.

272.     Later, when Ms. Walton became pregnant, Ortiz told Ms. Walton that she should have gotten pregnant by him and she should have "given [him] some."

273.     Ms. Walton always refused Ortiz's requests to hang out, and she tried to ignore Reid and not engage him when he started talking about sex.  Yet she felt extremely embarrassed and distressed about their harassment of her.  She was afraid to speak about it because she did not want to jeopardize her job.

274.     In part, Ms. Walton's fear of speaking up was driven by her knowledge of the culture at Allied.  Ms. Walton knew that female security guards who rebuked the Supervisor

Defendants were often retaliated against, whereas female security guards who were in sexual relationships with the Supervisor Defendants were often rewarded or promoted.

275.     For example, Ms. Walton observed first-hand what appeared to be an intimate relationship between Defendant Ortiz and a female security guard who was promoted to supervisor.  Ms. Walton once witnessed that female security guard touch Ortiz's buttocks during work hours.

276.     In addition, Ms. Walton was aware that videos regularly circulated depicting sex acts between supervisors and security guards.  Fellow security guards frequently mentioned these videos.  And in or around March 2016, a male Allied security guard showed Ms. Walton a photo of him receiving oral sex from another one of their female co-workers.  Ms. Walton felt embarrassed and disgusted about the culture of sex that pervaded Allied.

277.     Although Ms. Walton did not want to engage in sex acts with her supervisors, she feared that Defendants would treat her unfairly if she spoke up against their harassing behavior. She believed that if she did not smile and pretend to flirt with the Supervisor Defendants and laugh off their harassing jokes, she would be retaliated against.

**Ms. Walton Is Denied Pregnancy Accommodations**
**and Subjected to Pregnancy Discrimination**

278.     In April 2016, Ms. Walton became pregnant.

279.     In June 2016, Ms. Walton was experiencing severe morning sickness and, on one occasion, vomited while she was at work.

280.     Reid learned of Ms. Walton's vomiting via security cameras, and he reported her to Port Authority for being intoxicated at work.  Ms. Walton was not intoxicated, but rather was experiencing morning sickness associated with her pregnancy.

281.     Subsequently, a representative from Port Authority came to speak with Ms. Walton about the incident.  Ms. Walton explained to the representative that she had vomited due to her morning sickness, and that she had not been intoxicated at work.  The Port Authority representative did not substantiate Reid's report.

282.     After informing the Port Authority representative of her pregnancy in June 2016, Ms. Walton provided formal written notice of her pregnancy to Allied.

283.     Once Reid learned that Ms. Walton had his write-up overridden and that she was pregnant, he began treating her worse than the other security guards.

284.     After Ms. Walton revealed she was pregnant, Reid transferred her so that she worked primarily at Post Hotel, a very busy post that was considered undesirable by security guards.  Because it was stressful and physically difficult for Ms. Walton to work primarily at Post Hotel due to her pregnancy, Ms. Walton asked Reid if she could be assigned to a different post due to the stress, and even produced a letter from her doctor stating that she required a light-duty post where she was not required to move around as much.  Reid refused to re-assign her.

285.     Reid and the other Supervisor Defendants also refused to provide Ms. Walton with a uniform that would fit her during her pregnancy, despite her repeated requests for larger-size clothes.  She was forced to wear her pants open and unbuttoned because she could not close them due to her pregnancy.

286.     In addition, Ms. Walton continued to experience severe morning sickness late into her pregnancy, and Reid would mark her late for 7:30 a.m. roll call, even if she was present but merely outside or in the bathroom experiencing morning sickness.  He did this on several occasions—even though Ms. Walton's shift did not technically start, and she did not receive pay, until 8:00 a.m.

287.     In or around July or early August 2016, Ms. Walton reported Reid's treatment of her to Defendants Timberlake and Tarantola.  She told them that Reid had been harassing her ever since he learned of her pregnancy, and that he had been assigning her to Post Hotel and other busy posts.

288.     At the same time, Ms. Walton also told Timberlake and Tarantola that Reid was inappropriate and always talked to her about "sucking dick."  Timberlake and Tarantola told Ms. Walton *not* to report the issue to Human Resources, and Tarantola said that he would "talk to" Reid about it.

289.     Yet after, Ms. Walton complained about Reid to Timberlake and Tarantola, Reid's treatment of her only worsened.  For example, he told people not to talk to Ms. Walton, and he continued to demean her.

290.     At some point in the late summer, Ms. Walton produced a doctor's note saying that she required a lighter-duty post due to her pregnancy.  Reid still refused to move her in response to the note, but Ms. Walton spoke to other supervisors and was ultimately assigned to a driving shift.

291.     On August 20, 2016, Reid issued Ms. Walton a write-up, stating that "ASA Sheila Walton assigned to report at 07:30 hours for roll call, missed roll call, Agent showed up approximately 0745 outside."  Ms. Walton had been present all along but was outside because she was not feeling well.  On information and belief, Reid was aware of this fact and marked Ms. Walton as late anyway.

292.     Ms. Walton's shift did not begin until 8:00 a.m. and she was not compensated for work performed before 8:00 a.m.  Reid wrote her up even though Allied's requirement that she be present at 7:30 a.m. violated state and federal wage and hour laws.

293.     The next day, on August 21, 2016, Reid caused Ms. Walton to be suspended.  He asked her to sign the write-up that he issued on the previous day and Ms. Walton resisted because the facts alleged in the write-up were not true.  She stood up to Reid, and told him that he had been harassing her and she would not sign it.

294.     In retaliation, Reid then reported to senior Allied management that he overheard Ms. Walton speaking on a cell phone to someone and he believed that she was making threats about him.  That never happened.  Ms. Walton was speaking to a friend on her cell phone, during non-working hours, about someone else.  As she explained in an incident report dated August 22, 2016, "I was using my phone outside the building, speaking to someone about [another company].  At no time did I make or direct a statement to anyone using any type of force or any threat."  Regardless, Reid caused Ms. Walton to be suspended pending an investigation.

295.     Ms. Walton complained to her union about her suspension, and ultimately returned to work in the fall of 2016.  Over the course of her employment, she also complained to her union on two different occasions about Reid and his constant comments to her about oral sex.  She ultimately told the union that she did not want to follow through on her complaints about Reid's harassment because she was afraid of being fired.

296.     After she returned to work in the fall of 2016, Tarantola told Ms. Walton that she could no longer work with Reid due to her complaints against him.  Tarantola then transferred Ms. Walton to the midnight to 7:00 a.m. tour, which is considered an undesirable shift by most security guards.  She was 6 months pregnant at the time.

297.     After several weeks of working this shift at six months pregnant, Ms. Walton told Tarantola that it was too much for her body during her pregnancy, and that she needed to switch

shifts. Tarantola told her that the only shifts available were the 4:00 p.m. to midnight shift and the midnight to 7 a.m. shift. He refused to make a reasonable accommodation for her pregnancy.

298.    Instead, he switched Ms. Walton's schedule such that she worked the 4:00 p.m. to midnight shift Saturdays, Sundays, and Mondays. Tuesday was technically her day off, but she had to come in at midnight on Tuesday to start the midnight to 7 a.m. shift for Wednesday and Thursday. Her schedule continued to cause a severe strain on her body during pregnancy.

299.    At this point, in late October 2016, Ms. Walton was approximately 7 months pregnant. She was beginning to have trouble driving due to her pregnancy because she could not easily fit in the Allied vans. She also had trouble properly manipulating the Allied vehicles because she had to recline the seat far back in order to fit, which made it difficult for her to see the road. Ms. Walton informed her shift supervisors that she was having trouble driving, and she asked if she could be assigned to a post that did not require driving. She was not accommodated, and she continued to be assigned to driving posts.

300.    On November 3, 2016, Ms. Walton was driving an Allied vehicle during her shift (after she requested to stop driving) when she encountered a curb and got a flat tire. She immediately reported the flat tire to her supervisor at the time. He told her it was fine, and that she did not need to write a report about it.

301.    Despite her shift supervisor telling her that she did not have to take further action to report the flat tire, Ms. Walton was written up for the incident and suspended on November 6, 2016. Tarantola told her that her suspension was because she did not report running over the curb—only the flat tire itself. Ms. Walton disputed that account, and said that she reported the entire incident to her supervisor that night.

302.    Approximately two weeks after the flat tire, in November 2016, Ms. Walton was terminated from Allied.  She was approximately 8 months pregnant at the time.

**Ms. Walton Is Subjected to Abusive Work Conditions**
**and Illegally Denied Overtime Pay**

303.    Ms. Walton was also regularly denied breaks and overtime pay to which she was entitled.

304.    Each day that Ms. Walton worked, she was required to sign-in and sign-out using a daily attendance log that always stated that she worked an 8-hour shift—regardless of the time that she actually worked.  Ms. Walton was not permitted to write in the actual times that she started and ended work, nor was she allowed to record meal breaks or bathroom breaks.

305.    For example, Ms. Walton was required each day to show up twenty to thirty minutes before her shift began for an unpaid pre-shift "roll call."  Ms. Walton was never compensated for the time that she was required to spend at Allied for roll call.  She was even written up for being late to roll call (though she in fact was present and sick) despite the fact that she was never compensated for this time.

306.    After her shift ended, Ms. Walton was still required to be at Allied for an additional 20-30 minutes to return to the Allied building, change out of her uniform, and sign out.  She was not compensated for this time, either.

307.    In addition, Ms. Walton was entitled to a 50-minute lunch break every day, but she often received a shortened lunch break due to time spent driving to and from the lunch location, or even no break at all.

308.    Allied's failure to pay Ms. Walton for time outside of her eight-hour shift constituted a failure to pay overtime.

309.     In addition, on at least three occasions during her employment at Allied, Ms. Walton was not given a bathroom break when she requested one.  On these occasions, Ms. Walton severely needed to use the bathroom and called for relief, but no relief was provided.  As a result, Ms. Walton was forced to urinate either outside or in a cup.

**Ms. Walton Has Suffered Severe Damages**

310.     Ms. Walton experienced severe emotional distress as a result of Defendants' discriminatory conduct.

311.     Among other things, Ms. Walton was extremely traumatized and emotionally distressed as a result of Defendants' discrimination against her.  She felt constant pressure to succumb to her supervisors' sexual advances, and she (rightfully) feared retaliation for her refusal to acquiesce.

312.     After she became pregnant and began to experience unfair treatment by Reid and the other Defendants, Ms. Walton became extremely emotionally distressed to the point where it affected her pregnancy.  Her doctor even sent a note to Allied explaining that the stress of her job was affecting her pregnancy.

313.     Ms. Walton wanted to leave Allied before she was terminated, but she was unable to do so because she needed the salary she earned from Allied, including to support the child that she was carrying at the time.

314.     After Ms. Walton was terminated from Allied, she was deprived of three months of paid maternity leave that she would have received had she continued to be employed by Allied.  She was unemployed for almost nine months without a salary.  Ms. Walton did not obtain employment again until September 2017, and she makes significantly less money in her current position than she made while she was employed at Allied.

**ROY FIELDS**

315.     Mr. Fields began employment as a security guard with FJC in the summer of 2013.  His starting salary was around $18 per hour.

316.     At that time, FJC had a contract with Port Authority to provide security services at JFK.

317.     In mid-late 2013, Allied took over FJC's contract with Port Authority and became Mr. Fields's employer.

318.     Mr. Fields was assigned to the 8:00 a.m. to 4:00 p.m. shift at JFK.  His supervisors were Defendants Ortiz, Reid, and Diaz.

319.     In mid-2014, Mr. Fields was promoted to work as a "lead" two out of five days per week at the AirTrain.  A lead is a position at Allied that is in between a security guard and a supervisor.

320.     The decision to promote Mr. Fields was made by Defendant Timberlake and was based on his strong work performance.

321.     During shifts that Mr. Fields worked as a lead, he made approximately $2 to $3 more per hour than when he worked as a security guard.

322.     Mr. Fields remained employed as a security guard and lead until the time of his termination.

323.     In January or February of 2014, Mr. Fields became friends with a certain female security guard (referred to throughout this complaint as the "Female ASA").

324.     After approximately two months, in the early spring of 2014, Mr. Fields and the Female ASA began a sexual relationship.

325.     Mr. Fields learned that Defendant Ortiz was also in a sexual relationship with the Female ASA.

326.     The Female ASA tried to hide her relationship with Mr. Fields from Ortiz.  For example, if Mr. Fields and the Female ASA were together and Ortiz called her, she would tell Mr. Fields to be quiet.

327.     Eventually, however, Ortiz learned about the nature of the relationship between Mr. Fields and the Female ASA.

328.     After learning about their relationship, in or around May or June of 2014, Ortiz began retaliating against Mr. Fields and changing his regular posts to assign him to posts where he could not see or interact with the Female ASA.  Often, this resulted in Mr. Fields being assigned to less favorable posts.

329.     Ortiz would also switch Mr. Fields's schedule so that he was no longer assigned to work as a lead at the AirTrain.  Instead, he would have to work as a regular security guard at a different post, which meant that he would earn a lower hourly pay.

330.     After months of Ortiz denying him lead opportunities and assigning him to unfavorable shifts, Mr. Fields met with Timberlake to report Ortiz's conduct.

331.     Mr. Fields met with Timberlake in or around January 2015 in Timberlake's office. Mr. Fields told Timberlake that Ortiz had been picking on him and changing his schedule. Timberlake dismissed Mr. Fields's complaint, telling him that it was merely about seniority (*i.e.,* guards with more seniority received the first opportunity to work as a lead).  On information and belief, Mr. Fields's seniority at the time entitled him to work at a lead over other individuals that Ortiz was assigning to lead positions.

332.     In or around February or March 2015, Mr. Fields and the Female ASA ceased their sexual relationship.  After their relationship ended, the Female ASA was upset with Mr. Fields, and she told him, on multiple occasions, that she was going to tell Ortiz to give him a bad schedule.

333.     Mr. Fields continued to receive unfavorable schedules and shifts even after he and the Female ASA ceased their sexual relationship.  On information and belief, Reid assigned him to unfavorable posts because of sexual jealousy arising out of Mr. Fields's relationship with the Female ASA.

334.     The Female ASA was eventually promoted to supervisor.

335.     At the same time that Mr. Fields was being harassed by Ortiz for his relationship with the Female ASA, Mr. Fields was aware of numerous relationships between male supervisors and female security guards.

336.     For example, on one occasion in or around October 2014, Mr. Fields was walking past the uniform closet when he saw Reid emerge with a female security guard.  The two were adjusting their clothes and they appeared to Mr. Fields as if they had just been engaged in a sex act.

337.     In or around March or early April 2015, Mr. Fields confided in another security guard about the harassing treatment that he was experiencing.  That guard encouraged Mr. Fields to report the treatment to Human Resources, but Mr. Fields was reluctant because he had heard of others who experienced retaliation after making reports to Human Resources.

338.     In April 2015, the security guard Mr. Fields confided in wrote a letter regarding the pervasive sexual harassment and retaliation experienced by Allied employees at JFK.  The

letter was printed and placed all over the locker room. It was also photographed and texted to numerous employees. Ms. Powell received a copy.

339.    In response to the letter, a Human Resources investigation was initiated.

340.    On April 27, 2015, Mr. Fields was interviewed as part of the Human Resources investigation into the letter. Initially, Human Resources and the Supervisor Defendants believed that Mr. Fields had written the letter.

341.    Mr. Fields was interviewed by a representative from Allied's corporate Human Resources, Nicoletta Colombo, and Eve Monroe, Allied's on-site Human Resources official at JFK at the time.

342.    Mr. Fields told Human Resources that he did not know anything about the letter but, when asked about whether he knew about the underlying circumstances of harassment and retaliation, he replied that he did.

343.    Mr. Fields agreed to tell Human Resources about his harassment by Ortiz, but requested that Monroe first leave the meeting, since Mr. Fields knew that individuals who reported information to Ms. Monroe often were retaliated against. He told Colombo that his confidentiality could not be ensured if Monroe remained.

344.    Colombo and Monroe would not agree to excuse Monroe, but they agreed to let Mr. Fields call a union representative to be present with him during the interview.

345.    Mr. Fields then proceeded to tell Colombo, Monroe, and the union representative about the harassing treatment that he experienced from Ortiz due to his relationship with the Female ASA. He also provided a written statement to them.

346.    Colombo asked Mr. Fields if he had any texts or other documents to corroborate his story. He responded that he did, but he was receiving poor cell phone reception indoors.

56

Colombo instructed Mr. Fields to step outside to send him the relevant text messages and then return inside. Following Colombo's instructions, Mr. Fields stepped outside.

347.    When he arrived outside, Mr. Fields encountered a Port Authority representative who asked him what he was doing. Mr. Fields explained to him that he was sending texts to Human Resources, and then would be returning to his interview.

348.    Minutes later, Defendant Feeney came outside and started berating Mr. Fields, yelling, "get over here," "why are you over there," and "why are you talking to Port Authority, you troublemaker?" On information and belief, Feeney believed Fields had written the letter.

349.    Feeney then yelled at Mr. Fields to go back inside and wait for him in Timberlake's office. Mr. Fields told Mr. Feeney not to speak to speak to him rudely. He also said that he had a union representative inside with him for the interview, and he would not go to Timberlake's office unless the union representative could join him.

350.    Feeney proceeded to tell Mr. Fields that he was being "insubordinate." He demanded that Mr. Fields turn over his ID and told him that, if he refused, he would call the Port Authority Police.

351.    Mr. Fields responded that he would wait for the Port Authority Police outside if Feeney wanted to call them. Feeney then went inside, but returned outside within several minutes, screaming again at Mr. Fields about how "ridiculous" he was being.

352.    At that point, another Port Authority representative, Caleb Chu, arrived at the scene. Chu asked Mr. Fields to write a statement detailing what had happened. Mr. Fields wrote the statement in the lobby, and he gave it to a Port Authority representative to give to Feeney. He also gave a copy of the statement to Allied.

353.  Feeney then told Mr. Fields that he was suspended until further notice and could not return to the Allied building.  Mr. Fields asked why he was being suspended, but Feeney did not respond.

354.  Eventually, a Port Authority representative came to escort Mr. Fields to obtain his clothes from the locker room.  He then left the premises.

355.  A week later, Mr. Fields received a call from Allied's corporate Human Resources office, requesting an additional interview with him at Allied's offices in Manhattan. Fields attended the meeting.  Following the meeting, Mr. Fields filed a union grievance regarding the harassment and suspension.

356.  Mr. Fields did not hear anything from Allied for weeks after his suspension, despite his multiple attempts to call Monroe and Colombo.

357.  Approximately one month after his suspension, Mr. Fields received a letter in the mail stating that he was terminated for insubordination.  He was terminated because Defendants were angry at him for reporting inappropriate sexual relationships and harassment at Allied.

358.  Mr. Fields has significant damages arising from the illegal harassment and discrimination that he suffered at Allied.

359.  Mr. Fields lost his vehicle because he no longer had income needed to make payments on it.

360.  Mr. Fields was unemployed for four months from April 2015 until August 2015.

361.  Mr. Fields makes less money at his current position than he made at Allied.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1981 – Intentional Discrimination and Hostile Work Environment
### (By Plaintiffs Powell and Irving Against Defendants Allied, Tarantola, Feeney, and McNamara)

362. Plaintiffs Powell and Irving (the "Race Plaintiffs") repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

363. By the conduct described above, Defendants Allied, Tarantola, Feeney, and McNamara (the "Race Defendants") intentionally deprived the Race Plaintiffs, who are black, of the same rights enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual relationship with Allied, in violation of 42 U.S.C. § 1981.

364. The Race Plaintiffs were subjected to harassment by the Race Defendants that was motivated by Plaintiffs' race and protected status as black individuals in violation of Plaintiff's rights pursuant to 42 U.S.C. § 1981.

365. The race-based discriminatory conduct by the Race Defendants was so severe and pervasive as to create a hostile and abusive work environment for the Race Plaintiffs.

366. Defendant Allied knew or reasonably should have known about the hostile work environment within the company and failed to take appropriate remedial actions.

367. Defendants Tarantola, Feeney, and McNamara directly created or participated in the creation of the hostile and abusive work environment, exhibited gross negligence in supervising subordinates who directly created or participated in the creation of the hostile and abusive work environment, and/or failed to take action upon receiving information about a hostile and abusive work environment that was occurring in violation of 42 U.S.C. § 1981.

368. As a result of the discrimination in violation of 42 U.S.C. § 1981 by the Race Defendants, the Race Plaintiffs have been denied employment opportunities providing

substantial compensation and benefits and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, entitling them to compensatory damages.

369.    In their race-based discrimination in violation of 42 U.S.C. § 1981, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, entitling the Race Plaintiffs to an award of punitive damages.

370.    Pursuant to 42 U.S.C. §§ 1981 and 1988, the Race Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1981 – Retaliation**
**(By Plaintiffs Powell and Irving Against Defendants Allied, Tarantola, Feeney, and McNamara)**

371.    Plaintiffs Powell and Irving repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

372.    The Race Plaintiffs engaged in activity protected by 42 U.S.C. § 1981 by making written and oral reports regarding race-based discriminatory conduct that they experienced at Allied to their supervisors and human resources.

373.    The Race Defendants subjected the Race Plaintiffs to adverse employment actions, including by reducing their hours and subjecting them to a hostile work environment.

374.    The Race Plaintiffs' adverse employment actions were a direct and proximate result of their protected complaints and reports regarding the Race Defendants' race-based discriminatory conduct.

375.    As a result of the retaliation by the Race Defendants in violation of 42 U.S.C. § 1981, the Race Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they

have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to their actions, entitling them to compensatory damages.

376.    In their retaliatory actions alleged in violation of 42 U.S.C. § 1981, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, thereby entitling the Race Plaintiffs to an award of punitive damages.

377.    Pursuant to 42 U.S.C. §§ 1981 and 1988, the Race Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF
**Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* – Wage and Hour Violations**
**(By All Plaintiffs Against Defendants Allied, Timberlake, Tarantola, and Feeney)**

378.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

379.    At all relevant times, Defendants Allied, Timberlake, Tarantola, and Feeney (the "Overtime Defendants") were employers and Plaintiffs were employees employed by Defendants within the meaning of 29 U.S.C. § 203.

380.    The Overtime Defendants knowingly, willfully, and intentionally failed to pay Plaintiffs overtime and failed to give them overtime pay at a rate one and one-half times the regular rate for hours worked in excess of forty hours per week, in violation of 29 U.S.C. § 207(a)(1).

381.    The Overtime Defendants also knowingly, willfully, and intentionally failed to pay Defendants for excess time that they worked before and after their shifts, during lunch breaks, and during other allotted breaks.

382.    As a result of the willful violation of the Fair Labor Standards Act by the Overtime Defendants, Plaintiffs have been denied employment opportunities providing

substantial compensation and benefits, entitling them to injunctive and equitable relief and to compensatory damages.

383.     As a result of the willful violation of the Fair Labor Standards Act by the Overtime Defendants, Plaintiffs are entitled to recover from these Defendants, jointly and severally, unpaid overtime compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre-judgment interest, pursuant to the Fair Labor Standards Act, all in an amount to be determined at trial, pursuant to 29 U.S.C. § 216(b).

**FOURTH CLAIM FOR RELIEF**
**N.Y. State Labor Law – Wage and Hour Violations**
**(By All Plaintiffs Against Defendants Allied, Timberlake, Tarantola, and Feeney)**

384.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

385.     The Overtime Defendants knowingly, willfully, and intentionally failed to pay overtime pay for hours Plaintiffs worked in excess of forty hours per week at a rate one and one-half times the regular hourly rate, which must be equal to or greater than the minimum wage as set forth in the N.Y. Labor Law § 652, in violation of N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.2.

386.     In addition, the Overtime Defendants knowingly, willfully, and intentionally required Plaintiffs to be at work in excess of ten hours per day, and knowingly, willfully, and intentionally failed to pay Plaintiffs one extra hour's pay at a minimum wage for every day in which the interval between Plaintiffs' start and end times exceeded ten hours, in violation of N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4.

387.   The Overtime Defendants also knowingly, willfully, and intentionally failed to pay Plaintiffs for excess time that they worked before and after their shifts, during lunch breaks, and during other allotted breaks.

388.   Pursuant to N.Y. Labor Law §§ 198.1-a and 663, an employer who willfully fails to pay overtime required by the Minimum Wage Act shall be liable for liquidated damages in addition to the amount of any under-payments.

389.   Because of the willful violation of the N.Y. Labor Law by the Overtime Defendants, Plaintiffs are entitled to recover from the Overtime Defendants, jointly and severally, their unpaid overtime compensation, and an amount equal to their unpaid wages in the form of liquidated damages.

390.   Pursuant to the N.Y. Labor Law § 663, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of the action, including pre-judgment interest.

**FIFTH CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107(1) – Intentional Race Discrimination in**
**Violation of the New York City Human Rights Law**
**(By Plaintiffs Powell and Irving Against Defendants Allied,**
**Tarantola, Feeney, and McNamara)**

391.   Plaintiffs Powell and Irving repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

392.   The Race Plaintiffs are black women of West Indian descent who fall within a protected class of individuals.

393.   The Race Plaintiffs performed satisfactorily since their job performances met or exceeded expectations.

394.   The Race Defendants engaged in conduct, as alleged herein, that constituted unlawful discriminatory practices and unlawful discrimination on the basis of race and national

origin in violation of the New York City Human Rights Law, N.Y.C. Admin. Code. § 8-107 *et seq.*

395.    The Race Defendants subjected the Race Plaintiffs to adverse employment actions on account of their protected status and denied them equal opportunity and treatment in the conditions of employment.

396.    By the acts and practices described above, the Race Defendants directly and/or through employees and/or agents, subjected the Race Plaintiffs to discrimination in violation of the New York City Human Rights Law.

397.    The Race Defendants exercised managerial and/or supervisory control over the Race Plaintiffs and failed to take corrective action and/or participated directly in the discriminatory acts.

398.    As a result of the discrimination by the Race Defendants in violation of the New York City Human Rights Law, the Race Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to their actions, entitling them to compensatory damages.

399.    In their race-based discriminatory actions alleged in violation of New York City Human Rights Law, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, thereby entitling them to an award of punitive damages.

400.    Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, the Race Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

## SIXTH CLAIM FOR RELIEF
### N.Y.C. Admin. Code § 8-107(1) – Gender Discrimination, Sexual Harassment, and Hostile Work Environment in Violation of the New York City Human Rights Law
### (By All Plaintiffs Against All Defendants)

401.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

402.    This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

403.    Defendants discriminated against Plaintiffs on the basis of their genders, and/or sexually harassed Plaintiffs, and/or caused Plaintiffs to experience a hostile work environment in violation of the New York City Human Rights Law by treating Plaintiffs less favorably on account of their genders, and/or making harassing or discriminatory comments to Plaintiffs based on their genders, and/or by sexually harassing and assaulting Plaintiffs.

404.    Defendants knew of the general discrimination and sexual harassment perpetrated against Plaintiffs, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of sexual harassment of female employees that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

405.    The sexual harassment perpetrated against Plaintiffs by Defendants affected the terms, conditions, and privileges of their employment.

406.    As a result of Defendants' gender discrimination and sexual harassment of Plaintiffs in violation of the New York City Human Rights Law, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress,

inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling them to compensatory damages.

407. In their gender-based discriminatory actions alleged in violation of the New York City Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling her to an award of punitive damages.

408. Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

**SEVENTH CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107(1) – Pregnancy Discrimination in Violation of the New York City Human Rights Law**
**(By Plaintiff Walton Against Defendants Reid,**
**Ortiz, Timberlake, Feeney, and Allied)**

409. Plaintiff Sheila Walton repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

410. Defendants Reid, Ortiz, Timberlake, Feeney, and Allied (the "Pregnancy Defendants") discriminated against Ms. Walton on the basis of her gender by treating her less favorably than her colleagues and subjecting her to differential treatment on the basis of her pregnancy.

411. The Pregnancy Defendants knew of the pregnancy discrimination perpetrated against Ms. Walton, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of sexual harassment and discrimination against female employees that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

412. The pregnancy discrimination perpetrated against Ms. Walton by the Pregnancy Defendants affected the terms, conditions, and privileges of her employment.

413.     As a result of the Pregnancy Defendants' pregnancy discrimination against Walton in violation of the New York City Human Rights Law, Ms. Walton has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to the Pregnancy Defendants' actions, entitling her to compensatory damages.

414.     In their pregnancy-based discriminatory actions alleged in violation of the New York City Human Rights Law, the Pregnancy Defendants have acted with malice or deliberate indifference to the rights of Ms. Walton, thereby entitling her to an award of punitive damages.

415.     Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Ms. Walton is entitled to recover reasonable attorneys' fees and costs of this action

### EIGHTH CLAIM FOR RELIEF
**N.Y.C. Admin. Code § 8-107(1) – Retaliation in Violation of the New York City Human Rights Law**
**(By All Plaintiffs Against All Defendants)**

416.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

417.     This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

418.     Plaintiffs engaged in protected activity by making written and oral complaints about the sexual harassment, race discrimination, gender discrimination, and pregnancy discrimination that Defendants subjected them to on account of status as members of various protected classes, and by seeking to be protected against those same discriminatory acts.

419. Defendants knew that Plaintiffs had engaged in protected activity.

420. Defendants subjected Plaintiffs to adverse employment actions, including by reducing the hours that they were eligible to work, giving them worse shifts, writing them up up for pretextual reasons, terminating them, and subjecting them to a hostile work environment.

421. Plaintiffs' adverse employment actions were a direct and proximate result of Plaintiffs' protected complaints and reports to Defendants regarding their discriminatory conduct.

422. As a result of the illegal conduct perpetrated by Defendants, Plaintiffs have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, as well as lost wages and work opportunities, entitling them to compensatory damages.

423. In their retaliatory acts in violation of the New York City Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling them to an award of punitive damages.

424. Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

425. Pursuant to N.Y.C. Admin. Code § 8-502(c), Plaintiffs are providing the New York City Human Rights Commission with notice of their claims under the New York City Human Rights Law.

**NINTH CLAIM FOR RELIEF**
**N.Y. Exec. Law § 296 – Race Discrimination in Violation of the**
**New York State Human Rights Law**
**(By Plaintiffs Powell and Irving Against Defendants Allied,**
**Tarantola, Feeney, and McNamara)**

426. Plaintiffs Powell and Irving are a black women of West Indian descent who fall within a protected class of individuals.

427. The Race Plaintiffs performed satisfactorily since their job performances met or exceeded the Race Defendants' expectations.

428. The conduct by the Race Defendants, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race and national origin in violation of the New York State Human Rights Law.

429. The Race Defendants subjected the Race Plaintiffs to adverse employment actions on account of their protected status and denied them equal opportunity and treatment in the conditions of employment.

430. By the acts and practices described above, the Race Defendants, directly and/or through employees and/or agents, subjected the Race Plaintiffs to discrimination in violation of the New York State Human Rights Law.

431. The Race Defendants exercised managerial and/or supervisory control over the Race Plaintiffs, participated in the discriminatory acts, and failed to take corrective action.

432. As a result of the Race Defendants' discrimination in violation of the New York State Human Rights Law, the Race Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to the Race Defendants' actions, entitling her to compensatory damages.

433. In their race-based discriminatory actions alleged in violation of the New York State Human Rights Law, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, thereby entitling them to an award of punitive damages.

## TENTH CLAIM FOR RELIEF

### N.Y. Exec. Law § 296 – Gender Discrimination, Sexual Harassment, and Hostile Work Environment in Violation of the New York State Human Rights Law
### (All Plaintiffs Against All Defendants)

434. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

435. This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

436. Defendants discriminated against Plaintiffs on the basis of their genders by treating them less favorably on the basis of their genders, and/or sexually harassing Plaintiffs, and/or subjecting Plaintiffs to a hostile work environment in violation of the New York State Human Rights Law.

437. Defendants knew of the gender discrimination and/or sexual harassment perpetrated against Plaintiffs, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of gender discrimination and sexual harassment that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

438. The sexual harassment perpetrated against Plaintiffs by Defendants affected the terms, conditions, and privileges of their employment.

439. As a result of Defendants' discrimination in violation of the New York State Human Rights Law, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling them to compensatory damages.

440.     In their gender-based discriminatory actions and sexual harassment alleged in violation of the New York State Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling them to an award of punitive damages.

441.     Under the New York State Human Rights Law, N.Y. Exec. Law § 297.10, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

### ELEVENTH CLAIM FOR RELIEF
**N.Y. Exec. Law § 296 – Failure to Accommodate Pregnancy
and Retaliation for Reasonable Accommodation Requests in Violation of the
New York State Human Rights Law
(By Plaintiff Walton Against Defendants Reid,
Ortiz, Timberlake, Feeney, and Allied)**

442.     Ms. Walton repeats and realleges the allegations set forth above as if fully set forth herein.

443.     The Pregnancy Defendants failed to provide Ms. Walton with reasonable accommodations for her pregnancy in violation of N.Y. Exec. Law § 296 and 9 N.Y.C.R.R. § 466.11(j) and (k).

444.     Ms. Walton requested reasonable accommodations for her pregnancy by requesting (1) appropriately sized uniforms that would fit her during pregnancy, (2) to be assigned to shifts that would not require her to work overnight, (3) to be assigned to posts that would not require her to engage in excessive movement, and (4) during the end of her pregnancy, to be assigned to posts that would not require her to drive Allied vehicles.

445.     Ms. Walton's accommodations requests were for reasonable work accommodations that would have permitted her to reasonably continue to perform her job duties at Allied.  None of these accommodations would have caused the Pregnancy Defendants an undue hardship.

446.     Ms. Walton provided medical information from her doctor to the Pregnancy Defendants that verified the existence of her pregnancy and the limitations associated with her pregnancy.

447.     The Pregnancy Defendants denied Ms. Walton's requests for reasonable accommodations during her pregnancy.

448.     The Pregnancy Defendants also retaliated against Ms. Walton in response to her requests for reasonable accommodations during her pregnancy.

449.     Ms. Walton engaged in protected activity by requesting reasonable accommodations and complaining about pregnancy discrimination that she was experiencing.

450.     The Pregnancy Defendants responded to Ms. Walton's protected activity by engaging in retaliatory acts, including by suspending her, issuing her write-ups, assigning her to unfavorable posts, assigning her to unfavorable shifts, and ultimately terminating her.

451.     In their retaliatory acts in violation of the New York State Human Rights Law, the Pregnancy Defendants have acted with malice or deliberate indifference to the rights of Ms. Walton, thereby entitling her to an award of punitive damages.

**TWELFTH CLAIM FOR RELIEF**
**N.Y. Exec. Law § 296 – Retaliation in Violation of the**
**New York State Human Rights Law**
**(All Plaintiffs Against All Defendants)**

452.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

453.     This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

454. Plaintiffs engaged in protected activity by making written and oral complaints about the sexual harassment, race discrimination, gender discrimination, and pregnancy discrimination to which Defendants subjected them on account of their membership in various protected classes, and by seeking to be protected against those same discriminatory acts.

455. Defendants knew that Plaintiffs had engaged in protected activity.

456. Defendants subjected Plaintiffs to adverse employment actions, including by reducing the hours that they were eligible to work, subjecting them to worse shifts, terminating them, and subjecting them to a hostile work environment.

457. Plaintiffs' adverse employment actions were a direct and proximate result of Plaintiffs' protected complaints and reports to Defendants regarding their discriminatory conduct.

458. As a result of the illegal conduct perpetrated by Defendants, Plaintiffs have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, as well as lost wages and work opportunities, entitling them to compensatory damages.

459. In their retaliatory acts in violation of the New York State Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

460. Under the New York State Human Rights Law, N.Y. Exec. Law § 297.10, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

### THIRTEENTH CLAIM FOR RELIEF
**Retaliation in Violation of Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e
(By Plaintiff Irving Against Defendants Reid, Diaz, and Allied)**

461. Plaintiff Irving repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

462.     Defendants Reid, Diaz, and Allied (the "Title VII Defendants") retaliated against Ms. Irving in violation of Title VII of the Civil Rights Act of 1964.

463.     In or around February 2017, Ms. Irving filed a timely Charge of Discrimination alleging gender discrimination with the New York Division of Human Rights and Equal Employment Opportunity Commission ("EEOC").

464.     The Charge of Discrimination described the incident in which Ms. Irving received a friend request from Defendant Diaz, reported the request because she reasonably believed it to be sexual harassment, and then was subject to retaliation by Defendants.  The Charge of Discrimination was limited to the Facebook request incident and accompanying retaliation; it did not include the other incidents of gender discrimination or sexual harassment included in this Complaint.

465.     The Title VII Defendants are liable under Title VII for retaliating against Ms. Irving for her complaint that she reasonably believed she was subjected to sexual harassment. Ms. Irving engaged in a protective activity by reporting a Facebook friend request that she reasonably constituted sexual harassment.  In response, the Title VII Defendants subjected Ms. Irving to adverse employment actions, including by giving her worse assignments, issuing her to unjustified write-ups, and threatening to terminate her.  Ms. Irving's response to and report of Defendant Diaz's friend request was the reason that the Title VII Defendants retaliated against her.

466.     On or about Friday, November 3, 2017, Ms. Irving received a "Dismissal and Notice of Rights" letter from the EEOC for her Charge of Discrimination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests judgment against Defendants as follows:

a) Awarding compensatory damages to Plaintiffs;

b) Awarding punitive damages to Plaintiffs;

c) Declaring that the Race Defendants have violated the Race Plaintiffs' rights in violation of 42 U.S.C. § 1981;

d) Declaring that Defendants have violated Plaintiffs' rights under the New York City Human Rights Law and the New York State Human Rights Law;

e) Declaring that the Title VII Defendants have violated Ms. Irving's rights under 42 U.S.C. 2000e;

f) Awarding Plaintiffs any and all under-payments that they are entitled to as a result of Defendants' failure to comply with the Federal Fair Labor Standards Act and the N.Y. Labor Law;

g) Awarding liquidated damages due to Plaintiffs under the Fair Labor Standards Act and/or the N.Y. Labor Law;

h) Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

i) Awarding injunctive relief appropriate to remedy the unlawful conduct and conditions described herein; and

j) Granting Plaintiffs all such other relief as may be just and proper.

Dated: December 5, 2017
      New York, New York

                                             Respectfully submitted,

                                             EMERY CELLI BRINCKERHOFF
                                             & ABADY LLP

                                             By:    /s/ Elizabeth Saylor
                                                  Elizabeth Saylor
                                                  Alanna Kaufman
                                                  David Lebowitz

                                           600 Fifth Avenue, 10th Floor
                                         New York, New York 10020
                                         Telephone: 212.763.5000
                                         Facsimile: 212.763.5001

                                         *Attorneys for Plaintiffs LaDonna Powell,*
                                         *Marsha-Nique Irving, Sheila Walton, and*
                                         *Roy Fields*