UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
LADONNA POWELL, MARSHA-NIQUE IRVING,
SHEILA WALTON, and ROY FIELDS,
                       Plaintiffs,                          Index No. 1:17-cv-6133

        against-

ALLIED UNIVERSAL SECURITY SERVICES,
ALLIED BARTON SECURITY SERVICES, LLC,
THOMAS TARANTOLA, CHRISTOPHER
TIMBERLAKE, OSVALDO ORTIZ, KEITH REED,
ALBERTO DIAZ, KEVIN MCNAMARA, and
MARTIN FEENEY,

              Defendants.
-----------------------------------------------------------------------X

## DEFENDANTS' ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

NOW COMES Defendants Universal Protection Service, LLC (d/b/a Allied Universal Security Services), AlliedBarton Security Services LLC, Thomas Tarantola, Christopher Timberlake, Osvaldo Ortiz, Keith Reid, Alberto Diaz, Kevin McNamara, and Martin Feeney (together "Defendants") and files this their Answer to Plaintiffs' Amended Complaint as follows:

## PRELIMINARY STATEMENT

1.     This case is about a company overrun with misogyny, racism, and harassment, and the brave employees who were retaliated against for speaking up about it.

**ANSWER:** Defendants deny the allegations contained in Paragraph 1 of the Amended Complaint.

2.     Women employed by Defendants at John F. Kennedy International Airport ("JFK") face a choice: have sex with male supervisors and get ahead, or refuse and be relentlessly harassed and retaliated against.

**ANSWER:** Defendants deny the allegations contained in Paragraph 2 of the Amended Complaint.

1

3.    Defendant Allied Universal Security Services (referred to herein collectively with Defendant Allied Barton Security Services, LLC as "Allied") contracts with the Port Authority of New York and New Jersey to provide security services at JFK, LaGuardia Airport, and the World Trade Center.

**ANSWER:** In response to Paragraph 3 of the Amended Complaint, Defendants admit that Allied Universal Security Services has a contract with the Port Authority of New York and New Jersey to provide security services at JFK, LaGuardia Airport, and the World Trade Center. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 3 of the Amended Complaint.

4.    Plaintiffs LaDonna Powell, Marsha-Nique Irving, and Sheila Walton are a few of the women who rejected the advances of their supervisors and, as a result, were subjected to a shocking campaign of discrimination, hazing, and abuse. When they reported this mistreatment, it worsened—to the point where all three women were fired or forced to leave the company.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 4 of the Amended Complaint.

5.    Even male security guards at Allied were not allowed to interfere with the sordid arrangement in which male supervisors controlled certain female security guards. Plaintiff Roy Fields was given undesirable shifts and lower pay after an Allied supervisor found out that Mr. Fields was in a romantic relationship with a female security guard with whom the supervisor was also having sex. When Mr. Fields reported this mistreatment to human resources, he was fired for it.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 5 of the Amended Complaint.

6.    This is not a case of a few bad apples or a couple of discrete instances of misconduct. The culture of Allied at JFK is one of ubiquitous discrimination and harassment. Instead of providing security services as required by their taxpayer-funded contract with Port Authority, Defendants spent their work hours circulating pornographic videos and propositioning female employees for sex, among other things.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 6 of the Amended Complaint.

7.    Plaintiffs repeatedly reported the harassment to Human Resources and Allied's supervisors and top managers (including two ex-NYPD police officers), but they did nothing to

stop it, choosing instead to perpetuate and participate in the illegal conduct. Plaintiffs also repeatedly complained to Port Authority, but nothing was resolved, and the Supervisor Defendants told Plaintiffs not to involve "the client" (Port Authority) in Allied issues.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 7 of the Amended Complaint.

8.     The severity of the discrimination and harassment that Plaintiffs experienced at Allied is harrowing.  For example:

- Ms. Powell was repeatedly forced to watch her supervisors video-record her colleagues having sex in security booths via closed circuit television cameras (they then shared and circulated the recordings).
- Ms. Irving was told that she was on a "list" of women security guards that Allied supervisors wanted to have sex with and asked when she would give in to sexual demands.
- Ms. Walton was subjected to repeated comments about oral sex by her Allied supervisor, who regularly told her that "you gotta make sure you know how to suck a dick" and would talk to her about how to "do it right."
- Ms. Powell was repeatedly forced by her supervisors to watch online videos of women pole dancing and asked if she could "dance like that," and was further subjected to countless lewd comments about her body, including observations about her breasts and remarks that "back in the day" she would be "bent over in the [security] booths."
- Plaintiffs were denied overtime pay and denied access to food, water, and bathroom breaks while working as a security guard—to the point where, on multiple occasions, Plaintiffs had to urinate in a cup or outside in the middle of their shift.  The denial of breaks often followed Plaintiffs' complaints for harassments.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 8 of the Amended Complaint.

9.     Despite this treatment, Plaintiffs refused to submit to their supervisors' harassment. Ms. Powell, Ms. Irving, and Ms. Walton refused to engage in sex acts with Allied supervisors in exchange for better shifts and days off.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 9 of the Amended Complaint.

10.     Ms. Powell spoke up in response to reports by black security guards that they were being called the n-word and treated worse than white employees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 10 of the Amended Complaint.

11. Ms. Irving complained about widespread wage-and-hour violations affecting her and her fellow employees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 11 of the Amended Complaint.

12. Mr. Fields told Human Resources about the culture of sexual harassment at Allied and the unfair treatment that he had received.

**ANSWER:** Defendants deny the allegations contained in Paragraph 12 of the Amended Complaint.

13. In response, Defendants fired Ms. Powell. They fired Ms. Walton. And they fired Mr. Fields. They forced Ms. Irving to resign under the threat of imminent termination. Each Plaintiff's departure occurred shortly after—or simultaneously with—complaints that he or she made about discrimination at Allied.

**ANSWER:** Defendants deny the allegations contained in Paragraph 13 of the Amended Complaint.

14. Defendants' persistent harassment and retaliation against Plaintiffs devastated them. Plaintiffs dreaded going to work each day, not knowing what horrible conduct awaited them. Ms. Powell often left the office in tears, disgusted and frustrated with the treatment she received and her inability to improve her situation. The harassment took an enormous toll on Plaintiffs, and their departures from Allied were emotionally and financially shattering.

**ANSWER:** Defendants deny the allegations contained in Paragraph 14 of the Amended Complaint.

15. Defendants' conduct is shocking, illegal, and gives rise to Plaintiffs' claims for race discrimination, sex discrimination, pregnancy discrimination, retaliation, and wage and hour violations under federal, state, and local law.

**ANSWER:** Defendants deny the allegations contained in Paragraph 15 of the Amended Complaint.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over Plaintiffs' federal law claims under 28 U.S.C. §§ 1331, 1343, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and 29 U.S.C. § 201 et seq. The Court has supplemental jurisdiction over Plaintiffs' New York State and New York City law claims under 28 U.S.C. § 1367(a).

**ANSWER:**  In response to Paragraph 16 of the Amended Complaint, Defendants state that Paragraph 16 is a legal conclusion to which no response in necessary.  To the extent a response is necessary, Defendants admit that this Court has subject matter jurisdiction over Plaintiffs' federal law claims and may exercise supplemental jurisdiction over Plaintiffs' state law and New York City law claims.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**ANSWER:**  In response to Paragraph 17 of the Amended Complaint, Defendants state that Paragraph 17 is a legal conclusion to which no response is necessary.  To the extent a response is necessary, Defendants admit that venue is proper in the Eastern District of New York.

## JURY DEMAND

18.     Plaintiffs demand a trial by jury in this action.

**ANSWER:**  In response to Paragraph 18 of the Amended Complaint, Defendants acknowledge that Plaintiff has requested a trial by jury but state that no such trial is necessary or warranted.

## PARTIES

19.     Plaintiff LaDonna Powell is a black woman who was employed by Allied from September 2013 (when it assumed the Port Authority contract) to May 2016.  She was previously employed beginning in 2012 by FJC Security, Inc. ("FJC") at JFK and was supervised by the Supervisor Defendants.  She currently resides in Long Island, New York.

**ANSWER:**  In response to Paragraph 19 of the Amended Complaint, Defendants admit that Plaintiff Powell is a black woman who was employed by AlliedBarton Security Services LLC from in or about August 2013 through in or about May 2016.  Upon information and belief, Defendants admit that Plaintiff Powell was previously employed by FJC.  Further responding to

5

Paragraph 19 of the Amended Complaint, Defendants state that they are without sufficient

information or belief to either admit or deny that Plaintiff Powell resides on Long Island, New

York and, based thereon, denies that Plaintiff Powell resides on Long Island, New York. Except

as expressly admitted, Defendants deny the allegations contained in Paragraph 19 of the Amended

Complaint.

20.     Plaintiff Marsha-Nique Irving is a black woman who was employed by Allied from
September 2013 (when it assumed the Port Authority contract) to March 2017. She currently
resides in Queens, New York.

**ANSWER:**  In response to Paragraph 20 of the Amended Complaint, Defendants admit that

Plaintiff Irving is a black woman who was employed by AlliedBarton Security Services LLC

and/or Allied Universal Security Services from in or about August 2013 to in or about March 2017.

Further responding to Paragraph 20 of the Amended Complaint, Defendants state that they are

without sufficient information or belief to either admit or deny that Plaintiff Irving resides in

Queens, New York and, based thereon, denies that Plaintiff Irving resides in Queens, New York.

Except as expressly admitted, Defendants deny the allegations contained in Paragraph 20 of the

Amended Complaint.

21.     Plaintiff Sheila Walton is a black woman who was employed by Allied from
February 2015 until November 2016. She currently resides in Brooklyn, New York.

**ANSWER:**  In response to Paragraph 21 of the Amended Complaint, Defendants admit that

Plaintiff Walton is a black woman who was employed by AlliedBarton Security Services LLC

and/or Allied Universal Security Services from in or about February 2015 to in or about November

2016.  Further responding to Paragraph 21 of the Amended Complaint, Defendants state that they

are without sufficient information or belief to either admit or deny that Plaintiff Walton resides in

Brooklyn, New York and, based thereon, denies that Plaintiff Walton resides in Brooklyn, New

York.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 21 of the Amended Complaint.

22.     Plaintiff Roy Fields is a black man who was employed by Allied from the summer of 2013 until April 2015. He currently resides in Allentown, Pennsylvania.

**ANSWER:**  In response to Paragraph 22 of the Amended Complaint, Defendants admit that Plaintiff Fields is a black man who was employed by AlliedBarton Security Services LLC from in or about September 2013 to in or about May 2015.  Further responding to Paragraph 22 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny that Plaintiff Fields resides in Allentown, Pennsylvania and, based thereon, denies that Plaintiff Fields resides in Allentown, Pennsylvania.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 20 of the Amended Complaint.

23.     Defendant Allied Universal Security Services is a Delaware corporation that maintains corporate headquarters at 229 West 36th Street, New York, New York 10018 and 199 Water Street, New York, New York 10038 and maintains an office at JFK. Allied Universal Security Services was formed in or around August 2016 as the result of a merger between Defendant Allied Barton Security Services, LLC and Universal Services of America. On information and belief, Allied Universal Security Services is the parent company of and/or successor-in-interest to Allied Barton Security Services LLC. Allied Universal Security Services contracts with the Port Authority to provide security services at JFK, LaGuardia Airport, and the World Trade Center.

**ANSWER:**  In response to Paragraph 23 of the Amended Complaint, Defendants admit that Defendant Universal Protection Service, LLC (d/b/a Allied Universal Security Services) contracts with Port Authority to provide security services at JFK.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 23 of the Amended Complaint.

24.     Defendant Allied Barton Security Services, LLC is a Delaware corporation with offices in New York, New York. In 2016, Defendant Allied Barton Security Services, LLC merged with Universal Services of America to become Defendant Allied Universal Security Services. Defendant Allied Barton Security Services contracted with the Port Authority to provide security services at JFK from 2013 until the 2016 merger, when the new entity, Defendant Allied Universal Security Services, assumed the contract.

**ANSWER:** In response to Paragraph 24 of the Amended Complaint, Defendants admit that Universal Protection Service, LLC assumed the Port Authority contract from AlliedBarton Security Services LLC in or about September 2016. Defendants further admit that AlliedBarton Security Services provided security services at JFK pursuant to a contract with the Port Authority from in or about September 2013 through in or about September 2016. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 24 of the Amended Complaint.

25. In this Complaint, Defendants Allied Universal Security Services and Defendant Allied Barton Security Services, LLC are referred to collectively as "Allied." Despite the name changes and merger, the same supervisors oversaw Plaintiffs' work and managed Allied's contract with Port Authority at all relevant times.

**ANSWER:** In response to Paragraph 25 of the Amended Complaint, Defendants acknowledge that Plaintiffs are referring to Defendants Allied Universal Security Services and AlliedBarton Security Services LLC collectively as "Allied." Except as expressly acknowledged, Defendants deny the allegations contained in Paragraph 25 of the Amended Complaint.

26. Defendant Thomas Tarantola is the project manager for Allied at JFK. Tarantola is one of Allied's most senior managers at JFK and is responsible for overseeing Allied employees at that site. Tarantola is a resident of New York.

**ANSWER:** Defendants admit the allegations contained in Paragraph 26 of the Amended Complaint.

27. Defendant Christopher Timberlake is an assistant project manager at Allied at JFK. Timberlake is a resident of New York.

**ANSWER:** Defendants admit the allegations contained in Paragraph 27 of the Amended Complaint.

28. Defendant Osvaldo Ortiz is a security supervisor at Allied at JFK. Ortiz is a resident of New York.

**ANSWER:** In response to Paragraph 28 of the Amended Complaint, Defendants admit that Defendant Osvaldo Ortiz is a supervisor at JFK and a resident of the State of New York. Except

as expressly admitted, Defendants deny the allegations contained in Paragraph 28 of the Amended Complaint.

29.     Defendant Keith Reid is a security supervisor at Allied at JFK. Reid is a resident of New York.

**ANSWER:**  In response to Paragraph 29 of the Amended Complaint, Defendants admit that Defendant Keith Reid is a supervisor at JFK and a resident of the State of New York.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 29 of the Amended Complaint.

30.     Defendant Alberto Diaz is a security supervisor at Allied at JFK.  Diaz is a resident of New York.

**ANSWER:**  In response to Paragraph 30 of the Amended Complaint, Defendants admit that Defendant Alberto Diaz is a supervisor at JFK and a resident of the State of New York.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 30 of the Amended Complaint.

31.     Defendant Kevin McNamara is a security supervisor at Allied at JFK. McNamara is a resident of New York.

**ANSWER:**  Defendants admit that Defendant Kevin McNamara is a resident of the State of New York.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 31 of the Amended Complaint.

32.     Defendant Martin Feeney is a Regional Vice President at Allied. Prior to that, Feeney serviced as the project manager for Allied at JFK. As project manager, Feeney was a senior supervisor in charge of Allied's contract with Port Authority at JFK, and he was responsible for overseeing that Allied employees at that site. Feeney is a resident of New York.

**ANSWER:**   In response to Paragraph 32 of the Complaint, Defendants admit that Defendant Martin Feeney is a Regional Vice President.  Further responding to Paragraph 32 of the Complaint, Defendants admit that Feeney was previously the Project Manager at JFK.  Further responding to

Paragraph 32 of the Amended Complaint, Defendants admit that Feeney is a resident of the State of New York.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 32 of the Amended Complaint.

33.     Collectively, the individual named Defendants are referred to in this Complaint as the "Supervisor Defendants." At all relevant times, the Supervisor Defendants were Allied supervisors and upper managers at JFK responsible for carrying out the contract between Allied and Port Authority and overseeing Allied employees at that site.

**ANSWER:**  In response to Paragraph 33 of the Amended Complaint, Defendants acknowledge that the individually named Defendants in this Amended Complaint are referred to as the "Supervisor Defendants."  Except as expressly acknowledged, Defendants deny the allegations contained in Paragraph 33 of the Amended Complaint.

## FACTS

### THE CULTURE AT ALLIED

34.     The culture at Allied is one of discrimination and harassment on the basis of gender and race.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 34 of the Amended Complaint.

35.     Male supervisors regularly sexually harass female Allied employees, including by soliciting them for sex acts, showing them sexual videos, and talking to them about sex at work.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 35 of the Amended Complaint.

36.     Supervisors also regularly harass Allied employees based on their race, including by using racial slurs, making racially charged comments, and treating black security guards worse than security guards of other races.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 36 of the Amended Complaint.

37.    When Allied employees refuse to acquiesce to their supervisors' advances, or when they report discrimination of any kind, they are retaliated against, including by receiving pretextual write-ups, fewer shifts, and worse schedules and posts. They are also denied breaks, including bathroom breaks and lunch breaks, to the point where they are forced to urinate without a bathroom.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 37 of the Amended Complaint.

38.    Many employees who speak up are ultimately fired or forced to resign.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 38 of the Amended Complaint.

39.    Defendants' willingness to engage in unlawful behavior is not limited to acts of discrimination. They are also engaged in flagrant violations of federal and local wage and hour laws, and they regularly deny Allied employees at JFK earned overtime and other wages.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 39 of the Amended Complaint.

40.    Allied and the Supervisor Defendants have been aware of the discriminatory culture and unlawful conduct at Allied for years. Instead of addressing it, they have perpetuated it. On information and belief, even after the first Complaint in this action was filed, Defendants have continued to engage in the same type of harassment, retaliation, and threatening behavior that is the subject of his action.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 40 of the Amended Complaint.

## LADONNA POWELL

41.    In 2012, Ms. Powell began working at JFK as a part-time security officer employed by FJC Security, Inc. ("FJC").

**ANSWER:**  Upon information and belief, Defendants admit that Plaintiff Powell began working at JFK for FJC in 2012.

42.    At that time, FJC had a contract with the Port Authority to provide security services at JFK.

**ANSWER:** Upon information and belief, Defendants admit the allegations contained in Paragraph 42 of the Amended Complaint.

43.     As a part-time security officer, Ms. Powell was paid approximately $14 to $15 per hour, and her primary job responsibility was to screen vehicles bringing cargo to airplanes.

**ANSWER:** Defendants deny the allegations contained in Paragraph 43 of the Amended Complaint.

44.     In mid-late 2013, Allied took over FJC's contract with Port Authority and became Ms. Powell's employer.

**ANSWER:** In response to Paragraph 44 of the Amended Complaint, Defendants admit that Plaintiff was hired by AlliedBarton Security Services LLC in or about August 2013. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 44 of the Amended Complaint.

45.     Around the same time, in September 2013, Ms. Powell was promoted to operations assistant. Her salary increased to approximately $19 to $20 per hour, and she began working in Allied's office to carry out its contract with Port Authority, including by working on payroll, scheduling, and assisting with technology repairs.

**ANSWER:** Defendants deny the allegations contained in Paragraph 45 of the Amended Complaint.

46.     In early 2014, Ms. Powell was promoted to office specialist. Her salary increased to approximately $21 to $22 per hour, and her primary job responsibilities were to conduct fingerprinting, process identification cards, and oversee background checks for new Allied employees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 46 of the Amended Complaint.

47.     In June 2014, Ms. Powell was promoted to supervisor within the security division. As a supervisor, Ms. Powell's salary increased to $32.50 per hour. Her primary job responsibility was to drive around in the field to supervise the security officers. She was also responsible for communicating with Port Authority regarding any security issues.

**ANSWER:** In response to Paragraph 47 of the Amended Complaint, Defendants admit that Plaintiff was promoted to Tour Supervisor on or about August 1, 2014. As a Tour Supervisor, Plaintiff's initial wage rate was $31.26 per hour. In further response to Paragraph 47 of the Amended Complaint, Defendants admit that Plaintiff's responsibilities as a Tour Supervisor included supervising the Security Officers in the field and communicating regarding security issues. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 47 of the Amended Complaint.

48. Ms. Powell's promotion to supervisor was due to Port Authority's support for her. Recognizing Ms. Powell's strength as an employee, Port Authority supervisor Caleb Chu had told then-Project Manager (now Allied Vice President) and Defendant Martin Feeney that he wanted to recruit Ms. Powell to join Port Authority. Not wanting to lose Ms. Powell as an employee, Feeney promoted her to supervisor.

**ANSWER:** Defendants deny the allegations contained in Paragraph 48 of the Amended Complaint.

49. Shortly after her promotion to supervisor, Ms. Powell was promoted again to supervisor/trainer. This promotion was not accompanied by a pay increase. As supervisor/trainer, Ms. Powell was responsible for training new classes of security officers and conducting refresher trainings for current security officers.

**ANSWER:** In response to Paragraph 49 of the Amended Complaint, Defendants admit that, as a Tour Supervisor, Plaintiff was tasked with providing training to new and current Security Officers. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 49 of the Amended Complaint.

50. Ms. Powell took a several-month hiatus in the summer of 2015 to attend training for a part-time position with U.S. Customs and Border Protection ("U.S. Customs"), but she returned to her position as supervisor/trainer at Allied after the training in August 2015.

**ANSWER:** In response to Paragraph 50 of the Amended Complaint, Defendants admit that Plaintiff took a leave of absence from in or about July 2015 to in or about December 2015. Except

as expressly admitted, Defendants deny the allegations contained in Paragraph 50 of the Amended Complaint.

51.     Starting in August 2015, Ms. Powell worked part-time for U.S. Customs in addition to her work as a supervisor/trainer at Allied.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 51 of the Amended Complaint.

52.     Ms. Powell remained a supervisor/trainer at Allied from 2014 until she was terminated in May 2016.

**ANSWER:**  In response to Paragraph 52 of the Amended Complaint, Defendants admit that Plaintiff Powell was employed as a supervisor at the time of her termination in May 2016.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 52 of the Amended Complaint.

**Ms. Powell is Sexually Harassed and Subjected to a
Hostile Work Environment**

53.     The following incidents are just several of many examples of the harassment that Ms. Powell was subjected to every day of her employment.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 53 of the Amended Complaint.

*Ms. Powell Was Exposed to Photos and Videos
of Supervisors Having Sex with Female Employees*

54.     On more than one occasion, Ms. Powell was present while several of the Supervisor Defendants looked at videos and photos of male Allied employees (including supervisors) engaging in sex acts with female Allied employees.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 54 of the Amended Complaint.

55.     For example, in early 2015, Ms. Powell was present in the office while Defendants Reid, Ortiz, and Diaz watched two videos of a female Allied employee performing oral sex on two different male Allied employees. One of them had recorded the video from the female employee's

phone and was sharing it with the others.

**ANSWER:** Defendants deny the allegations contained in Paragraph 55 of the Amended Complaint.

56. While watching the videos, Reid, Ortiz, and Diaz made crude and inappropriate remarks in front of Ms. Powell and another female Allied employee. They said things like: "look how she's doing that" and "she's so good." They kept repeating that they were "turned on" by the videos and that it made their "toes curl." One even remarked that if he were the male employee in the video, he would have already ejaculated.

**ANSWER:** Defendants deny the allegations contained in Paragraph 56 of the Amended Complaint.

57. This was not the only time that the Supervisor Defendants watched or shared pornographic videos or images that showed female employees. It happened all the time. Once, while several of the Supervisor Defendants were watching such a video in front of Ms. Powell, Reid asked her: "Do you know how to give head like that?"

**ANSWER:** Defendants deny the allegations contained in Paragraph 57 of the Amended Complaint.

58. Also in or around May 2015, when Ms. Powell was checking on a security guard at a field post, the guard took out her cell phone and showed Ms. Powell multiple photographs of her performing oral and manual sex on Ortiz. The security guard also showed Ms. Powell a graph she had made comparing the size of Ortiz's penis to the penis of another Allied employee.

**ANSWER:** Defendants deny the allegations contained in Paragraph 58 of the Amended Complaint.

59. On another occasion, in the spring of 2016, a security guard made a FaceTime call to the on-duty supervisor's cell phone and Ms. Powell answered. Ms. Powell saw that the female security guard was topless, and she told Ms. Powell that she had removed her uniform because she thought that Ortiz was on-duty and using the supervisor's cell phone, not Ms. Powell.

**ANSWER:** Defendants deny the allegations contained in Paragraph 59 of the Amended Complaint.

60. During all of these incidents, Ms. Powell was shocked, distressed, and uncomfortable about the fact that sex between Allied employees was being openly shared and bragged about. In each instance, she ignored the conduct and tried to continue her work without

engaging with the inappropriate behavior.

**ANSWER:** Defendants deny the allegations contained in Paragraph 60 of the Amended Complaint.

*Ms. Powell Was Present While Her Colleagues Orchestrated and Watched Allied Employees Have Sex on Security Cameras*

61.     On more than one occasion, Ms. Powell was present while several of the Supervisor Defendants watched security guards have sex via the closed-circuit cameras that were placed in security booths in the field.

**ANSWER:** Defendants deny the allegations contained in Paragraph 61 of the Amended Complaint.

62.     For example, in September 2013, while Ms. Powell was serving as an operations assistant, she was in the office with Diaz and Ortiz when they began watching a live video of two security officers having sex in a security booth (via the closed-circuit cameras that allow supervisors in the office to view the booths). Ms. Powell was present as Diaz and Ortiz watched the two officers for several minutes, laughing and making crude comments like "What is he doing with that old pussy?", "Don't they live together?", and "Why can't he wait?"

**ANSWER:** Defendants deny the allegations contained in Paragraph 62 of the Amended Complaint.

63.     Some of the Supervisor Defendants regularly assigned security guards to certain posts together to see whether they would have sex with each other.

**ANSWER:** Defendants deny the allegations contained in Paragraph 63 of the Amended Complaint.

64.     For example, in June or July 2015, Ortiz assigned a female security guard with whom he was having sex to the same post as a certain male security guard for the purpose of determining whether she would "cheat" on him. When he observed the two having sex via the closed-circuit cameras, Ortiz made a video recording of the screen. The video showed pairs of pants lying on the ground and it was clear that the two were having sex off-screen. Ortiz shared the video with numerous security guards and supervisors, including Ms. Powell.

**ANSWER:** Defendants deny the allegations contained in Paragraph 64 of the Amended Complaint.

65.     As a result of this behavior, Ms. Powell felt disgusted, humiliated, extremely uncomfortable, and extremely distressed and unsafe at work.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 65 of the Amended Complaint.

*Ms. Powell Was Forced to Watch Pole-Dancing Videos*

66.     On more than one occasion, Ms. Powell was forced to watch sexually explicit videos and then harassed by several of the Supervisor Defendants.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 66 of the Amended Complaint.

67.     In 2014, while Ms. Powell was working as an operations assistant, Timberlake and Ortiz called her into Timberlake's office. They showed Ms. Powell a video of women pole dancing that was playing on Timberlake's computer.  The women in the video were wearing little clothing and dancing in a sexually explicit manner. Ortiz and Timberlake then asked Ms. Powell if she knew how to dance like that. Shocked and humiliated, Ms. Powell did not respond and simply walked out of the office.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 67 of the Amended Complaint.

68.     In early 2016, Timberlake, Ortiz, and Diaz called Ms. Powell into Timberlake's office and again showed her a similar video of women pole dancing in a sexual manner. They again asked Ms. Powell if she knew how to dance like the women in the video, and Ms. Powell again felt too shocked and humiliated to even respond.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 68 of the Amended Complaint.

69.     Timberlake, Ortiz, and Diaz then proceeded to tell Ms. Powell that they used to regularly have sex with women security guards while in the security booths and on duty.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 69 of the Amended Complaint.

70.     Timberlake, Ortiz, and Diaz told Ms. Powell that they would have had sex with her too, remarking that "back in the day" she would be "bent over in the booths"—a crude reference to penetrating her from behind.

**ANSWER:** Defendants deny the allegations contained in Paragraph 70 of the Amended Complaint.

71.     Timberlake then told Ms. Powell that he met the woman with whom he fathered his first child at work, implying that the child had been conceived at work with a female security guard.

**ANSWER:** Defendants deny the allegations contained in Paragraph 71 of the Amended Complaint.

72.     Ms. Powell was extremely humiliated and distraught as a result of this interaction. She felt like her supervisors were pressuring her to have sex with them by saying that it was part of the office culture, and she felt like was treated worse than other employees because she refused.

**ANSWER:** Defendants deny the allegations contained in Paragraph 72 of the Amended Complaint.

*Timberlake Directly Suggested That Ms. Powell Should Have Sex With Supervisors*

73.     In late 2014 or early 2015, Timberlake called Ms. Powell into his office. A supervisor from Port Authority was also present. Ms. Powell was wearing a white sweater dress. The Port Authority supervisor remarked to Timberlake: "Doesn't she look good?"

**ANSWER:** Defendants deny the allegations contained in Paragraph 73 of the Amended Complaint.

74.     The Port Authority Supervisor then asked Ms. Powell: "How much further do you want to go [at Allied]?" When Ms. Powell responded that she wanted to remain a supervisor and develop her career with the federal government through her position with U.S. Customs, he told her: "There are things you can do to get where you want to go."

**ANSWER:** Defendants deny the allegations contained in Paragraph 74 of the Amended Complaint.

75.     Timberlake was laughing and agreeing with the Port Authority Supervisor throughout the conversation.

**ANSWER:** Defendants deny the allegations contained in Paragraph 75 of the Amended Complaint.

76. The clear implication to Ms. Powell was that she could engage in sex acts to advance her career.

**ANSWER:** Defendants deny the allegations contained in Paragraph 76 of the Amended Complaint.

77. Ms. Powell saw firsthand that other female employees who had sex with supervisors were given promotions, better shifts, more breaks, and better days off. On occasion, she thought to herself that if she wanted even a lunch break, she should have sex with supervisors.

**ANSWER:** Defendants deny the allegations contained in Paragraph 77 of the Amended Complaint.

78. On another occasion, Timberlake told Ms. Powell something akin to: "Since everyone already thinks we had sex, let's bend you over the table."

**ANSWER:** Defendants deny the allegations contained in Paragraph 78 of the Amended Complaint.

79. Ms. Powell was extremely embarrassed and distraught following this situation. She again felt pressure to have sex with her supervisors in order to advance her career and fit in with the culture at Allied.

**ANSWER:** Defendants deny the allegations contained in Paragraph 79 of the Amended Complaint.

*Timberlake Commented On Ms. Powell's*
*Breasts and Inappropriately Touched Her Body*

80. On or around November 12 or 13, 2015, after Ms. Powell returned from U.S. Customs training, Timberlake called Ms. Powell into his office. He said to her: "Your breasts got smaller, you really lost weight."

**ANSWER:** Defendants deny the allegations contained in Paragraph 80 of the Amended Complaint.

81. Timberlake constantly made comments about Ms. Powell's body, as well as the

bodies of many other women employed by Allied.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 81 of the Amended Complaint.

82.  Timberlake also repeatedly and deliberately brushed up against Ms. Powell's body when walking past her and made unnecessary contact with her body, including her legs and her butt. Timberlake would make such inappropriate and unnecessary contact on a weekly—if not daily—basis.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 82 of the Amended Complaint.

83.  Timberlake's comments and inappropriate touching were extremely distressing to Ms. Powell and made her feel uncomfortable and unsafe at work. The comments and touching also made her feel like she should acquiesce to having sex with Timberlake in order to fit in at work.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 83 of the Amended Complaint.

_Ms. Powell Was Told Only to Hire "Cute Girls"_

84.  In November 2015, when Ms. Powell was bringing in candidates to interview for security guard positions, Timberlake told Ms. Powell: "We don't want too many men and no fat women."

**ANSWER:**  Defendants deny the allegations contained in Paragraph 84 of the Amended Complaint.

85.  A Port Authority supervisor who was present agreed and told Ms. Powell: "You brought some cute girls last time but you only hired one." Ortiz and Reid were present for this conversation.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 85 of the Amended Complaint.

86.  Ortiz, Timberlake, and Feeney also took affirmative steps to make sure that women they perceived as attractive were hired, regardless of their qualifications. These Defendants regularly brought in women applicants who did not meet the job requirements for security guard and sought to have them hired due to their appearances. On one occasion, they caused a woman to be hired even though she did not have either a High School diploma or a New York driver's

license—two mandatory job requirements for every security guard.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 86 of the Amended Complaint.

*Ms. Powell Was Sexually Harassed by Kevin McNamara*

87.    In September 2013, while Ms. Powell was serving as a security officer, she was sexually harassed by Defendant McNamara.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 87 of the Amended Complaint.

88.    McNamara approached Ms. Powell in the security booth where she was stationed and told her that he needed to photograph her. McNamara demanded that Ms. Powell take off her uniform jacket and spin around so that he could photograph her. Ms. Powell knew that McNamara only needed to photograph the outside of her jacket, and she refused to take her jacket off for him.

**ANSWER:**  In response to Paragraph 88 of the Amended Complaint, Defendants admit that part of Defendant McNamara's duties as a supervisor included taking photographs of Airport Security Agents to ensure compliance with the Company's uniform standards.   Except as expressly admitted, Defendants deny the allegations contained in Paragraph 88 of the Amended Complaint.

89.    Ms. Powell later learned that McNamara had made the same demand of other female security guards.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 89 of the Amended Complaint.

90.    Ms. Powell felt extremely upset and uncomfortable at McNamara's demand that she take off her jacket and spin around for him.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 90 of the Amended Complaint.

91.    Ms. Powell reported McNamara's harassment in the security booth to Timberlake. On information and belief, Timberlake did not investigate or take any action in response to Ms. Powell's complaint.

**ANSWER:** Defendants deny the allegations contained in Paragraph 91 of the Amended Complaint.

92. McNamara also repeatedly called Ms. Powell a "kid," despite her asking him to stop. He once asked her, "how old are you, twelve?"

**ANSWER:** Defendants deny the allegations contained in Paragraph 92 of the Amended Complaint.

**Ms. Powell is Discriminated Against and Subjected
to Harassment on the Basis of her Race**

93. Ms. Powell and the other black Allied employees were discriminated against and received inferior treatment from white male supervisors and managers, particularly McNamara, Feeney, and Tarantola, who are white, because of their race.

**ANSWER:** In response to Paragraph 93 of the Amended Complaint, Defendants admit that Defendants McNamara, Feeney, and Tarantola are white. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 93 of the Amended Complaint.

94. Black security guards were regularly referred to using the n-word and other racial slurs by white supervisors and management.

**ANSWER:** Defendants deny the allegations contained in Paragraph 94 of the Amended Complaint.

95. In or around 2015, Ms. Powell and McNamara were in the supervisor's office, along with a female office assistant who is Hispanic. The female assistant was upset because paperwork had been filled out incorrectly by a supervisor on the previous shift. In response, McNamara lashed out against Ms. Powell, saying "I'm tired of all of you niggers" and "I'm tired of seeing your nigger faces."

**ANSWER:** Defendants deny the allegations contained in Paragraph 95 of the Amended Complaint.

96. On or around March 5, 2016, Ms. Powell was pulled aside by a security officer trainee following a refresher training session. The trainee told Ms. Powell that he is referred to using the n-word all the time, including on three specific occasions by McNamara.

**ANSWER:** Defendants deny the allegations contained in Paragraph 96 of the Amended Complaint.

97. Ms. Powell reported the trainee's complaint to McNamara directly, as well as Timberlake, Diaz, and Ortiz together in Timberlake's office. When she reported the complaint to Timberlake, Diaz, and Ortiz, Ms. Powell also reported the 2015 incident where McNamara used the n-word in front of her.

**ANSWER:** Defendants deny the allegations contained in Paragraph 97 of the Amended Complaint.

98. On information and belief, no action was taken in response to Ms. Powell's complaint.

**ANSWER:** Defendants deny the allegations contained in Paragraph 98 of the Amended Complaint on the grounds that Plaintiff never made any such complaints.

99. Ms. Powell was extremely upset and distressed by the rampant use of n-word and other racial slurs by Allied employees and by the failure by management to respond or investigate.

**ANSWER:** Defendants deny the allegations contained in Paragraph 99 of the Amended Complaint.

100. In addition, in or around 2013, right after Ms. Powell was promoted to operations assistant, McNamara stormed into the area where Ms. Powell was seated and started screaming at her about filing something. McNamara threw paper in Ms. Powell's face. When Ms. Powell asked McNamara to stop screaming at her, he muttered that she was a "bitch."

**ANSWER:** Defendants deny the allegations contained in Paragraph 100 of the Amended Complaint.

101. Ms. Powell then told McNamara that she was going to write a complaint about his harassment, and McNamara told Ms. Powell that "your kind of people don't understand" before walking out of Ms. Powell's space and slammed the door behind him.

**ANSWER:** Defendants deny the allegations contained in Paragraph 101 of the Amended Complaint.

102. Ms. Powell reported McNamara's harassment of her to human resources. She wrote a written complaint and gave it to Eve Monroe, who worked in the human resources department

at the time.  She also gave copies to Feeney, Diaz, and Timberlake.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 102 of the Amended Complaint.

103.   On information and belief, there was no investigation of the incident and no action was taken in response to Ms. Powell's complaint.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 103 of the Amended Complaint on the grounds that Plaintiff never made any such complaints.

104.   When Feeney saw Ms. Powell's complaint about McNamara, he told Ms. Powell: "You know how Kevin is.  Next time he does it, kick him in the balls."

**ANSWER:**   Defendants deny the allegations contained in Paragraph 104 of the Amended Complaint.

105.   On another occasion, when Ms. Powell was promoted to supervisor in 2014, she overheard McNamara tell others that Ms. Powell is "disgusting" and that Allied was "digging at the bottom of the barrel" by promoting Ms. Powell.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 105 of the Amended Complaint.

106.   In addition to experiencing racial epithets and discriminatory comments, black Allied employees, including Ms. Powell, were given worse assignments and shifts, and fewer responsibilities, than white employees.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 106 of the Amended Complaint.

107.   Black employees were penalized more harshly than white employees for the same mistakes, and they were required to do extra work that white employees were not asked to do, including writing extra reports, sending extra emails, and filling out extra paperwork.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 107 of the Amended Complaint.

108.   Black employees were berated and harassed with greater frequency than white employees, and there was a sense among black employees that they had less job security than white

employees and could be fired at any time.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 108 of the Amended

Complaint.

109.  The culture of racial discrimination and harassment went all the way to the top. When Ms. Powell first met Tarantola in November 2015 after returning from leave for U.S. Customs training, he was visibly shocked to learn that Ms. Powell—a well-regarded supervisor— was black. He said to her: "You're LaDonna Powell? Your name sounds Italian."

**ANSWER:**  Defendants deny the allegations contained in Paragraph 109 of the Amended

Complaint.

110.  In or around January or February of 2016, Tarantola asked Ms. Powell how long she planned to continue to work with both Allied and U.S. Customs. Ms. Powell responded that she planned to "for as long as I can." Tarantola then said: "I guess since you are Jamaican you are nice to the security guards who are West Indian." When Ms. Powell responded that she is nice to everyone, Tarantola said: "I don't know whose side you are on."

**ANSWER:**  Defendants deny the allegations contained in Paragraph 110 of the Amended

Complaint.

111.  It was extremely stressful and emotionally distressing for Ms. Powell, a black woman, to work in an environment where black employees were called the n-word and were regularly treated worse than white employees.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 111 of the Amended Complaint.

**Ms. Powell is Subjected to Abusive Work Conditions
and Denied Overtime Pay**

112.  During her four years of employment with Allied, Ms. Powell was illegally deprived of overtime pay and was subjected to abusive work conditions.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 112 of the Amended

Complaint.

113.  Wage and hour violations were widespread at Allied, and they affected numerous employees from security guards to supervisors. *See generally Douglas v. Allied Universal Security Services, et al.*, No 17 Civ. 06093 (E.D.N.Y.).

**ANSWER:** Defendants deny the allegations contained in Paragraph 113 of the Amended Complaint.

114. Throughout her tenure at Allied, Ms. Powell was always paid hourly and was never salaried.

**ANSWER:** In response to Paragraph 114 of the Amended Complaint, Defendants admit that Plaintiff was paid on an hourly basis. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 114 of the Amended Complaint.

115. Throughout her tenure at Allied, Ms. Powell was required to sign in and sign out for each shift using a daily attendance log; however, she was not permitted to enter her actual start and end time. Instead, her start and end times were pre-printed on the sheet and could not be altered.

**ANSWER:** Defendants deny the allegations contained in Paragraph 115 of the Amended Complaint.

116. Although shifts were supposed to be eight hours, Ms. Powell was forced to work for many hours beyond her designated shift. But because she was never allowed to report her extra hours, she was not compensated for her additional time.

**ANSWER:** Defendants deny the allegations contained in Paragraph 116 of the Amended Complaint.

117. Ms. Powell frequently tried to write in her extra time and seek compensation for it, but she was told by Timberlake and other Supervisor Defendants that her actions were not permitted.

**ANSWER:** Defendants deny the allegations contained in Paragraph 117 of the Amended Complaint.

118. On average, throughout her employment at Allied, Ms. Powell worked an additional three hours per day over her assigned eight-hour shift and she was never compensated for any of this time.

**ANSWER:** Defendants deny the allegations contained in Paragraph 118 of the Amended Complaint.

119.    Throughout her time at Allied, Ms. Powell was required to report for work thirty minutes before her shift began for a "roll call" or attendance drill. She was not compensated for this time either.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 119 of the Amended Complaint.

*Ms. Powell Was Denied Overtime and*
*Breaks as a Security Officer*

120.    As a security officer from 2012 to September 2013, Ms. Powell was forced to work long shifts outside and was not given any breaks to eat or use the bathroom. She was never paid overtime or compensated in any way for the extra hours of work.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 120 of the Amended Complaint.

121.    Although Ms. Powell was supposed to receive one fifty-minute unpaid lunch break per shift as a security officer, she was denied her lunch break at least once per week because no one came to relieve her and she was not permitted to eat or drink while at her post.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 121 of the Amended Complaint.

122.    Even when Ms. Powell was relieved for lunch, it took ten to twenty minutes to drive to the meal area and the same amount of time to return, leaving little time to take an actual lunch break.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 122 of the Amended Complaint.

123.    In addition, Ms. Powell was frequently not given bathroom breaks when she worked as a security officer. When she asked to use the bathroom during a shift as a security officer, she was regularly told to urinate in a cup, which she was forced to do on numerous occasions.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 123 of the Amended Complaint.

124.    Ms. Powell would often work 8 to 12 hours as a security officer without receiving a single break.

**ANSWER:** Defendants deny the allegations contained in Paragraph 124 of the Amended Complaint.

125. Ms. Powell repeatedly complained about not receiving lunch or bathroom breaks as a security officer to Timberlake and other Supervisor Defendants.

**ANSWER:** Defendants deny the allegations contained in Paragraph 125 of the Amended Complaint.

126. In response, Ms. Powell was occasionally told that she would be compensated for an additional 30 minutes of time, but she did not receive any such compensation.

**ANSWER:** Defendants deny the allegations contained in Paragraph 126 of the Amended Complaint.

*Ms. Powell Was Denied Overtime and Breaks*
*as an Operations Assistant and Office Specialist*

127. As an operations assistant and office specialist from September 2013 through June 2014, Ms. Powell continued to be denied overtime and breaks.

**ANSWER:** Defendants deny the allegations contained in Paragraph 127 of the Amended Complaint.

128. Ms. Powell was not permitted to leave her desk for lunch and she was required to answer phones at all times during her shifts, even when she was supposed to be on a lunch break.

**ANSWER:** Defendants deny the allegations contained in Paragraph 128 of the Amended Complaint.

129. Even on the rare occasion that Ms. Powell tried to eat at her desk, she was unable to take an actual lunch break because she was required to answer phones and requests from her supervisors.

**ANSWER:** Defendants deny the allegations contained in Paragraph 129 of the Amended Complaint.

130. Ms. Powell was not paid for her lunch breaks when she served as an operations assistant and office specialist, even though she regularly worked through them.

**ANSWER:** Defendants deny the allegations contained in Paragraph 130 of the Amended Complaint.

131. Ms. Powell regularly complained to the Supervisor Defendants, including Timberlake, about her denial of breaks and overtime as an operations assistant and office specialist.

**ANSWER:** Defendants deny the allegations contained in Paragraph 131 of the Amended Complaint.

*Ms. Powell Was Denied Overtime and*
*Breaks as a Supervisor*

132. Ms. Powell continued to be subjected to Allied's illegal wage and hour practices as a supervisor from June 2014 to May 2016.

**ANSWER:** Defendants deny the allegations contained in Paragraph 132 of the Amended Complaint.

133. During her employment as a supervisor, Ms. Powell was regularly forced to work through her unpaid lunch breaks.

**ANSWER:** Defendants deny the allegations contained in Paragraph 133 of the Amended Complaint.

134. Although Ms. Powell was supposed to receive a one-hour lunch break per shift, she was unable to take her lunch break at least four days per week because she was busy driving between posts to supervise security officers.

**ANSWER:** Defendants deny the allegations contained in Paragraph 134 of the Amended Complaint.

135. Diaz once told Ms. Powell that supervisors were not permitted to eat where anyone could "see them," rendering it nearly impossible for her to take a lunch break.

**ANSWER:** Defendants deny the allegations contained in Paragraph 135 of the Amended Complaint.

136. Furthermore, as a supervisor, Ms. Powell was expected to be "on duty" and report any traffic infractions any time she was using an Allied vehicle—even if she was supposed to be

on a break.

**ANSWER:** Defendants deny the allegations contained in Paragraph 136 of the Amended Complaint.

137. On at least one occasion, Ms. Powell witnessed a vehicle accident on her way to her lunch break and was required to stop at the accident to assist, alert the proper authorities, and write a witness incident report. The process took over an hour, requiring Ms. Powell to work through her entire lunch break. Ms. Powell was never paid for this time.

**ANSWER:** Defendants deny the allegations contained in Paragraph 137 of the Amended Complaint.

138. In addition, as a supervisor, Ms. Powell was forced to attend weekly supervisor calls every Tuesday even though Tuesday was Ms. Powell's day off. The calls often lasted for three to four hours. Ms. Powell was never compensated for any of the time she spent participating in supervisor's calls during her days off.

**ANSWER:** Defendants deny the allegations contained in Paragraph 138 of the Amended Complaint.

139. And, as was the case throughout her employment at Allied, Ms. Powell was regularly forced to work for hours after her supervisory shift technically ended, including to write incident reports and complete other paperwork.

**ANSWER:** Defendants deny the allegations contained in Paragraph 139 of the Amended Complaint.

140. Ms. Powell regularly complained to Timberlake that she was never paid overtime as a supervisor. In response, Timberlake told her that it was part of the job.

**ANSWER:** Defendants deny the allegations contained in Paragraph 140 of the Amended Complaint.

141. Finally, when Ms. Powell was a supervisor, she was instructed by senior managers, including Timberlake, not to give certain security guards lunch breaks because the managers did not like them.

**ANSWER:** Defendants deny the allegations contained in Paragraph 141 of the Amended Complaint.

**Allied Turned a Blind Eye to Race Discrimination, Gender Discrimination, Sexual Harassment and Assault, Including Rape Allegations**

142.    Allied was repeatedly made aware of the ongoing sexual harassment, violence against women, gender discrimination, race discrimination, and wage and hour violations, and Allied and the Supervisor Defendants did nothing to stop it.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 142 of the Amended Complaint.

143.    As described above, Ms. Powell alone made regular complaints about the discrimination she faced.   In addition to filing a formal complaint to human resources about McNamara, Ms. Powell made repeated oral complaints to the Supervisor Defendants and Port Authority about racial discrimination (including use of the n-word) and sexual harassment. She also regularly complained to the Supervisor Defendants about not receiving breaks and not being paid overtime.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 143 of the Amended Complaint.

144.    On information and belief, other female and black Allied employees were also subjected to discriminatory treatment and complained about that treatment to the Supervisor Defendants. Like Ms. Powell, these employees' complaints were ignored and they were retaliated against by, among other things, receiving worse shifts and fewer breaks and being forced to urinate in cups during shifts.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 144 of the Amended Complaint.

145.    In addition to the regular complaints by Ms. Powell and numerous others, in late June or early July 2015, a letter was placed in the locker of every Allied employee at JFK complaining about the pervasive harassment and mistreatment of employees, including sexual harassment and discrimination on the basis of race and sex.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 145 of the Amended Complaint.

146.    On information and belief, Allied investigated the complaint and fired the employee who circulated the letter, but did not discipline any other employees or supervisors, including those who were named for engaging in harassing and discriminatory conduct.

**ANSWER:** Defendants deny the allegations contained in Paragraph 146 of the Amended Complaint.

147. After the letter came out, Ms. Powell was threatened by another female supervisor, who told Ms. Powell not to have sex with certain male supervisors because that female supervisor needed the good shifts and breaks that came as perks for having sex with particular male supervisors such as Ortiz.

**ANSWER:** Defendants deny the allegations contained in Paragraph 147 of the Amended Complaint.

148. Allied also failed to respond to a credible complaint of sexual assault of a female employee by two male employees. In mid-2015, after a work event celebrating Ms. Powell's departure for U.S. Customs training, a security guard was allegedly sexually assaulted by two other Allied employees. They were driving her home, and one of the employees allegedly held her down while the other employee assaulted her without consent.

**ANSWER:** In response to Paragraph 148 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether a security guard was sexually assaulted outside of work by two other off-duty employees and, based thereon, denies that any such incident occurred. Except as expressly stated, Defendants deny the allegations contained in Paragraph 148.

149. After the assault, the security guard told Ms. Powell what happened, and Ms. Powell immediately reported the incident to Ortiz, Reid, and Diaz. All three told Ms. Powell that there was nothing that they could do to investigate the alleged sexual assault of an employee after a work-sanctioned event.

**ANSWER:** Defendants deny the allegations contained in Paragraph 149 of the Amended Complaint.

150. On the female employee's behalf, Ms. Powell requested that—at a minimum—the female employee not have to be assigned to work directly with the individuals she asserted assaulted her. This request was also ignored.

**ANSWER:** Defendants deny the allegations contained in Paragraph 150 of the Amended Complaint.

151. Defendants also specifically discouraged reporting incidents of harassment and disciplined Ms. Powell for encouraging others to come forward. Specifically, in November 2015, when Ms. Powell was conducting training sessions, many Allied employees came forward to her with complaints of race and gender discrimination. Ms. Powell told her trainees that they should take notes about the treatment that they were experiencing.

**ANSWER:** Defendants deny the allegations contained in Paragraph 151 of the Amended Complaint.

152. After one of the trainees reported Ms. Powell's advice to Allied management, Tarantola, Timberlake, and Diaz called Ms. Powell into a meeting in Timberlake's office where they told her that she was supposed to be giving only a "light training," that she should not "ruffle any feathers," and that she should not advise any employees to take notes about discriminatory treatment.

**ANSWER:** Defendants deny the allegations contained in Paragraph 152 of the Amended Complaint.

153. Not only were Defendants aware of the egregious sexual harassment taking place at Allied, they encouraged it and boasted about it. For example, Ms. Powell's supervisors bragged to her that the reason JFK removed the security towers that used to be utilized by security guards was because there was too much sexual activity taking place in them.

**ANSWER:** Defendants deny the allegations contained in Paragraph 153 of the Amended Complaint.

154. Finally, Allied was aware of a history of discrimination against women not just at JFK, but also at LaGuardia Airport and possibly at other sites. For example, in 2014, two Allied employees at LaGuardia filed a sexual harassment and gender discrimination lawsuit with allegations strikingly similar to those alleged here. *See Lloyd, et al. v. FJC Security Services, Inc., et al.*, No. 14 Civ. 5548 (E.D.N.Y. 2014).

**ANSWER:** In response to Paragraph 154 of the Amended Complaint, Defendants admit that AlliedBarton Security Services LLC was a defendant in a lawsuit filed in the Eastern District of New York, Case No. 14-cv-05548. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 154 of the Amended Complaint.

155.     On information and belief, Allied has privately settled multiple claims on behalf of women like Ms. Powell who were harassed and discriminated against by Allied and its employees.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 155 of the Amended Complaint.

156.     Since Ms. Powell publicly disclosed her allegations several weeks ago, numerous other Allied employees—particularly women—have come forward complaining of the same discriminatory treatment and harassment by Defendants.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 156 of the Amended Complaint.

**Defendants Retaliate Against Ms. Powell**

157.     In addition to the written and oral complaints described above, in or around late 2015 (after she returned from leave for U.S. Customs training), Ms. Powell began complaining regularly to supervisors at Port Authority about the mistreatment, harassment, and discrimination taking place at Allied.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 157 of the Amended Complaint.

158.     On information and belief, Port Authority supervisors told Tarantola and other Allied supervisors about Ms. Powell's complaints. In response, Tarantola told all of the supervisors that they should not communicate complaints directly to Port Authority.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 158 of the Amended Complaint.

159.   Ms. Powell's complaints about Allied and its culture of harassment and mistreatment, including on the basis of race and gender, triggered a campaign of retaliation against Ms. Powell—spearheaded by Tarantola—that ultimately ended in her termination.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 159 of the Amended Complaint.

160.   Starting in March 2016, Ms. Powell learned that her hours had been reduced and she was told that there was not enough room for her to continue to work as a supervisor, even

though she was the only supervisor who was told that she would receive fewer shifts.

**ANSWER:** Defendants deny the allegations contained in Paragraph 160 of the Amended

Complaint.

161. In response, Ms. Powell asked about returning to the position of operations assistant because there was a position open, but Tarantola told her that she had to apply for the job and she might not be qualified (even though she had *written the manual for that position* after she held it several years earlier). Ultimately, the position was given to a white woman who had less experience than Ms. Powell.

**ANSWER:** Defendants deny the allegations contained in Paragraph 161 of the Amended

Complaint.

162. Allied's efforts to push Ms. Powell out continued for months. For example, she took a coffee break once while covering for another supervisor, and was called and told never to leave the airport again—even though all other supervisors regularly took breaks. From then on, Ms. Powell specifically asked permission from Feeney before taking a coffee break.

**ANSWER:** Defendants deny the allegations contained in Paragraph 162 of the Amended

Complaint.

163. On another occasion in the spring of 2016, Ms. Powell was in a car between shifts with another supervisor, Kirk Douglas, when Tarantola approached the vehicle and tried to grab Ms. Powell and physically pull her out of the car. Tarantola screamed at Ms. Powell that she was not allowed to be in a vehicle when she was technically not on duty, even though it was a common practice among supervisors.

**ANSWER:** Defendants deny the allegations contained in Paragraph 163 of the Amended

Complaint.

164. After this incident, Ms. Powell sent a text message to Feeney, via his assistant, stating that she was afraid of Tarantola and did not want to work with him anymore. On information and belief, no action was taken in response to Ms. Powell's complaint.

**ANSWER:** Defendants deny the allegations contained in Paragraph 164 of the Amended

Complaint.

165. In May 2016, Ms. Powell was screamed at by Feeney for refusing to issue a write-up for a security guard who was handicapped for parking in the handicapped parking spot.

**ANSWER:** Defendants deny the allegations contained in Paragraph 165 of the Amended Complaint.

166.     Approximately one to two weeks before she was terminated, Ms. Powell became so fed up with Allied and its horrific work environment that she broke down crying at work. A Port Authority official saw Ms. Powell and asked her what was wrong. Ms. Powell expressed that she was very disappointed by the toxic culture, harassment, and race- and gender-based discrimination that she experienced at Allied. She specifically explained that she had tried to address these issues with her Allied supervisors, but none of them did anything in response to her complaints. Ms. Powell told the Port Authority supervisor everything that she could remember about the discrimination she experienced, including the use of the n-word and her sexual and racial harassment by the Supervisor Defendants. An Allied security guard was also present for this conversation.

**ANSWER:** Defendants deny the allegations contained in Paragraph 166 of the Amended Complaint.

167.     The Port Authority supervisor that Ms. Powell complained to during this conversation promised her that he would address her concerns with Allied management.

**ANSWER:** Defendants deny the allegations contained in Paragraph 167 of the Amended Complaint.

168.     After months of retaliation against Ms. Powell for speaking up and complaining about Allied, including to Port Authority supervisors, Ms. Powell was fired.

**ANSWER:** In response to Paragraph 168 of the Amended Complaint, Defendants admit that Plaintiff's employment was terminated in or about May 2016. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 168 of the Amended Complaint.

169.     In May 2016, Ms. Powell was called and asked to meet with management and human resources. When Ms. Powell asked what the meeting was about, she was told that it was about an investigation into Kirk Douglas, another supervisor.

**ANSWER:** In response to Paragraph 169 of the Amended Complaint, Defendants admit that Plaintiff was called and asked to meet with management and human resources on or about May 4, 2016. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 169 of the Amended Complaint.

170.    Ms. Powell went to Tarantola's office for the meeting. When she arrived, Tarantola was present, along with Timberlake and Ana Tovar (a representative from human resources).

**ANSWER:**  In response to Paragraph 170 of the Amended Complaint, Defendants admit that Plaintiff met with Thomas Tarantola, Ana Tovar, and Christopher Timberlake on or about May 4, 2016.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 170 of the Amended Complaint.

171.    Tarantola questioned Ms. Powell about where she was the previous Thursday night. When Ms. Powell explained that she was working, Tarantola responded that Ms. Powell was not in the supervisor's vehicle that she was supposed to be in.

**ANSWER:**  In response to Paragraph 171 of the Amended Complaint, Defendants admit that Tarantola questioned Plaintiff about her activities the previous Thursday night.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 171 of the Amended Complaint.

172.    Ms. Powell responded that she had taken a different vehicle because the supervisor on the prior shift (Diaz) had accidentally taken the keys to the supervisor's car home.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 172 of the Amended Complaint.

173.    Tarantola lept out of his seat, and started yelling that Ms. Powell should have let him know if she was using a different car.  Tarantola was loud and abrasive and stood in very close proximity to Ms. Powell's face. Although Ms. Powell stated that she felt uncomfortable, Tarantola continued berating her.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 173 of the Amended Complaint.

174.    Tarantola yelled at Ms. Powell that he "does not like the type of person" that she is. When Ms. Powell asked what that meant, Tarantola told Ms. Powell that she does not issue enough write-ups of the security guards and that she is too nice to them.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 174 of the Amended Complaint.

175.    Tarantola also yelled at Ms. Powell that it was "not her place" to talk to supervisors at Port Authority about conditions at Allied.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 175 of the Amended Complaint.

176.    He continued to scream at her that he does not want her to wear an Allied badge and tried to grab the badge off of her body.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 176 of the Amended Complaint.

177.    Extremely shaken, Ms. Powell then left the room to call Feeney, but was able to reach only his assistant, who told her that Feeney was on vacation.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 177 of the Amended Complaint.

178.    When she re-entered the room, Timberlake told Ms. Powell that she was going to be suspended.  When she asked why, she was not given an answer.

**ANSWER:**    In response to Paragraph 178 of the Amended Complaint, Defendants admit that Plaintiff was told that she was going to be suspended pending investigation.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 178 of the Amended Complaint.

179.    Ms. Powell asked whether she was being fired, and Timberlake only answered "we'll call you."

**ANSWER:**    Defendants deny the allegations contained in Paragraph 179 of the Amended Complaint.

180.    After she learned of her suspension, Ms. Powell left the Allied premises.

**ANSWER:**    In response to Paragraph 180 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny where Plaintiff went following the May 4, 2016 meeting and, based thereon, denies that Plaintiff left JFK airport.  Except as

expressly stated, Defendants deny the allegations contained in Paragraph 180 of the Amended Complaint.

181.    Three weeks later, Ms. Powell was asked to come to Allied for a meeting. Ms. Powell was working at U.S. Customs at the time and said that she could meet after 4 p.m. She was told that 4 p.m. was too late, and she would be called back about another meeting time. Ms. Powell was never called back.

**ANSWER:**  In response to Paragraph 181 of the Amended Complaint, Defendants admit that, on or about May 12, 2017, Plaintiff was contacted about coming to another meeting at JFK.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 181 of the Amended Complaint.

182.    Two days later, Ms. Powell logged onto Allied's online portal to get employment information to apply for a mortgage. She saw that she was no longer an employee and had been terminated.

**ANSWER:**  In response to Paragraph 182 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 182 of the Amended Complaint and, based thereon, denies the allegations contained in Paragraph 182 of the Amended Complaint.

183.    Ms. Powell was never given any performance-related reasons for her termination and she never received anything but outstanding performance reviews. Several days before Ms. Powell was terminated, Feeney commented that "if we had a hundred LaDonnas," Allied would be a much better run organization.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 183 of the Amended Complaint.

184.    On information and belief, Ms. Powell's termination was retaliation in response to her race and gender discrimination complaints to Port Authority about Allied.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 184 of the Amended Complaint.

**Ms. Powell Suffers Extraordinary Damages**
**Following Her Retaliatory Termination**

185. Ms. Powell experienced severe emotional distress as a result of Defendants' discriminatory conduct. During her employment with Allied, Ms. Powell felt extremely stressed, distressed, and embarrassed about the discrimination that she was experiencing. She dreaded coming to work, feared interacting with her supervisors, and felt sick to her stomach about continuing to work in a place where she was treated so horribly. She often left work in tears, frustrated and exasperated at the discrimination she experienced and the lack of any response by Allied or the Supervisor Defendants.

**ANSWER:** Defendants deny the allegations contained in Paragraph 185 of the Amended Complaint.

186. The severe emotional distress that Ms. Powell suffered throughout her employment was compounded as a result of her unlawful retaliatory termination.

**ANSWER:** Defendants deny the allegations contained in Paragraph 186 of the Amended Complaint.

187. Ms. Powell was extremely embarrassed and emotionally distraught after she was screamed at and terminated for no legitimate reason. She was devastated about losing income that she needed to support her family, including her mother and another family member suffering from a disability. She was worried that she would no longer be able to provide for her family members in need.

**ANSWER:** Defendants deny the allegations contained in Paragraph 187 of the Amended Complaint.

188. At the time of her termination, Ms. Powell was also seeking to buy a home for herself and several family members whom she supports. Ms. Powell was relying on her income from Port Authority to secure a mortgage, which she was almost unable to receive as a result of her unlawful termination. This too caused Ms. Powell extreme stress and worry in the aftermath of her termination.

**ANSWER:** In response to Paragraph 188 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff was seeking to buy a home and, based thereon, denies that Plaintiff was seeking to buy a home. Defendants deny the remaining allegations contained in Paragraph 188 of the Amended Complaint.

189. To this day, Ms. Powell feels embarrassed and distressed about her treatment at Allied and her unlawful termination. She also continues to feel the financial implications of her unlawful termination. Although she immediately sought more shifts with U.S. Customs, she makes approximately $20,000 less per year now than she did when she worked for both U.S. Customs and Allied.

**ANSWER:** In response to Paragraph 189, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff now makes less money than she did when she was employed by AlliedBarton Security Services LLC and, based thereon, denies that Plaintiff makes less money now than she did when she was employed by AlliedBarton Security Services LLC. Except as expressly stated, Defendants deny the allegations contained in Paragraph 189 of the Amended Complaint.

### MARSHA-NIQUE IRVING

190. In 2012, Ms. Irving began working at JFK as a security officer employed by FJC Security, Inc. ("FJC").

**ANSWER:** Defendants deny the allegations contained in Paragraph 190 of the Amended Complaint.

191. In September 2013, Allied took over the Port Authority contract at JFK and became Ms. Irving's employer.

**ANSWER:** In response to Paragraph 191 of the Amended Complaint, Defendants admit that Plaintiff Irving was hired by AlliedBarton Security Services LLC in or about August 2013. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 191 of the Amended Complaint.

192. Ms. Irving remained a security officer with Allied until she resigned in March 2017.

**ANSWER:** In response to Paragraph 192 of the Amended Complaint, Defendants admit that Plaintiff Irving voluntarily resigned her employment in or about March 2017. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 192 of the Amended Complaint.

**Ms. Irving is Subjected to Sexual Harassment,
Gender Discrimination, and Retaliation**

*Ms. Irving is Sexually Harassed By Defendant Reid and
Retaliated Against Because She Declined His Advances*

193.    In October or November of 2012, a couple of months after Ms. Irving began working for FJC, Defendant Keith Reid told Ms. Irving about "The List"—a list of women security guards whom supervisors wanted to have sex with. Reid told Ms. Irving that she and one other female security guard were the only women on The List who had not yet had sex with any supervisors.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 193 of the Amended

Complaint.

194.    In the subsequent months, Reid regularly reminded Ms. Irving about The List and propositioned her for dinner and sex. He frequently asked Ms. Irving when he could take her out to dinner and asked her, "When am I going to see you naked?"

**ANSWER:**    Defendants deny the allegations contained in Paragraph 194 of the Amended

Complaint.

195.    In early 2013, Ms. Irving was working at a security post when Reid picked Ms. Irving up in a vehicle and drove her to relieve another security officer who needed to use the restroom. While they were in the vehicle, Reid again started harassing Ms. Irving about when she would go out with him. At that point, Ms. Irving firmly told Reid that she was not interested in having a sexual or romantic relationship with him.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 195 of the Amended

Complaint.

196.    After Ms. Irving told Reid that she did not want a relationship with him, she was treated differently and unfavorably. For example, Reid began giving Ms. Irving worse shifts and security posts, and he began to ignore her requests for bathroom and lunch breaks.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 196 of the Amended

Complaint.

197.    In August 2013, Ms. Irving reported Reid's harassment and retaliation to FJC, her employer at the time. On information and belief, Defendants Reid, Diaz, and Ortiz—who worked for FJC at the time—were made aware of Ms. Irving's complaint against Reid at or around the time that she made it. On information and belief, Defendants Feeney and Timberlake became aware of the complaint at some point in 2014.

**ANSWER:** Defendants deny the allegations contained in Paragraph 197 of the Amended Complaint.

198.    Instead of investigating the complaint, the Human Resources liaison called Ms. Irving a "rat." The Human Resources liaison also informed other security guards about Ms. Irving's complaint, which resulted in Ms. Irving being teased and isolated by her peer security guards.

**ANSWER:** Defendants deny the allegations contained in Paragraph 198 of the Amended Complaint.

199.    Ms. Irving's August 2013 complaint against Reid marked the start of a campaign of retaliation that she experienced throughout the rest of her tenure at FJC and Allied. Although the retaliation worsened as Ms. Irving made additional complaints during the next several years, this first report of harassment put a target on her back.

**ANSWER:** Defendants deny the allegations contained in Paragraph 199 of the Amended Complaint.

200.    As Ms. Irving documented in a 2015 complaint filed with Allied's Human Resources Department, ever since she reported Reid in 2013, Defendant Feeney referred to her as a "troublemaker."

**ANSWER:** Defendants deny the allegations contained in Paragraph 200 of the Amended Complaint.

*Ms. Irving Is Subjected to Videos of Colleagues and Supervisors Having Oral Sex*

201.    During Ms. Irving's tenure at Allied, two of the Supervisor Defendants showed Ms. Irving graphic videos depicting sex acts between themselves and female security guards, and they harassed Ms. Irving about those videos.

**ANSWER:** Defendants deny the allegations contained in Paragraph 201 of the Amended Complaint.

202.    In or around early 2013, Ms. Irving and Reid were together in the Allied break room when Reid showed Ms. Irving a video of him receiving oral sex from a female security guard that Ms. Irving knew and recognized.

**ANSWER:** Defendants deny the allegations contained in Paragraph 202 of the Amended Complaint.

203.    Several months later, in or around the summer of 2013, Ms. Irving and Reid were in an Allied vehicle when Reid showed Ms. Irving another video of him receiving oral sex from a different female security guard that Ms. Irving knew and recognized.

**ANSWER:** Defendants deny the allegations contained in Paragraph 203 of the Amended Complaint.

204.    On both of these occasions, Reid bragged to Ms. Irving about his sexual relationships with female security guards. Ms. Irving felt extremely embarrassed and uncomfortable during each of these instances, especially given Reid's ongoing sexual harassment of her. Ms. Irving felt pressure to give in to Reid's harassment and have sex with him in order to fit in at Allied and gain favor with her supervisor.

**ANSWER:** Defendants deny the allegations contained in Paragraph 204 of the Amended Complaint.

205.    In early January 2015, Reid and Ms. Irving were again in the breakroom when Reid showed Ms. Irving a third video of him receiving oral sex. Ms. Irving did not recognize the woman in the video, but she recognized that the woman was wearing an FJC uniform.

**ANSWER:** Defendants deny the allegations contained in Paragraph 205 of the Amended Complaint.

206.    In response to seeing the video, Ms. Irving asked Reid, "Why are you showing me this?" Reid responded, "It's just head" and asked Ms. Irving "When are you going to give it to me?" Ms. Irving did not respond and became extremely distressed and uncomfortable. Reid then proceeded to berate Ms. Irving, telling her, "You think you're better than people" because she refused to engage in sex acts with her supervisors.

**ANSWER:** Defendants deny the allegations contained in Paragraph 206 of the Amended Complaint.

207.    Also in early January 2015, about a week after Reid showed her the above-mentioned video, Defendant Ortiz showed Ms. Irving a video on his phone of him receiving oral sex from a female security guard that Ms. Irving knew and recognized. Ortiz and Ms. Irving were in the Allied break room during this occurrence.

**ANSWER:** Defendants deny the allegations contained in Paragraph 207 of the Amended Complaint.

208. When Ms. Irving started walking away, and Ortiz asked her "when are you going to do it?" (referring to oral sex). Ms. Irving told him that she was not interested. As she was walking away, Ortiz yelled after Ms. Irving that she was going to "end up like" another female security guard who had recently been fired after she resisted her supervisors' advances. The female security guard who Ortiz referred to has since reached a confidential settlement with Allied.

**ANSWER:** In response to Paragraph 208 of the Amended Complaint, Defendants state that they are without sufficient information or belief to identify the female employee who allegedly entered into a confidential settlement agreement and, based thereon, denies that this female employee entered into a confidential settlement agreement. Except as expressly stated, Defendants deny the allegations contained in Paragraph 208 of the Amended Complaint.

209. A couple of months later, in March 2015, Ms. Irving was working a shift when Ortiz approached her and told her that she was going to be written up because she forgot to remove one of her earrings. In response, Ms. Irving noted to Ortiz that another female security guard with whom Ortiz was just speaking was wearing two earrings. Ortiz told Ms. Irving that he did not have a problem with that security guard, but he had a problem with Ms. Irving.

**ANSWER:** Defendants deny the allegations contained in Paragraph 209 of the Amended Complaint.

210. Ortiz's willingness to berate Ms. Irving—but not others—over minor infractions is an example of the Supervisor Defendants' retaliation against Ms. Irving for refusing to acquiesce to their sexual advances.

**ANSWER:** Defendants deny the allegations contained in Paragraph 210 of the Amended Complaint.

211. Also, in or around 2015, a male Allied "Fence Lead"—a position at Allied that is in between a security guard and a supervisor—showed Ms. Irving a video on his phone that was recorded from Allied's closed-circuit television system. The video depicted two Allied security guards who were kissing while on duty at a post. Again, Ms. Irving felt embarrassed and uncomfortable with the sexualized workplace culture at Allied.

**ANSWER:** Defendants deny the allegations contained in Paragraph 211 of the Amended Complaint.

*Defendant Timberlake Comments on Ms. Irving's Breasts*

212.    In or around fall of 2016, Defendant Timberlake approached Ms. Irving and told her that she had "nice boobs." Timberlake told Ms. Irving that he had observed her breasts via Allied security cameras while she was in a vehicle and fixing buttons on her shirt.

**ANSWER:** Defendants deny the allegations contained in Paragraph 212 of the Amended Complaint.

213.    Ms. Irving felt extremely embarrassed and uncomfortable that Timberlake had been watching her in this manner. She also felt angry and distressed that Timberlake had commented to her about her body and her breasts.

**ANSWER:** Defendants deny the allegations contained in Paragraph 213 of the Amended Complaint.

*Ms. Irving Observes Supervisors Engaging in Inappropriate Behavior at Allied*

214.    In or around the summer of 2015, Ms. Irving observed Defendant Reid kissing a female security guard inside an Allied vehicle. It was in the evening, and Ms. Irving was standing in the yard outside of Allied's offices. Reid and the female security guard saw that Ms. Irving was present and subsequently stopped kissing.

**ANSWER:** Defendants deny the allegations contained in Paragraph 214 of the Amended Complaint.

215.    Similarly, in or around 2014, Ms. Irving observed Defendant Ortiz with a female security guard. Ortiz and the female security guard were at or near the Fuel Farm post, and Ortiz was feeding the female security guard with his mouth.

**ANSWER:** Defendants deny the allegations contained in Paragraph 215 of the Amended Complaint.

216.    Ms. Irving felt extremely uncomfortable about this incident, and she complained to Allied's Human Resources department about it. Specifically, in a written complaint dated January 23, 2015, Ms. Irving wrote that "[s]ince I saw [Ortiz] and another ASA in a very ugly inappropriate position I felt like he has been challenging me." On information and belief, no action was taken

in response to Ms. Irving's complaint. The female security guard whom Ms. Irving observed being fed by Ortiz was later promoted.

**ANSWER:** In response to Paragraph 216, Defendants admit that Plaintiff Irving filed a written complaint dated January 23, 2015. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 216 of the Amended Complaint.

*Ms. Irving Is Harassed and Retaliated Against by Defendant Diaz*

217.     In December 2016, Defendant Diaz sent Ms. Irving a "friend request" on Facebook. Ms. Irving did not respond to Diaz's request.

**ANSWER:** In response to Paragraph 217 of the Amended Complaint, Defendants admit that Defendant Diaz sent Plaintiff Irving a Facebook "friend request" in or about December 2016. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 217 of the Amended Complaint.

218.     Several weeks after Diaz sent the request and Ms. Irving did not respond, Diaz set off a false alarm at a security post that required Ms. Irving to respond. Ms. Irving, not knowing that the alarm was false, immediately showed up at the site and found Diaz there waiting for her.

**ANSWER:** Defendants deny the allegations contained in Paragraph 218 of the Amended Complaint.

219.     Ms. Irving, sensing that Diaz was upset at her, told him that she preferred not to be Facebook friends with her colleagues. In response, Diaz became extremely defensive, and told Ms. Irving that it was "not like he wanted something from her."

**ANSWER:** Defendants deny the allegations contained in Paragraph 219 of the Amended Complaint.

220.     Uncomfortable, Ms. Irving proceeded to walk away from Diaz. As she was leaving, Diaz hissed at Ms. Irving through his teeth.

**ANSWER:** Defendants deny the allegations contained in Paragraph 220 of the Amended Complaint.

221.     Given Ms. Irving's history of sexual harassment at Allied, her knowledge of the sexualized environment at Allied, and the history of inappropriate sexual relationships between male supervisors and female security guards, Ms. Irving believed in good faith that Diaz's conduct was illegal sexual harassment. Ms. Irving had heard that Diaz had been involved in a sexual relationship with another female security guard, and she knew that Diaz was friends with that guard on Facebook. She was worried that Diaz would try to pursue her sexually as well.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 221 of the Amended Complaint.

222.     As she wrote in a later complaint to Human Resources, she perceived Diaz's actions as illegal sexual harassment and gender discrimination because "I think making a work environment uncomfortable for a subordinate due to a personal reason can be considered sexual harassment." In the same complaint, she added that Diaz's actions caused her to experience "a hostile work environment."

**ANSWER**:  In response to Paragraph 222 of the Amended Complaint, Defendants admit that Plaintiff Irving filed a written complaint on or about February 2, 2017.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 222 of the Amended Complaint.

223.     Immediately after this incident, Ms. Irving ran into another Fence Lead and told him about Diaz's behavior and his hissing at her. The Fence Lead laughed off Ms. Irving's complaint.

**ANSWER:**  In response to Paragraph 223 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff Irving had a conversation about Defendant Diaz with a Fence Lead and, based thereon, denies that Plaintiff Irving had a conversation about Defendant Diaz with a Fence Lead.  Except as expressly stated, Defendants deny the allegations contained in Paragraph 223 of the Amended Complaint.

224.     Just two weeks later, Diaz issued Ms. Irving a write-up for leaving without signing out at the end of her shift, even though her male partner also failed to sign out and did not receive a write-up. As Ms. Irving explained to her supervisors, the reason she did not sign out is that she was experiencing severe pain due to a prior car accident and needed to quickly access her medication, which was located in her car. There was no legitimate reason why Ms. Irving was written up for this incident but her male colleague was not.

**ANSWER:** In response to Paragraph 224 of the Amended Complaint, Defendants admit that

Plaintiff Irving received a Disciplinary/Counseling Statement on or about January 17, 2017 for

failing to sign out at the end of her shift. Except as expressly admitted, Defendants deny the

allegations contained in Paragraph 224 of the Amended Complaint.

225.     Following this write-up, Ms. Irving made an oral complaint to Human Resources
and she mentioned that she believed that Diaz was retaliating against because she rejected his
Facebook friend request. On information and belief, the Human Resources liaison did not take any
action in response to Ms. Irving's complaint.

**ANSWER:** In response to Paragraph 225 of the Amended Complaint, Defendants admit that

Plaintiff Irving made a complaint to Human Resources Manager Ana Tovar during which Plaintiff

Irving alleged that she believed that Defendant Diaz was retaliating against her because Plaintiff

Irving rejected Defendant Diaz's Facebook friend request. Except as expressly admitted,

Defendants deny the allegations contained in Paragraph 225 of the Amended Complaint.

226.     At or around the same time, in or around January 2017, Defendant Diaz began
regularly assigning Ms. Irving to a security post at the AirTrain—which was considered an
undesirable post because it was geographically far from the rest of the posts and required standing
in place for the entire shift.

**ANSWER:** Defendants deny the allegations contained in Paragraph 226 of the Amended

Complaint.

227.     Within weeks of assigning Ms. Irving to the AirTrain, Defendant Diaz again
issued Ms. Irving another unjustified write-up—this time for allegedly not carrying her radio, even
though several witnesses corroborated that she had been on break in the bathroom and given her
radio to the security guard who relieved her.

**ANSWER:** In response to Paragraph 227 of the Amended Complaint, Defendants admit that

Plaintiff Irving was issued a Disciplinary/Counseling Statement in or about February 2017 for not

carrying a radio. Except as expressly admitted, Defendants deny the allegations contained in

Paragraph 227 of the Amended Complaint.

228. Ms. Irving contested the write-up, but Defendant Tarantola told her that she had to sign and accept it, otherwise she would be fired.

**ANSWER:** Defendants deny the allegations contained in Paragraph 228 of the Amended Complaint.

229. Diaz and Tarantola informed Ms. Irving that if she received any additional write-ups, she would be terminated.

**ANSWER:** Defendants deny the allegations contained in Paragraph 229 of the Amended Complaint.

230. Ms. Irving reasonably believed that Defendants' actions were retaliation for her oral complaint to Human Resources about what she perceived to be sexual harassment by Diaz.

**ANSWER:** Defendants deny the allegations contained in Paragraph 230 of the Amended Complaint.

231. At this point, in February 2017, Ms. Irving filed a written complaint with Human Resources regarding Diaz's Facebook request and the ensuing retaliation that she was experiencing. As noted above, she reported that she was experiencing "a hostile work environment" and that "I think making a work environment uncomfortable for a subordinate due to a personal reason can be considered sexual harassment."

**ANSWER:** In response to Paragraph 231 of the Amended Complaint, Defendants admit that Plaintiff Irving filed a written complaint with Human Resources on or about February 2, 2017. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 231 of the Amended Complaint.

232. As demonstrated by her written complaint to Human Resources, Ms. Irving believed that she was reporting illegal sexual harassment and retaliation by her supervisor, Diaz.

**ANSWER:** Defendants deny the allegations contained in Paragraph 232 of the Amended Complaint.

233. Approximately one week following the submission of this complaint, the Human Resources liaison called Ms. Irving to her office and explained that there was no rule against sending a friendship request on Facebook. Ms. Irving responded that she felt like she was being retaliated against, and that this was not the first time she had experienced retaliation by a

supervisor.

**ANSWER:**  In response to Paragraph 233 of the Amended Complaint, Defendants admit that, at some point following Plaintiff Irving's complaint regarding Defendant Diaz, Human Resources Manager Ana Tovar requested that Plaintiff Irving come to her office.  During that meeting, Tovar explained to Plaintiff Irving that there was no rule against one Company employee sending a Facebook friend request to another Company employee.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 233 of the Amended Complaint.

234.     Shortly after Ms. Irving's conversation with the Human Resources liaison in March 2017, she resigned.  Ms. Irving understood that Diaz was determined to have her fired, and she felt that she could no longer remain employed at Allied. She believed that Defendants would continue to retaliate against her and that they would ultimately have her fired regardless of her job performance.

**ANSWER:**  In response to Paragraph 234 of the Amended Complaint, Defendants admit that Plaintiff Irving voluntarily resigned her employment on or about March 13, 2017.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 234 of the Amended Complaint.

**Ms. Irving is Discriminated Against and Subjected
to Harassment on the Basis of Her Race**

235.     Ms. Irving was discriminated against and berated by white male supervisors, particularly Defendant Feeney, because of her race.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 235 of the Amended Complaint.

236.     For example, Ms. Irving repeatedly heard Feeney refer to "dumb black people" and he would frequently talk down to black employees. On one occasion in September 2013, Mr. Feeney was speaking rudely to Ms. Irving and he referred to her using the n-word. Ms. Irving asked Feeney to change his tone and, in response, Feeney told Ms. Irving, "I'll talk to you how I want." Ms. Irving then asked, "would you talk to me like that if I was white?" and Feeney screamed at her to "get out" of his sight.

**ANSWER:** Defendants deny the allegations contained in Paragraph 236 of the Amended Complaint.

237.    The next night, one of Ms. Irving's supervisors approached Ms. Irving and told her that if she wanted to keep her job, she had to apologize to Feeney. Ms. Irving reluctantly agreed.

**ANSWER:** Defendants deny the allegations contained in Paragraph 237 of the Amended Complaint.

238.    On another occasion, Ms. Irving mentioned to Feeney that she was considering going back to school for nursing. Feeney responded: "Who would want you to be their nurse?" Ms. Irving was extremely hurt and distressed by this comment, and she mentioned it in her January 23, 2015 written complaint to Human Resources.

**ANSWER:** Defendants deny the allegations contained in Paragraph 238 of the Amended Complaint.

239.    Ms. Irving also heard Feeney and Defendant McNamara use the n-word in reference to other security guards in or around 2013 and early 2014.

**ANSWER:** Defendants deny the allegations contained in Paragraph 239 of the Amended Complaint.

**Ms. Irving Is Subjected to Abusive Work Conditions**

240.    During her four years of employment with Allied, Ms. Irving was illegally deprived of overtime pay and was subjected to abusive work conditions, including as retaliation for refusing to engage in sex acts with the Supervisor Defendants, including Reid and Diaz.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 240 of the Amended Complaint.

241.    In or around 2014, Ms. Irving was assigned to a security post referred to as "Post Gulf." There were no bathrooms at the post but Ms. Irving needed to use the restroom, so she called and requested relief so that she could take a bathroom break at around 11:00 a.m. Allied did not send anyone to relieve Ms. Irving until around 3:30 p.m., and she was forced to urinate on herself.

**ANSWER:** In response to Paragraph 241 of the Amended Complaint, Defendants admit that, on at least one occasion in 2014, Plaintiff Irving was assigned to Post Golf. Except as expressly

admitted, Defendants deny the allegations contained in Paragraph 241 of the Amended Complaint.

242.     Defendant Ortiz was the supervisor assigned to Ms. Irving's shift on the day when she urinated on herself.  On information and belief, Ortiz left work that day prior to 3:30 p.m. and without sending anyone to relieve Ms. Irving. The subsequent supervisor who took over for Ortiz learned of the request and sent someone to relieve her, but it was too late.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 242 of the Amended Complaint.

243.     Because she had experienced ongoing retaliation since her complaint against Reid in August 2013 and subsequent complaints since, Ms. Irving reasonably believed that Ortiz's decision not to relieve her was an act of retaliation.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 243 of the Amended Complaint.

244.     On another occasion in or around 2014, Ms. Irving again requested relief to use the restroom and, again, Allied sent no one to relieve her. Ms. Irving was forced to hold her urine for several hours and was later diagnosed with a urinary tract infection as result of not being able to use the bathroom. She was prescribed medication for the infection.

**ANSWER:**  In response to Paragraph 244 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff Irving was diagnosed with a urinary tract infection and prescribed medication for the infection and, based thereon, denies that Plaintiff Irving was diagnosed with a urinary tract infection and prescribed medication for same.  Except as expressly stated, Defendants deny the allegations contained in Paragraph 244 of the Amended Complaint.

245.     On at least one other occasion in or around 2014, Ms. Irving requested relief because she had her menstrual period and, again, Allied sent no one to relieve her. Ms. Irving bled through to her uniform and soiled it.

**ANSWER:**  In response to Paragraph 245 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff Irving bled through her uniform and soiled it at some point in 2014 and, based thereon, denies that Plaintiff

Irving bled through her uniform and soiled it at some point in 2014. Except as expressly stated, Defendants deny the allegations contained in Paragraph 245 of the Amended Complaint.

246. After Ms. Irving urinated on herself in 2014, multiple Allied employees, including the Supervisor Defendants, made fun of her. They asked her how a grown woman could pee on herself. As Ms. Irving documented in a January 23, 2015 complaint that she filed with Allied's Human Resources department:

> Everyone is aware that I peed on myself a few months ago which I also documented and gave to HR manager and I feel like I have to relive that embarrassment almost every day. I was questioned about my bathroom problem with three males present and I am trying to not say anything because this was spoken about on many occasions and documented. I had to go to the doctor because I held my pee for over an hour and I caught a UTI, was on my period and messed up my clothes on more than one occasion and had to go home which HR eve is also aware of and having documentation. . . . . I cried all the way to classes couldn't concentrate because the fact that a grown woman as myself pee on myself month ago and it keeps being brought up and that is very embarrassing and upsetting.

**ANSWER:** In response to Paragraph 246 of the Amended Complaint, Defendants admit that Plaintiff Irving filed a complaint dated January 23, 2015. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 246 of the Amended Complaint.

247. Ms. Irving reasonably believed that Defendants' failure to provide her with bathroom breaks—and their subsequent teasing and berating her for urinating on herself—was retaliation for her complaint against Defendant Reid for sexual harassment and her refusal to give in to his sexual advances.

**ANSWER:** Defendants deny the allegations contained in Paragraph 247 of the Amended Complaint.

**Ms. Irving Is Illegally Denied Overtime Pay**

248. Ms. Irving was also regularly denied breaks and overtime pay to which she was entitled.

**ANSWER:** Defendants deny the allegations contained in Paragraph 248 of the Amended Complaint.

249.    Each day that Ms. Irving worked, she was required to sign-in and sign-out using a daily attendance log that always stated that she worked an 8-hour shift—regardless of the time that she actually worked. Ms. Irving was not permitted to record the actual times that she started and ended work, nor was she allowed to record meal breaks or bathroom breaks.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 249 of the Amended Complaint.

250.    For example, Ms. Irving was required each day to show up twenty to thirty minutes before her shift began for an unpaid pre-shift "roll call." Ms. Irving was never compensated for the time that she was required to spend at Allied for roll call.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 250 of the Amended Complaint.

251.    And at after her shift ended at 4 p.m., Ms. Irving was still required to be at Allied for an additional 20 to 30 minutes to return to the Allied building, change out of her uniform, and sign out. She was not compensated for this time, either.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 251 of the Amended Complaint.

252.    In addition, Ms. Irving was entitled to a 50-minute lunch break every day, but she regularly—approximately once per week—did not receive that break. Other days, she received a shortened lunch break due to time spent driving to and from the lunch location. Ms. Irving was not permitted to record when she did not receive lunch breaks, or when she received shortened lunch breaks.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 252 of the Amended Complaint.

253.    During her full-time employment with Allied from September 2013 to May 2015, Allied's failure to pay Ms. Irving for time outside of her eight-hour shift constituted a failure to pay overtime. From May 2015 to March 2017, when Ms. Irving was employed part-time, Allied's failure to pay Ms. Irving for time outside of her eight-hour shift constituted failure to pay wages.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 253 of the Amended Complaint.

254.    Even when Ms. Irving tried to submit overtime or unpaid hours, she usually was not compensated for this time. When she was working full-time, Ms. Irving worked approximately

8 to 24 hours of unpaid overtime per week.

**ANSWER:** Defendants deny the allegations contained in Paragraph 254 of the Amended Complaint.

255. Defendant Timberlake once told Ms. Irving that, as long as she was working at Allied, she would never be paid overtime.

**ANSWER:** Defendants deny the allegations contained in Paragraph 255 of the Amended Complaint.

**Ms. Irving Made Numerous Complaints to Allied,
and Was Retaliated Against in Response**

256. Ms. Irving repeatedly made Allied and the Supervisor Defendants aware of the ongoing sexual harassment, gender discrimination, race discrimination, and wage and hour violations via oral and written complaints. Instead of stopping it, they simply retaliated against Ms. Irving.

**ANSWER:** In response to Paragraph 256 of the Amended Complaint, Defendants admit that Plaintiff made various oral and written complaints. The provisions of those written complaints speak for themselves. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 256 of the Amended Complaint.

257. For example, in January 2015, Ms. Irving filed a complaint with Allied's Human Resources Department in which she reported that Ortiz had been retaliating against her ever since she wrote a complaint about witnessing him feeding a female security guard with his mouth in 2014. She wrote: "It is not the 1st time I have complained and wrote on supervisor Ortiz having a problem with me and I feel like he is out to get me into trouble. Since I saw him and another ASA in a very ugly inappropriate position, I felt like he has been challenging me . . . . I have made several reports both written and oral to HR Eve Monroe and I feel like things are good for one minute then not so the next."

**ANSWER:** In response to Paragraph 257 of the Amended Complaint, Defendants admit that Plaintiff submitted a written complaint containing various dates in January 2015. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 257 of the Amended Complaint.

258.    In the same complaint, Ms. Irving added that she was experiencing retaliation due to her complaint against Reid for making sexual advances toward her. She noted that Defendants' retaliatory acts included writing her up, failing to provide her with adequate uniforms, and embarrassing her publicly for the time that she urinated on herself because Defendants would not send anyone to relieve her.

**ANSWER:**   In response to Paragraph 258 of the Amended Complaint, Defendants admit that

Plaintiff submitted a written complaint containing various dates in January 2015.  The complaint

speaks for itself.  Except as expressly admitted, Defendants deny the allegations contained in

Paragraph 258 of the Amended Complaint.

259.    In March 2015, Ms. Irving filed another complaint with Human Resources, again complaining of the continuing retaliation in response to her reporting sexual harassment by Reid. She wrote: "Every time I document an issue there is retaliation or the APM/Supervisors try to find a way to get me in trouble or try to get me fired. I know this time won't be no different. Ever since the APM Timberlake heard about the sexual harassment issue I had with [Reid] he treats me difficult."

**ANSWER:**   Defendants deny the allegations contained in Paragraph 259 of the Amended

Complaint.

260.    In her March 2015 complaint, Ms. Irving detailed how, as part of the retaliation, she was not given replacement uniforms despite that fact that she made repeated requests and her uniforms were ripped and unsuitable to be worn.  Other women security guards who had not filed complaints like Ms. Irving were provided with new uniforms.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 260 of the Amended

Complaint.

261.    Following the incident with Diaz's Facebook request, Ms. Irving filed yet another complaint with Human Resources, complaining of Diaz's retaliation. She wrote that Diaz was treating her differently since she refused the request, and that the same thing happened "a few years ago with another male supervisor who asked me out to dinner and made other passes," referring to Reid. Ms. Irving reported that Diaz wrote her up for not having her radio at the AirTrain post even though she had it with her at all times when she was on duty.

**ANSWER:**   In response to Paragraph 261 of the Amended Complaint, Defendants admit that

Plaintiff filed a written complaint dated February 2, 2017.  The complaint speaks for itself.  Except

as expressly admitted, Defendants deny the allegations contained in Paragraph 261 of the

Amended Complaint.

**Ms. Irving Has Suffered Extraordinary Damages**

262.     Ms. Irving experienced severe emotional distress as a result of Defendants' discriminatory conduct.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 262 of the Amended Complaint.

263.     Among other things, Ms. Irving was extremely traumatized and emotionally distressed as a result of Defendants' discrimination against her. She felt constant pressure to succumb to her supervisors' sexual advances, and she (rightfully) feared retaliation for her refusal to acquiesce.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 263 of the Amended Complaint.

264.     Ms. Irving lived in perpetual fear at Allied that she would be denied bathroom breaks while on a post, and that she would be forced to urinate on herself or in a cup. When she had her period, she was constantly afraid that Defendants' denial of bathroom breaks would cause her to bleed on herself.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 264 of the Amended Complaint.

265.     Ms. Irving wanted to leave Allied for years, but she was unable to do so because she needed the salary she earned from Allied to support her three children.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 265 of the Amended Complaint.

## SHEILA WALTON

266.     Ms. Walton began working as a security guard for Allied in February 2015.

**ANSWER:**   In response to Paragraph 266 of the Amended Complaint, Defendants admit that Plaintiff Walton began working for AlliedBarton Security Services in February 2015.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 266 of the Amended

Complaint.

267.     When she started her employment, she was assigned to the 8 a.m. to 4 p.m. shift. Her supervisors at the time were Defendants Reid and Ortiz.

**ANSWER:**  In response to Paragraph 267 of the Amended Complaint, Defendants admit that Plaintiff Walton was assigned regularly to work the B-Tour, which typically began at 7:30 a.m. and ended at 4:00 p.m.   Further responding to Paragraph 267 of the Amended Complaint, Defendants admit that, in February 2015, the Tour Supervisors for the B-Tour included Defendants Reid and Ortiz.   Except as expressly admitted, Defendants deny the allegations contained in Paragraph 267 of the Amended Complaint.

**Ms. Walton Is Sexually Harassed by Reid and Ortiz**

268.     In or around June 2015, Reid and Ortiz began sexually harassing Ms. Walton.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 268 of the Amended Complaint.

269.     For example, beginning in June 2015 and continuing through the summer of 2015, Reid regularly began making crude comments to Ms. Walton about oral sex while he was supervising her on her posts. He regularly told her that "you gotta make sure you know how to suck a dick" and would talk to her about how to "do it right." He asked her if she "sucked dick sloppy." Defendant Reid would make these comments on a weekly, if not daily, basis.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 269 of the Amended Complaint.

270.     Reid's perverse comments were not just limited to oral sex. He would also talk to Ms. Walton about his sex life with his wife. For example, he told her about how he would "eat [his] wife's ass" and how grateful she was for it.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 270 of the Amended Complaint.

271.     Also beginning in the summer of 2015, Ortiz repeatedly approached Ms. Walton and asked her if she wanted to "hang out" after work. Ortiz would ask Ms. Walton about her relationship status and her private life. Ms. Walton was aware at the time that Ortiz had

sexual relationships with other women security guards, and she was anxious that he was trying to become sexually involved with her too.

**ANSWER:** Defendants deny the allegations contained in Paragraph 271 of the Amended Complaint.

272.     Later, when Ms. Walton became pregnant, Ortiz told Ms. Walton that she should have gotten pregnant by him and she should have "given [him] some."

**ANSWER:** Defendants deny the allegations contained in Paragraph 272 of the Amended Complaint.

273.     Ms. Walton always refused Ortiz's requests to hang out, and she tried to ignore Reid and not engage him when he started talking about sex. Yet she felt extremely embarrassed and distressed about their harassment of her. She was afraid to speak about it because she did not want to jeopardize her job.

**ANSWER:** Defendants deny the allegations contained in Paragraph 273 of the Amended Complaint.

274.     In part, Ms. Walton's fear of speaking up was driven by her knowledge of the culture at Allied. Ms. Walton knew that female security guards who rebuked the Supervisor Defendants were often retaliated against, whereas female security guards who were in sexual relationships with the Supervisor Defendants were often rewarded or promoted.

**ANSWER:** Defendants deny the allegations contained in Paragraph 274 of the Amended Complaint.

275.     For example, Ms. Walton observed first-hand what appeared to be an intimate relationship between Defendant Ortiz and a female security guard who was promoted to supervisor. Ms. Walton once witnessed that female security guard touch Ortiz's buttocks during work hours.

**ANSWER:** Defendants deny the allegations contained in Paragraph 275 of the Amended Complaint.

276.     In addition, Ms. Walton was aware that videos regularly circulated depicting sex acts between supervisors and security guards. Fellow security guards frequently mentioned these videos. And in or around March 2016, a male Allied security guard showed Ms. Walton a photo of him receiving oral sex from another one of their female co-workers. Ms. Walton felt embarrassed and disgusted about the culture of sex that pervaded Allied.

**ANSWER:** Defendants deny the allegations contained in Paragraph 276 of the Amended Complaint.

277.     Although Ms. Walton did not want to engage in sex acts with her supervisors, she feared that Defendants would treat her unfairly if she spoke up against their harassing behavior. She believed that if she did not smile and pretend to flirt with the Supervisor Defendants and laugh off their harassing jokes, she would be retaliated against.

**ANSWER:** Defendants deny the allegations contained in Paragraph 277 of the Amended Complaint.

**Ms. Walton Is Denied Pregnancy Accommodations
and Subjected to Pregnancy Discrimination**

278.     In April 2016, Ms. Walton became pregnant.

**ANSWER:** In response to Paragraph 278 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny that Plaintiff Walton became pregnant in April 2016 and, based thereon, denies that Plaintiff Walton became pregnant in April 2016.

279.     In June 2016, Ms. Walton was experiencing severe morning sickness and, on one occasion, vomited while she was at work.

**ANSWER:** In response to Paragraph 279 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 279 of the Amended Complaint and, based thereon, Defendants deny the allegations contained in Paragraph 279 of the Amended Complaint.

280.     Reid learned of Ms. Walton's vomiting via security cameras, and he reported her to Port Authority for being intoxicated at work. Ms. Walton was not intoxicated, but rather was experiencing morning sickness associated with her pregnancy.

**ANSWER:** Defendants deny the allegations contained in Paragraph 280 of the Amended Complaint.

281.    Subsequently, a representative from Port Authority came to speak with Ms. Walton about the incident. Ms. Walton explained to the representative that she had vomited due to her morning sickness, and that she had not been intoxicated at work. The Port Authority representative did not substantiate Reid's report.

**ANSWER:**  In response to Paragraph 281 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny whether a Port Authority representative came to speak with Plaintiff Walton and, based thereon, denies that a Port Authority representative spoke to Plaintiff Walton regarding this incident.  Except as expressly stated, Defendants deny the allegations contained in Paragraph 281 of the Amended Complaint.

282.    After informing the Port Authority representative of her pregnancy in June 2016, Ms. Walton provided formal written notice of her pregnancy to Allied.

**ANSWER:**  In response to Paragraph 282 of the Amended Complaint, Defendants admit that Plaintiff Walton provided a letter from a doctor dated July 7, 2016, informing the Company that she was pregnant.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 282 of the Amended Complaint.

283.    Once Reid learned that Ms. Walton had his write-up overridden and that she was pregnant, he began treating her worse than the other security guards.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 283 of the Amended Complaint.

284.    After Ms. Walton revealed she was pregnant, Reid transferred her so that she worked primarily at Post Hotel, a very busy post that was considered undesirable by security guards.  Because it was stressful and physically difficult for Ms. Walton to work primarily at Post Hotel due to her pregnancy, Ms. Walton asked Reid if she could be assigned to a different post due to the stress, and even produced a letter from her doctor stating that she required a light- duty post where she was not required to move around as much. Reid refused to re-assign her.

**ANSWER:**  In response to Paragraph 284 of the Amended Complaint, Defendants admit that Plaintiff provided a Medical Inquiry Form In Response To An Accommodation Request dated July 7, 2016 that states as follows: "Patient cannot be lifting heavy objects, no bending, no standing for

a long period of time." The Form also states: "Patient needs to be near a bathroom due to her condition." Except as expressly admitted, Defendants deny the allegations contained in Paragraph 284 of the Amended Complaint.

285.   Reid and the other Supervisor Defendants also refused to provide Ms. Walton with a uniform that would fit her during her pregnancy, despite her repeated requests for larger- size clothes. She was forced to wear her pants open and unbuttoned because she could not close them due to her pregnancy.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 285 of the Amended Complaint.

286.   In addition, Ms. Walton continued to experience severe morning sickness late into her pregnancy, and Reid would mark her late for 7:30 a.m. roll call, even if she was present but merely outside or in the bathroom experiencing morning sickness. He did this on several occasions—even though Ms. Walton's shift did not technically start, and she did not receive pay, until 8:00 a.m.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 286 of the Amended Complaint.

287.   In or around July or early August 2016, Ms. Walton reported Reid's treatment of her to Defendants Timberlake and Tarantola. She told them that Reid had been harassing her ever since he learned of her pregnancy, and that he had been assigning her to Post Hotel and other busy posts.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 287 of the Amended Complaint.

288.   At the same time, Ms. Walton also told Timberlake and Tarantola that Reid was inappropriate and always talked to her about "sucking dick." Timberlake and Tarantola told Ms. Walton *not* to report the issue to Human Resources, and Tarantola said that he would "talk to" Reid about it.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 288 of the Amended Complaint.

289.     Yet after, Ms. Walton complained about Reid to Timberlake and Tarantola, Reid's treatment of her only worsened. For example, he told people not to talk to Ms. Walton, and he continued to demean her.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 289 of the Amended Complaint.

290.     At some point in the late summer, Ms. Walton produced a doctor's note saying that she required a lighter-duty post due to her pregnancy. Reid still refused to move her in response to the note, but Ms. Walton spoke to other supervisors and was ultimately assigned to a driving shift.

**ANSWER:**   In response to Paragraph 290 of the Amended Complaint, Defendants admit that Plaintiff provided a Medical Inquiry Form In Response To An Accommodation Request dated July 7, 2016 that states as follows: "Patient cannot be lifting heavy objects, no bending, no standing for a long period of time." The Form also states: "Patient needs to be near a bathroom due to her condition." Except as expressly admitted, Defendants deny the allegations contained in Paragraph 290 of the Amended Complaint.

291.     On August 20, 2016, Reid issued Ms. Walton a write-up, stating that "ASA Sheila Walton assigned to report at 07:30 hours for roll call, missed roll call, Agent showed up approximately 0745 outside." Ms. Walton had been present all along but was outside because she was not feeling well. On information and belief, Reid was aware of this fact and marked Ms. Walton as late anyway.

**ANSWER:**   In response to Paragraph 291 of the Amended Complaint, Defendants admit that Plaintiff Walton received a Corrective Action Counseling Form regarding her missing roll call on August 20, 2016.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 291 of the Amended Complaint.

292.     Ms. Walton's shift did not begin until 8:00 a.m. and she was not compensated for work performed before 8:00 a.m. Reid wrote her up even though Allied's requirement that she be present at 7:30 a.m. violated state and federal wage and hour laws.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 292 of the Amended Complaint.

293. The next day, on August 21, 2016, Reid caused Ms. Walton to be suspended. He asked her to sign the write-up that he issued on the previous day and Ms. Walton resisted because the facts alleged in the write-up were not true. She stood up to Reid, and told him that he had been harassing her and she would not sign it.

**ANSWER:** In response to Paragraph 293 of the Amended Complaint, Defendants admit that

Walton was suspended pending investigation on or about August 21, 2016. Except as expressly

admitted, Defendants deny the allegations contained in Paragraph 293 of the Amended Complaint.

294. In retaliation, Reid then reported to senior Allied management that he overheard Ms. Walton speaking on a cell phone to someone and he believed that she was making threats about him. That never happened. Ms. Walton was speaking to a friend on her cell phone, during non-working hours, about someone else. As she explained in an incident report dated August 22, 2016, "I was using my phone outside the building, speaking to someone about [another company]. At no time did I make or direct a statement to anyone using any type of force or any threat." Regardless, Reid caused Ms. Walton to be suspended pending an investigation.

**ANSWER:** In response to Paragraph 294 of the Amended Complaint, Defendants admit that

Plaintiff Walton submitted an incident report dated August 22, 2016. Defendants further admit that

Reid believed and reported that Walton was making threats about him. Defendants further admit

that Walton was suspended pending an investigation on or about August 21, 2016. Except as

expressly admitted, Defendants deny the allegations contained in Paragraph 294 of the Amended

Complaint.

295. Ms. Walton complained to her union about her suspension, and ultimately returned to work in the fall of 2016. Over the course of her employment, she also complained to her union on two different occasions about Reid and his constant comments to her about oral sex. She ultimately told the union that she did not want to follow through on her complaints about Reid's harassment because she was afraid of being fired.

**ANSWER:** In response to Paragraph 295 of the Amended Complaint, Defendants admit that

Plaintiff Walton returned to work on or about September 1, 2016. Further responding to Paragraph

295 of the Amended Complaint, Defendants state that they are without sufficient information or

belief to either admit or deny the content of Plaintiff Walton's discussions with her union and,

based thereon, deny the remaining allegations contained in Paragraph 295 of the Amended

Complaint.  Except as expressly admitted or stated, Defendants deny the allegations contained in Paragraph 295 of the Amended Complaint.

296.	After she returned to work in the fall of 2016, Tarantola told Ms. Walton that she could no longer work with Reid due to her complaints against him. Tarantola then transferred Ms. Walton to the midnight to 7:00 a.m. tour, which is considered an undesirable shift by most security guards. She was 6 months pregnant at the time.

**ANSWER:**  In response to Paragraph 296 of the Amended Complaint, Defendants admit that, upon her return to work on or around September 1, 2016, Plaintiff Walton was assigned to the A-Tour which typically began at 11:30 p.m. and ended at 8:00 a.m.  Further responding to Paragraph 296 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff Walton was six months pregnant on September 1, 2016 and, based thereon, denies that Plaintiff Walton was six months pregnant on September 1, 2016.  Except as expressly admitted or stated, Defendants deny the allegations contained in Paragraph 296 of the Amended Complaint.

297.	After several weeks of working this shift at six months pregnant, Ms. Walton told Tarantola that it was too much for her body during her pregnancy, and that she needed to switch shifts. Tarantola told her that the only shifts available were the 4:00 p.m. to midnight shift and the midnight to 7 a.m. shift. He refused to make a reasonable accommodation for her pregnancy.

**ANSWER:**  In response to Paragraph 297 of the Amended Complaint, Defendants admit that Plaintiff Walton had a discussion with Defendant Tarantola regarding changing her work hours. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 297 of the Amended Complaint.

298.	Instead, he switched Ms. Walton's schedule such that she worked the 4:00 p.m. to midnight shift Saturdays, Sundays, and Mondays. Tuesday was technically her day off, but she had to come in at midnight on Tuesday to start the midnight to 7 a.m. shift for Wednesday and Thursday. Her schedule continued to cause a severe strain on her body during pregnancy.

**ANSWER:**  In response to Paragraph 298 of the Amended Complaint, Defendants admit that, in or around September 2016, Walton began working the C-Tour some days, which typically began

at 3:30 p.m. and ended at midnight, and the A-Tour, which typically began at 11:30 p.m. and ended at 8 a.m., on other days. Except as expressly admitted, Defendant denies the allegations contained in Paragraph 298 of the Amended Complaint.

299. At this point, in late October 2016, Ms. Walton was approximately 7 months pregnant. She was beginning to have trouble driving due to her pregnancy because she could not easily fit in the Allied vans. She also had trouble properly manipulating the Allied vehicles because she had to recline the seat far back in order to fit, which made it difficult for her to see the road. Ms. Walton informed her shift supervisors that she was having trouble driving, and she asked if she could be assigned to a post that did not require driving. She was not accommodated, and she continued to be assigned to driving posts.

**ANSWER:** In response to Paragraph 299 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff was seven months pregnant in late October 2016 and, based thereon, deny that Plaintiff was seven months pregnant in late October 2016. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 299 of the Amended Complaint.

300. On November 3, 2016, Ms. Walton was driving an Allied vehicle during her shift (after she requested to stop driving) when she encountered a curb and got a flat tire. She immediately reported the flat tire to her supervisor at the time. He told her it was fine, and that she did not need to write a report about it.

**ANSWER:** In response to Paragraph 300 of the Amended Complaint, Defendants admit that on or about November 3, 2016, Plaintiff Walton struck a curb while driving an Allied vehicle causing damage to the vehicle. Defendants further admit that Plaintiff Walton reported a flat tire to her supervisor. Except as expressly admitted, Defendants deny the allegations in Paragraph 300 of the Amended Complaint.

301. Despite her shift supervisor telling her that she did not have to take further action to report the flat tire, Ms. Walton was written up for the incident and suspended on November 6, 2016. Tarantola told her that her suspension was because she did not report running over the curb— only the flat tire itself. Ms. Walton disputed that account, and said that she reported the entire incident to her supervisor that night.

**ANSWER:** In response to Paragraph 301 of the Amended Complaint, Defendants admit that Plaintiff Walton was suspended pending investigation on or about November 6, 2016. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 301 of the Amended Complaint.

302. Approximately two weeks after the flat tire, in November 2016, Ms. Walton was terminated from Allied. She was approximately 8 months pregnant at the time.

**ANSWER:** In response to Paragraph 302 of the Amended Complaint, Defendants admit that Walton was terminated on or about November 15, 2016. Further responding to Paragraph 302 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny the allegation that she was approximately eight months pregnant in November 2016 and, based thereon, denies that Plaintiff Walton was eight months pregnant in November 2016. Except as expressly admitted or stated, Defendants deny the allegations contained in Paragraph 302 of the Amended Complaint.

**Ms. Walton Is Subjected to Abusive Work Conditions
and Illegally Denied Overtime Pay**

303. Ms. Walton was also regularly denied breaks and overtime pay to which she was entitled.

**ANSWER:** Defendants deny the allegations contained in Paragraph 303 of the Amended Complaint.

304. Each day that Ms. Walton worked, she was required to sign-in and sign-out using a daily attendance log that always stated that she worked an 8-hour shift—regardless of the time that she actually worked. Ms. Walton was not permitted to write in the actual times that she started and ended work, nor was she allowed to record meal breaks or bathroom breaks.

**ANSWER:** Defendants deny the allegations contained in Paragraph 304 of the Amended Complaint.

305. For example, Ms. Walton was required each day to show up twenty to thirty minutes before her shift began for an unpaid pre-shift "roll call." Ms. Walton was never

compensated for the time that she was required to spend at Allied for roll call. She was even written up for being late to roll call (though she in fact was present and sick) despite the fact that she was never compensated for this time.

**ANSWER:** Defendants deny the allegations contained in Paragraph 305 of the Amended Complaint.

306. After her shift ended, Ms. Walton was still required to be at Allied for an additional 20-30 minutes to return to the Allied building, change out of her uniform, and sign out. She was not compensated for this time, either.

**ANSWER:** Defendants deny the allegations contained in Paragraph 306 of the Amended Complaint.

307. In addition, Ms. Walton was entitled to a 50-minute lunch break every day, but she often received a shortened lunch break due to time spent driving to and from the lunch location, or even no break at all.

**ANSWER:** Defendants deny the allegations contained in Paragraph 307 of the Amended Complaint.

308. Allied's failure to pay Ms. Walton for time outside of her eight-hour shift constituted a failure to pay overtime.

**ANSWER:** Defendants deny the allegations contained in Paragraph 308 of the Amended Complaint.

309. In addition, on at least three occasions during her employment at Allied, Ms. Walton was not given a bathroom break when she requested one. On these occasions, Ms. Walton severely needed to use the bathroom and called for relief, but no relief was provided. As a result, Ms. Walton was forced to urinate either outside or in a cup.

**ANSWER:** Defendants deny the allegations contained in Paragraph 309 of the Amended Complaint.

**Ms. Walton Has Suffered Severe Damages**

310. Ms. Walton experienced severe emotional distress as a result of Defendants' discriminatory conduct.

**ANSWER:** Defendants deny the allegations contained in Paragraph 310 of the Amended Complaint.

311.    Among other things, Ms. Walton was extremely traumatized and emotionally distressed as a result of Defendants' discrimination against her. She felt constant pressure to succumb to her supervisors' sexual advances, and she (rightfully) feared retaliation for her refusal to acquiesce.

**ANSWER:** Defendants deny the allegations contained in Paragraph 311 of the Amended Complaint.

312.    After she became pregnant and began to experience unfair treatment by Reid and the other Defendants, Ms. Walton became extremely emotionally distressed to the point where it affected her pregnancy. Her doctor even sent a note to Allied explaining that the stress of her job was affecting her pregnancy.

**ANSWER:** Defendants deny the allegations contained in Paragraph 312 of the Amended Complaint.

313.    Ms. Walton wanted to leave Allied before she was terminated, but she was unable to do so because she needed the salary she earned from Allied, including to support the child that she was carrying at the time.

**ANSWER:** Defendants deny the allegations contained in Paragraph 313 of the Amended Complaint.

314.    After Ms. Walton was terminated from Allied, she was deprived of three months of paid maternity leave that she would have received had she continued to be employed by Allied. She was unemployed for almost nine months without a salary. Ms. Walton did not obtain employment again until September 2017, and she makes significantly less money in her current position than she made while she was employed at Allied.

**ANSWER:** In response to Paragraph 314 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Plaintiff Walton was unemployed for a period of time, whether and when she obtained employment, and how much money she earns from that employment and, based thereon, deny the allegations contained in the second and third sentences of Paragraph 314 of the Amended Complaint. Defendants deny the

remaining allegations contained in Paragraph 314 of the Amended Complaint.

## ROY FIELDS

315.    Mr. Fields began employment as a security guard with FJC in the summer of 2013. His starting salary was around $18 per hour.

**ANSWER:**  Upon information and belief, Defendants admit that Plaintiff Fields began working for FJC in May 2013.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 315 of the Amended Complaint.

316.    At that time, FJC had a contract with Port Authority to provide security services at JFK.

**ANSWER:**  Upon information and belief, Defendants admit the allegations contained in Paragraph 316 of the Amended Complaint.

317.    In mid-late 2013, Allied took over FJC's contract with Port Authority and became Mr. Fields's employer.

**ANSWER:**  In response to Paragraph 317 of the Amended Complaint, Defendants admit that Plaintiff Fields was hired by AlliedBarton Security Services LLC in or about August 2013.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 317 of the Amended Complaint.

318.    Mr. Fields was assigned to the 8:00 a.m. to 4:00 p.m. shift at JFK.  His supervisors were Defendants Ortiz, Reid, and Diaz.

**ANSWER:**  In response to Paragraph 318 of the Amended Complaint, Defendants admit that Plaintiff Fields was generally assigned to the B-Tour, which typically began at 7:30 a.m. and ended at 4:00 p.m.  Further responding to Paragraph 318 of the Amended Complaint, Defendants admit that Plaintiff Roy Fields' supervisors included Defendants Ortiz, Reid, and Diaz.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 318 of the Amended Complaint.

319.    In mid-2014, Mr. Fields was promoted to work as a "lead" two out of five days per week at the AirTrain. A lead is a position at Allied that is in between a security guard and a supervisor.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 319 of the Amended Complaint.

320.    The decision to promote Mr. Fields was made by Defendant Timberlake and was based on his strong work performance.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 320 of the Amended Complaint.

321.    During shifts that Mr. Fields worked as a lead, he made approximately $2 to $3 more per hour than when he worked as a security guard.

**ANSWER:**    In response to Paragraph 321 of the Amended Complaint, Defendants admit that Plaintiff Fields was paid more for shifts when he worked as a lead Airport Security Agent than when he worked shifts as an Airport Security Agent.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 321 of the Amended Complaint.

322.    Mr. Fields remained employed as a security guard and lead until the time of his termination.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 322 of the Amended Complaint.

323.    In January or February of 2014, Mr. Fields became friends with a certain female security guard (referred to throughout this complaint as the "Female ASA").

**ANSWER:**  In response to Paragraph 323 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny the allegations contained in Paragraph 323 and, based thereon, deny the allegations contained in Paragraph 323 of the Amended Complaint.

324.    After approximately two months, in the early spring of 2014, Mr. Fields and the Female ASA began a sexual relationship.

**ANSWER:** In response to Paragraph 324 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny the allegations contained in Paragraph 324 and, based thereon, deny the allegations contained in Paragraph 324 of the Amended Complaint.

325.     Mr. Fields learned that Defendant Ortiz was also in a sexual relationship with the Female ASA.

**ANSWER:** Defendants deny the allegations contained in Paragraph 325 of the Amended Complaint.

326.     The Female ASA tried to hide her relationship with Mr. Fields from Ortiz. For example, if Mr. Fields and the Female ASA were together and Ortiz called her, she would tell Mr. Fields to be quiet.

**ANSWER:** In response to Paragraph 326 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny the allegations contained in Paragraph 326 and, based thereon, deny the allegations contained in Paragraph 326 of the Amended Complaint.

327.     Eventually, however, Ortiz learned about the nature of the relationship between Mr. Fields and the Female ASA.

**ANSWER:** Defendants deny the allegations contained in Paragraph 327 of the Amended Complaint on the basis that the identity of the Female ASA is unknown.

328.     After learning about their relationship, in or around May or June of 2014, Ortiz began retaliating against Mr. Fields and changing his regular posts to assign him to posts where he could not see or interact with the Female ASA. Often, this resulted in Mr. Fields being assigned to less favorable posts.

**ANSWER:** Defendants deny the allegations contained in Paragraph 328 of the Amended Complaint.

329.    Ortiz would also switch Mr. Fields's schedule so that he was no longer assigned to work as a lead at the AirTrain. Instead, he would have to work as a regular security guard at a different post, which meant that he would earn a lower hourly pay.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 329 of the Amended Complaint.

330.    After months of Ortiz denying him lead opportunities and assigning him to unfavorable shifts, Mr. Fields met with Timberlake to report Ortiz's conduct.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 330 of the Amended Complaint.

331.    Mr. Fields met with Timberlake in or around January 2015 in Timberlake's office. Mr. Fields told Timberlake that Ortiz had been picking on him and changing his schedule. Timberlake dismissed Mr. Fields's complaint, telling him that it was merely about seniority (*i.e.,* guards with more seniority received the first opportunity to work as a lead). On information and belief, Mr. Fields's seniority at the time entitled him to work at a lead over other individuals that Ortiz was assigning to lead positions.

**ANSWER:** Defendants deny the allegations contained in Paragraph 331 of the Amended Complaint.

332.    In or around February or March 2015, Mr. Fields and the Female ASA ceased their sexual relationship. After their relationship ended, the Female ASA was upset with Mr. Fields, and she told him, on multiple occasions, that she was going to tell Ortiz to give him a bad schedule.

**ANSWER:**  In response to Paragraph 332 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 332 of the Amended Complaint and, based thereon, denies the allegations contained in Paragraph 332 of the Amended Complaint.

333.    Mr. Fields continued to receive unfavorable schedules and shifts even after he and the Female ASA ceased their sexual relationship. On information and belief, Reid assigned him to unfavorable posts because of sexual jealousy arising out of Mr. Fields's relationship with the Female ASA.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 333 of the Amended Complaint.

334. The Female ASA was eventually promoted to supervisor.

**ANSWER:** In response to Paragraph 334 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 334 and, based thereon, denies the allegations contained in Paragraph 334 of the Amended Complaint.

335. At the same time that Mr. Fields was being harassed by Ortiz for his relationship with the Female ASA, Mr. Fields was aware of numerous relationships between male supervisors and female security guards.

**ANSWER:** Defendants deny the allegations contained in Paragraph 335 of the Amended Complaint.

336. For example, on one occasion in or around October 2014, Mr. Fields was walking past the uniform closet when he saw Reid emerge with a female security guard. The two were adjusting their clothes and they appeared to Mr. Fields as if they had just been engaged in a sex act.

**ANSWER:** Defendants deny the allegations contained in Paragraph 336 of the Amended Complaint.

337. In or around March or early April 2015, Mr. Fields confided in another security guard about the harassing treatment that he was experiencing. That guard encouraged Mr. Fields to report the treatment to Human Resources, but Mr. Fields was reluctant because he had heard of others who experienced retaliation after making reports to Human Resources.

**ANSWER:** Defendants deny the allegations contained in Paragraph 337 of the Amended Complaint.

338. In April 2015, the security guard Mr. Fields confided in wrote a letter regarding the pervasive sexual harassment and retaliation experienced by Allied employees at JFK. The letter was printed and placed all over the locker room. It was also photographed and texted to numerous employees. Ms. Powell received a copy.

**ANSWER:** Defendants deny the allegations contained in Paragraph 338 of the Amended Complaint.

339.    In response to the letter, a Human Resources investigation was initiated.

**ANSWER:**  In response to Paragraph 339 of the Amended Complaint, Defendants admit that

Human Resources conducted an investigation into a letter that was circulated at JFK.  Except as

expressly admitted, Defendants deny the allegations contained in Paragraph 339 of the Amended

Complaint.

340.    On April 27, 2015, Mr. Fields was interviewed as part of the Human Resources
investigation into the letter. Initially, Human Resources and the Supervisor Defendants believed
that Mr. Fields had written the letter.

**ANSWER:**  Defendants admit that Plaintiff Fields was interviewed on or about April 27, 2015, as

part of the investigation into the letter.  Except as expressly admitted, Defendants deny the

allegations contained in Paragraph 340 of the Amended Complaint.

341.    Mr. Fields was interviewed by a representative from Allied's corporate Human
Resources, Nicoletta Colombo, and Eve Monroe, Allied's on-site Human Resources official at
JFK at the time.

**ANSWER:**  Defendants admit the allegations contained in Paragraph 341 of the Amended

Complaint.

342.    Mr. Fields told Human Resources that he did not know anything about the letter
but, when asked about whether he knew about the underlying circumstances of harassment and
retaliation, he replied that he did.

**ANSWER:**  In response to Paragraph 342 of the Amended Complaint, Defendants admit that

Plaintiff Fields was interviewed by Human Resources personnel on or about April 27, 2015.

Except as expressly admitted, Defendants deny the allegations contained in Paragraph 342 of the

Amended Complaint.

343.    Mr. Fields agreed to tell Human Resources about his harassment by Ortiz, but
requested that Monroe first leave the meeting, since Mr. Fields knew that individuals who reported
information to Ms. Monroe often were retaliated against. He told Colombo that his confidentiality
could not be ensured if Monroe remained.

**ANSWER:** Defendants deny the allegations contained in Paragraph 343 of the Amended Complaint.

344. Colombo and Monroe would not agree to excuse Monroe, but they agreed to let Mr. Fields call a union representative to be present with him during the interview.

**ANSWER:** In response to Paragraph 344 of the Amended Complaint, Defendants admit that a Union Shop Steward was present during the meeting with Human Resources. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 344 of the Amended Complaint.

345. Mr. Fields then proceeded to tell Colombo, Monroe, and the union representative about the harassing treatment that he experienced from Ortiz due to his relationship with the Female ASA. He also provided a written statement to them.

**ANSWER:** In response to Paragraph 345 of the Amended Complaint, Defendants admit that Plaintiff Fields provided a written statement dated April 27, 2015. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 345 of the Amended Complaint.

346. Colombo asked Mr. Fields if he had any texts or other documents to corroborate his story. He responded that he did, but he was receiving poor cell phone reception indoors. Colombo instructed Mr. Fields to step outside to send him the relevant text messages and then return inside. Following Colombo's instructions, Mr. Fields stepped outside.

**ANSWER:** In response to Paragraph 346 of the Amended Complaint, Defendants admit that, at the conclusion of the meeting with Plaintiff Fields, Human Resources Manager Nicoletta Colombo requested that Plaintiff Fields provide her with copies of a phone conversation and any text messages relevant to the investigation. In response, Plaintiff Fields stated that he did not have good phone service inside the building and stated that he would go outside and send the requested information to her. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 346 of the Amended Complaint.

347. When he arrived outside, Mr. Fields encountered a Port Authority representative who asked him what he was doing. Mr. Fields explained to him that he was sending texts to Human Resources, and then would be returning to his interview.

**ANSWER:** In response to Paragraph 347 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 347 of the Amended Complaint and, based thereon, deny the allegations contained in Paragraph 347 of the Amended Complaint.

348. Minutes later, Defendant Feeney came outside and started berating Mr. Fields, yelling, "get over here," "why are you over there," and "why are you talking to Port Authority, you troublemaker?" On information and belief, Feeney believed Fields had written the letter.

**ANSWER:** Defendants deny the allegations contained in Paragraph 348 of the Amended Complaint.

349. Feeney then yelled at Mr. Fields to go back inside and wait for him in Timberlake's office. Mr. Fields told Mr. Feeney not to speak to speak to him rudely. He also said that he had a union representative inside with him for the interview, and he would not go to Timberlake's office unless the union representative could join him.

**ANSWER:** In response to Paragraph 349 of the Amended Complaint, Defendants admit that Defendant Feeney requested that Plaintiff Fields accompany Defendant Feeney back into the building. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 349 of the Amended Complaint.

350. Feeney proceeded to tell Mr. Fields that he was being "insubordinate." He demanded that Mr. Fields turn over his ID and told him that, if he refused, he would call the Port Authority Police.

**ANSWER:** In response to Paragraph 350 of the Amended Complaint, Defendants admit that Defendant Feeney informed Plaintiff Fields that he was being insubordinate and requested that Plaintiff Fields surrender his Port Authority identification. In response, Plaintiff Fields stated that he would only surrender his identification if Feeney called the police. Defendant Feeney then responded that he would do just that. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 350 of the Amended Complaint.

351.     Mr. Fields responded that he would wait for the Port Authority Police outside if Feeney wanted to call them. Feeney then went inside, but returned outside within several minutes, screaming again at Mr. Fields about how "ridiculous" he was being.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 351 of the Amended Complaint.

352.     At that point, another Port Authority representative, Caleb Chu, arrived at the scene. Chu asked Mr. Fields to write a statement detailing what had happened. Mr. Fields wrote the statement in the lobby, and he gave it to a Port Authority representative to give to Feeney. He also gave a copy of the statement to Allied.

**ANSWER:**  In response to Paragraph 352 of the Amended Complaint, Defendants admit that Port Authority employee Caleb Chu arrived at the scene at some point.  Defendants further admit that the Company received a copy of a written statement from Plaintiff Fields dated April 27, 2015. Further responding to Paragraph 352 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny whether Caleb Chu asked Plaintiff Fields to write a statement and, based thereon, deny that Caleb Chu asked Plaintiff Fields to write a statement.  Except as expressly admitted or stated, Defendant deny the allegations contained in Paragraph 352 of the Amended Complaint.

353.     Feeney then told Mr. Fields that he was suspended until further notice and could not return to the Allied building. Mr. Fields asked why he was being suspended, but Feeney did not respond.

**ANSWER:**  In response to Paragraph 353 of the Amended Complaint, Defendants admit that Defendant Feeney told Plaintiff Fields that he was being suspended and could not return to the Company's offices at JFK.  Except as expressly admitted, Defendants deny the allegations contained in Paragraph 353 of the Amended Complaint.

354.     Eventually, a Port Authority representative came to escort Mr. Fields to obtain his clothes from the locker room. He then left the premises.

**ANSWER:** In response to Paragraph 354 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 354 of the Amended Complaint and, based thereon, denies the allegations contained in Paragraph 354 of the Amended Complaint.

355.     A week later, Mr. Fields received a call from Allied's corporate Human Resources office, requesting an additional interview with him at Allied's offices in Manhattan. Fields attended the meeting. Following the meeting, Mr. Fields filed a union grievance regarding the harassment and suspension.

**ANSWER:** Defendants deny the allegations contained in Paragraph 355 of the Amended Complaint.

356.     Mr. Fields did not hear anything from Allied for weeks after his suspension, despite his multiple attempts to call Monroe and Colombo

**ANSWER:** Defendants deny the allegations contained in Paragraph 356 of the Amended Complaint.

357.     Approximately one month after his suspension, Mr. Fields received a letter in the mail stating that he was terminated for insubordination. He was terminated because Defendants were angry at him for reporting inappropriate sexual relationships and harassment at Allied.

**ANSWER:** In response to Paragraph 357 of the Amended Complaint, Defendants admit that Fields was mailed a Disciplinary/Counseling Statement on or about May 4, 2015, reflecting that he was terminated for insubordination or misconduct on Company/client premises. Except as expressly admitted, Defendants deny the allegations contained in Paragraph 357 of the Amended Complaint.

358.     Mr. Fields has significant damages arising from the illegal harassment and discrimination that he suffered at Allied.

**ANSWER:** Defendants deny the allegations contained in Paragraph 358 of the Amended Complaint.

359.     Mr. Fields lost his vehicle because he no longer had income needed to make payments on it.

**ANSWER:**  In response to Paragraph 359 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny whether Plaintiff Fields lost his vehicle and, based thereon, denies the allegations contained in Paragraph 359 of the Amended Complaint.

360.     Mr. Fields was unemployed for four months from April 2015 until August 2015.

**ANSWER:**  In response to Paragraph 360 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny that Plaintiff Fields was unemployed for four months and, based thereon, denies that Plaintiff Fields was unemployed for four months.

361.     Mr. Fields makes less money at his current position than he made at Allied.

**ANSWER:**  In response to Paragraph 361 of the Amended Complaint, Defendants state that they are without sufficient information or belief to either admit or deny the allegations contained in Paragraph 361 of the Amended Complaint and, based thereon, denies the allegations contained in Paragraph 361 of the Amended Complaint.

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1981 – Intentional Discrimination and Hostile Work Environment**
**(By Plaintiffs Powell and Irving Against Defendants Allied, Tarantola, Feeney, and McNamara)**

362.     Plaintiffs Powell and Irving (the "Race Plaintiffs") repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:**  Defendants repeat and reaver their responses to Paragraphs 1 through 361 of the Amended Complaint as if fully set forth herein.

363.     By the conduct described above, Defendants Allied, Tarantola, Feeney, and McNamara (the "Race Defendants") intentionally deprived the Race Plaintiffs, who are black, of the same rights enjoyed by white citizens to the creation, performance, enjoyment, and all benefits

and privileges, of their contractual relationship with Allied, in violation of 42 U.S.C. § 1981.

**ANSWER:** Defendants deny the allegations contained in Paragraph 363 of the Amended Complaint.

364.    The Race Plaintiffs were subjected to harassment by the Race Defendants that was motivated by Plaintiffs' race and protected status as black individuals in violation of Plaintiff's rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** Defendants deny the allegations contained in Paragraph 364 of the Amended Complaint.

365.    The race-based discriminatory conduct by the Race Defendants was so severe and pervasive as to create a hostile and abusive work environment for the Race Plaintiffs.

**ANSWER:** Defendants deny the allegations contained in Paragraph 365 of the Amended Complaint.

366.    Defendant Allied knew or reasonably should have known about the hostile work environment within the company and failed to take appropriate remedial actions.

**ANSWER:** Defendants deny the allegations contained in Paragraph 366 of the Amended Complaint.

367.    Defendants Tarantola, Feeney, and McNamara directly created or participated in the creation of the hostile and abusive work environment, exhibited gross negligence in supervising subordinates who directly created or participated in the creation of the hostile and abusive work environment, and/or failed to take action upon receiving information about a hostile and abusive work environment that was occurring in violation of 42 U.S.C. § 1981.

**ANSWER:** Defendants deny the allegations contained in Paragraph 367 of the Amended Complaint.

368.    As a result of the discrimination in violation of 42 U.S.C. § 1981 by the Race Defendants, the Race Plaintiffs have been denied employment opportunities providing substantial compensation and benefits and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, entitling them to compensatory damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 368 of the Amended Complaint.

369.   In their race-based discrimination in violation of 42 U.S.C. § 1981, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, entitling the Race Plaintiffs to an award of punitive damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 369 of the Amended Complaint.

370.   Pursuant to 42 U.S.C. §§ 1981 and 1988, the Race Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 370 of the Amended Complaint.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1981 – Retaliation
**(By Plaintiffs Powell and Irving Against Defendants Allied, Tarantola, Feeney, and McNamara)**

371.   Plaintiffs Powell and Irving repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

**ANSWER:**   Defendants repeat and reaver their responses to Paragraphs 1 through 370 of the Amended Complaint as if fully set forth herein.

372.   The Race Plaintiffs engaged in activity protected by 42 U.S.C. § 1981 by making written and oral reports regarding race-based discriminatory conduct that they experienced at Allied to their supervisors and human resources.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 372 of the Amended Complaint.

373.   The Race Defendants subjected the Race Plaintiffs to adverse employment actions, including by reducing their hours and subjecting them to a hostile work environment.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 373 of the Amended Complaint.

374.   The Race Plaintiffs adverse employment actions were a direct and proximate result of their protected complaints and reports regarding the Race Defendants' race-based discriminatory conduct.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 374 of the Amended Complaint.

375.   As a result of the retaliation by the Race Defendants in violation of 42 U.S.C. § 1981, the Race Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to their actions, entitling them to compensatory damages.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 375 of the Amended Complaint.

376.   In their retaliatory actions alleged in violation of 42 U.S.C. § 1981, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, thereby entitling the Race Plaintiffs to an award of punitive damages.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 376 of the Amended Complaint.

377.   Pursuant to 42 U.S.C. §§ 1981 and 1988, the Race Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**ANSWER:**     Defendants deny the allegations contained in Paragraphs 377 of the Amended Complaint.

## THIRD CLAIM FOR RELIEF
**Fair Labor Standards Act, 29 U.S.C. § 201, et seq. – Wage and Hour Violations**
**(By All Plaintiffs Against Defendants Allied, Timberlake, Tarantola, and Feeney)**

378.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants repeat and reaver their Answers to Paragraphs 1 through 377 as if fully set forth herein.

379.   At all relevant times, Defendants Allied, Timberlake, Tarantola, and Feeney (the "Overtime Defendants") were employers and Plaintiffs were employees employed by Defendants within the meaning of 29 U.S.C. § 203.

**ANSWER:** In response to Paragraph 194 of the Amended Complaint, Defendants state that Paragraph 379 is a legal conclusion to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations contained in Paragraph 379 of the Amended Complaint.

380. The Overtime Defendants knowingly, willfully, and intentionally failed to pay Plaintiffs overtime and failed to give them overtime pay at a rate one and one-half times the regular rate for hours worked in excess of forty hours per week, in violation of 29 U.S.C. § 207(a)(1).

**ANSWER:** Defendants deny the allegations contained in Paragraph 380 of the Amended Complaint.

381. The Overtime Defendants also knowingly, willfully, and intentionally failed to pay Defendants for excess time that they worked before and after their shifts, during lunch breaks, and during other allotted breaks.

**ANSWER:** Defendants deny the allegations contained in Paragraphs 381 of the Amended Complaint.

382. As a result of the willful violation of the Fair Labor Standards Act by the Overtime Defendants, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable relief and to compensatory damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 382 of the Amended Complaint.

383. As a result of the willful violation of the Fair Labor Standards Act by the Overtime Defendants, Plaintiffs are entitled to recover from these Defendants, jointly and severally, unpaid overtime compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre- judgment interest, pursuant to the Fair Labor Standards Act, all in an amount to be determined at trial, pursuant to 29 U.S.C. § 216(b).

**ANSWER:** Defendants deny the allegations contained in Paragraph 383 of the Amended Complaint.

## FOURTH CLAIM FOR RELIEF
### N.Y. State Labor Law – Wage and Hour Violations
### (By All Plaintiffs Against Defendants Allied, Timberlake, Tarantola, and Feeney)

384.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

**ANSWER:**  Defendants repeat and reaver their Answers to Paragraphs 1 through 383 as if fully set forth herein.

385.   The Overtime Defendants knowingly, willfully, and intentionally failed to pay overtime pay for hours Plaintiffs worked in excess of forty hours per week at a rate one and one-half times the regular hourly rate, which must be equal to or greater than the minimum wage as set forth in the N.Y. Labor Law § 652, in violation of N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.2.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 385 of the Amended Complaint.

386.   In addition, the Overtime Defendants knowingly, willfully, and intentionally required Plaintiffs to be at work in excess of ten hours per day, and knowingly, willfully, and intentionally failed to pay Plaintiffs one extra hour's pay at a minimum wage for every day in which the interval between Plaintiff's start and end times exceeded ten hours, in violation of N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 386 of the Amended Complaint.

387.   The Overtime Defendants also knowingly, willfully, and intentionally failed to pay Plaintiffs for excess time that they worked before and after their shifts, during lunch breaks, and during other allotted breaks.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 387 of the Amended Complaint.

388.   Pursuant to N.Y. Labor Law §§ 198.1-a and 663, an employer who willfully fails to pay overtime required by the Minimum Wage Act shall be liable for liquidated damages in addition to the amount of any under-payments.

**ANSWER:**   In response to Paragraph 388 of the Amended Complaint, Defendants state that Paragraph 388 is a legal conclusion to which no response is necessary.  To the extent a response

is necessary, Defendants deny the allegations contained in Paragraph 388 of the Amended Complaint.

389. Because of the willful violation of the N.Y. Labor Law by the Overtime Defendants, Plaintiffs are entitled to recover from the Overtime Defendants, jointly and severally, their unpaid overtime compensation, and an amount equal to their unpaid wages in the form of liquidated damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 389 of the Amended Complaint.

390. Pursuant to the N.Y. Labor Law § 663, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of the action, including pre-judgment interest.

**ANSWER:** Defendants deny the allegations contained in Paragraph 390 of the Amended Complaint.

**FIFTH CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107(1) – Intentional Race Discrimination in**
**Violation of the New York City Human Rights Law**
**(By Plaintiffs Powell and Irving Against Defendants**
**Allied, Tarantola, Feeney, and McNamara)**

391. Plaintiffs Powell and Irving repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants repeat and reaver their Answers to Paragraphs 1 through 390 as if fully set forth herein.

392. The Race Plaintiffs are black women of West Indian descent who fall within a protected class of individuals.

**ANSWER:** In response to Paragraph 392 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny the allegation that the Race Plaintiffs are black women of West Indian descent and, based thereon, denies that the Race Plaintiffs are black women of West Indian descent. Further responding to Paragraph 392 of the

Amended Complaint, Defendants deny the remaining allegations contained in Paragraph 392 of the Amended Complaint.

393. The Race Plaintiffs performed satisfactorily since their job performances met or exceeded expectations.

**ANSWER:** Defendants deny the allegations contained in Paragraph 393 of the Amended Complaint.

394. The Race Defendants engaged in conduct, as alleged herein, that constituted unlawful discriminatory practices and unlawful discrimination on the basis of race and national origin in violation of the New York City Human Rights Law, N.Y.C. Admin. Code. § 8-107 et seq.

**ANSWER:** Defendants deny the allegations contained in Paragraph 394 of the Amended Complaint.

395. The Race Defendants subjected the Race Plaintiffs to adverse employment actions on account of their protected status and denied them equal opportunity and treatment in the conditions of employment.

**ANSWER:** Defendants deny the allegations contained in Paragraph 395 of the Amended Complaint.

396. By the acts and practices described above, the Race Defendants directly and/or through employees and/or agents, subjected the Race Plaintiffs to discrimination in violation of the New York City Human Rights Law.

**ANSWER:** Defendants deny the allegations contained in Paragraph 396 of the Amended Complaint.

397. The Race Defendants exercised managerial and/or supervisory control over the Race Plaintiffs and failed to take correction action and/or participated directly in the discriminatory acts.

**ANSWER:** Defendants deny the allegations contained in Paragraph 397 of the Amended Complaint.

398. As a result of the discrimination by the Race Defendants in violation of the New York City Human Rights Law, the Race Plaintiffs have been denied employment opportunities

providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to their actions, entitling them to compensatory damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 398 of the Amended Complaint.

399. In their race-based discriminatory actions alleged in violation of New York City Human Rights Law, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, thereby entitling them to an award of punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 399 of the Amended Complaint.

400. Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, the Race Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

**ANSWER:** Defendants deny the allegations contained in Paragraph 400 of the Amended Complaint.

**SIXTH CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107(1) – Gender Discrimination, Sexual Harassment, and Hostile Work Environment in Violation of the New York City Human Rights Law**
**(By All Plaintiffs Against All Defendants)**

401. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants repeat and reaver their Answers to Paragraphs 1 through 400 as if fully set forth herein.

402. This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

**ANSWER:** In response to Paragraph 402 of the Amended Complaint, Defendants state that Paragraph 402 is not a factual allegation that requires a response. To the extent it requires a response, Defendants acknowledge that this claim is asserted by Plaintiff Powell against All

Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff

Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields

against Defendants Ortiz, Timberlake, Feeney, and Allied.  Except as expressly acknowledged,

Defendants deny the allegations contained in Paragraph 402 of the Amended Complaint.

403.   Defendants discriminated against Plaintiffs on the basis of their genders, sexually harassed Plaintiffs, and/or caused Plaintiffs to experience a hostile work environment in violation of the New York City Human Rights Law by treating Plaintiffs less favorably on account of their genders, and/or making harassing or discriminatory comments to Plaintiffs based on their genders, and/or by sexually harassing and assaulting Plaintiffs.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 403 of the Amended

Complaint.

404.   Defendants knew of the general discrimination and sexual harassment perpetrated against Plaintiffs, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of sexual harassment of female employees that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 404 of the Amended

Complaint.

405.   The sexual harassment perpetrated against Plaintiffs by Defendants affected a term, condition, and the privileges of their employment.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 405 of the Amended

Complaint.

406.   As a result of Defendants' gender discrimination and sexual harassment of Plaintiff in violation of the New York City Human Rights Law, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling them to compensatory damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 406 of the Amended

Complaint.

407.   In their gender-based discriminatory actions alleged in violation of the New York City Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights

of Plaintiffs, thereby entitling her to an award of punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 407 of the Amended Complaint.

408. Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

**ANSWER:** Defendants deny the allegations contained in Paragraph 408 of the Amended Complaint.

**SEVENTH CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107(1) – Pregnancy Discrimination in Violation of the New York City Human Rights Law**
**(By Plaintiff Walton Against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied)**

409. Plaintiff Sheila Walton repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants repeat and reaver their responses to Paragraphs 1 through 408 of the Amended Complaint as if fully set forth herein.

410. Defendants Reid, Ortiz, Timberlake, Feeney, and Allied (the "Pregnancy Defendants") discriminated against Ms. Walton on the basis of her gender by treating her less favorably than her colleagues and subjecting her to differential treatment on the basis of her pregnancy.

**ANSWER:** Defendants deny the allegations contained in Paragraph 410 of the Amended Complaint.

411. The Pregnancy Defendants knew of the pregnancy discrimination perpetrated against Ms. Walton, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of sexual harassment and discrimination against female employees that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

**ANSWER:** Defendants deny the allegations contained in Paragraph 411 of the Amended Complaint.

412. The pregnancy discrimination perpetrated against Ms. Walton by the Pregnancy Defendants affected the terms, conditions, and privileges of her employment.

**ANSWER:** Defendants deny the allegations contained in Paragraph 412 of the Amended Complaint.

413. As a result of the Pregnancy Defendants' pregnancy discrimination against Walton in violation of the New York City Human Rights Law, Ms. Walton has been denied employment opportunities providing substantial compensation and benefits, entitling her to injunctive and equitable monetary relief, and she has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to the Pregnancy Defendants' actions, entitling her to compensatory damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 413 of the Amended Complaint.

414. In their pregnancy-based discriminatory actions alleged in violation of the New York City Human Rights Law, the Pregnancy Defendants have acted with malice or deliberate indifference to the rights of Ms. Walton, thereby entitling her to an award of punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 414 of the Amended Complaint.

415. Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Ms. Walton is entitled to recover reasonable attorneys' fees and costs of this action

**ANSWER:** Defendants deny the allegations contained in Paragraph 415 of the Amended Complaint.

**EIGHTH CLAIM FOR RELIEF**
**N.Y.C. Admin. Code § 8-107(1) - Retaliation in Violation of the**
**New York City Human Rights Law**
**(By All Plaintiffs Against All Defendants)**

416. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER**: Defendants repeat and reaver their responses to Paragraphs 1 through 415 of the Amended Complaint as if fully set forth herein.

417. This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid,

Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

**ANSWER:** In response to Paragraph 417 of the Amended Complaint, Defendants state that Paragraph 417 is not a factual allegation that requires a response. To the extent it requires a response, Defendants acknowledge that this claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied. Except as expressly acknowledged, Defendants deny the allegations contained in Paragraph 417 of the Amended Complaint.

418. Plaintiffs engaged in protected activity by making written and oral complaints about the sexual harassment, race discrimination, gender discrimination, and pregnancy discrimination that Defendants subjected them to on account of status as members of various protected classes, and by seeking to be protected against those same discriminatory acts.

**ANSWER:** Defendants deny the allegations contained in Paragraph 418 of the Amended Complaint.

419. Defendants knew that Plaintiffs had engaged in protected activity.

**ANSWER:** Defendants deny the allegations contained in Paragraph 419 of the Amended Complaint.

420. Defendants subjected Plaintiffs to adverse employment actions, including by reducing the hours that they were eligible to work, giving them worse shifts, writing them up up for pretextual reasons, terminating them, and subjecting them to a hostile work environment.

**ANSWER:** Defendants deny the allegations contained in Paragraph 420 of the Amended Complaint.

421. Plaintiffs' adverse employment actions were a direct and proximate result of Plaintiffs' protected complaints and reports to Defendants regarding their discriminatory conduct.

**ANSWER:** Defendants deny the allegations contained in Paragraph 421 of the Amended Complaint.

422.   As a result of the illegal conduct perpetrated by Defendants, Plaintiffs have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, as well as lost wages and work opportunities, entitling them to compensatory damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 422 of the Amended Complaint.

423.   In their retaliatory acts in violation of the New York City Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling them to an award of punitive damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 423 of the Amended Complaint.

424.   Under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-120, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 424 of the Amended Complaint.

425.   Pursuant to N.Y.C. Admin. Code § 8-502(c), Plaintiffs are providing the New York City Human Rights Commission with notice of their claims under the New York City Human Rights Law.

**ANSWER:**   In response to Paragraph 425 of the Amended Complaint, Defendants state that they are without sufficient information and belief to either admit or deny the allegations contained in Paragraph 425 of the Amended Complaint and, based thereon, deny the allegations contained in Paragraph 425 of the Amended Complaint.

## NINTH CLAIM FOR RELIEF
**N.Y. Exec. Law § 296 – Race Discrimination in Violation of the
New York State Human Rights Law
(By Plaintiffs Powell and Irving Against Defendants Allied,
Tarantola, Feeney, and McNamara)**

426.   Plaintiffs Powell and Irving are black women of West Indian descent who fall within a protected class of individuals.

**ANSWER:** In response to Paragraph 426 of the Amended Complaint, Defendants state that they are without sufficient information to either admit or deny that Plaintiffs are black woman of West Indian descent and, based thereon, deny that Plaintiffs are black woman of West Indian descent. Defendants deny the remaining allegations contained in Paragraph 426 of the Amended Complaint.

427.    The Race Plaintiffs performed satisfactorily since their job performance met or exceeded the Defendants' expectations.

**ANSWER:** Defendants deny the allegations contained in Paragraph 427 of the Amended Complaint.

428.    The conduct by the Race Defendants, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of race and national origin in violation of the New York State Human Rights Law.

**ANSWER:** Defendants deny the allegations contained in Paragraph 428 of the Amended Complaint.

429.    The Race Defendants subjected the Race Plaintiffs to adverse employment actions on account of their protected status and denied them equal opportunity and treatment in the conditions of employment.

**ANSWER:** Defendants deny the allegations contained in Paragraph 429 of the Amended Complaint.

430.    By the acts and practices described above, the Race Defendants, directly and/or through employees and/or agents, subjected the Race Plaintiffs to discrimination in violation of the New York State Human Rights Law.

**ANSWER:** Defendants deny the allegations contained in Paragraph 430 of the Amended Complaint.

431.    The Race Defendants exercised managerial and/or supervisory control over the Race Plaintiffs, participated in the discriminatory acts, and failed to take correction action.

**ANSWER:** Defendants deny the allegations contained in Paragraph 431 of the Amended Complaint.

432.   As a result of the Race Defendants' discrimination in violation of the New York State Human Rights Law, the Race Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to the Race Defendants' actions, entitling her to compensatory damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 432 of the Amended Complaint.

433.   In their race-based discriminatory actions alleged in violation of New York State Human Rights Law, the Race Defendants have acted with malice or deliberate indifference to the rights of the Race Plaintiffs, thereby entitling them to an award of punitive damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 433 of the Amended Complaint.

## TENTH CLAIM FOR RELIEF
### N.Y. Exec. Law § 296 – Gender Discrimination, Sexual Harassment, and Hostile Work Environment in Violation of the New York State Human Rights Law
### (All Plaintiffs Against All Defendants)

434.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:**  Defendants repeat and reaver their Answers to Paragraphs 1 through 433 as if fully set forth herein.

435.   This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

**ANSWER:**  In response to Paragraph 435 of the Amended Complaint, Defendants state that Paragraph 435 is not a factual allegation that requires a response.  To the extent it requires a response, Defendants acknowledge that this claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields

against Defendants Ortiz, Timberlake, Feeney, and Allied. Except as expressly acknowledged, Defendants deny the allegations contained in Paragraph 435 of the Amended Complaint.

436.   Defendants discriminated against Plaintiffs on the basis of their genders by treating them less favorable on the basis of their genders, and/or sexually harassing Plaintiffs, and/or subjecting Plaintiffs to a hostile work environment in violation of the New York State Human Rights Law.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 436 of the Amended Complaint.

437.   Defendants knew of the gender discrimination and/or sexual harassment perpetrated against Plaintiffs, or at a minimum, should have known about the harassment, based on the pervasive atmosphere of gender discrimination and sexual harassment that was tolerated and condoned at Allied and under the Supervisor Defendants' leadership generally.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 437 of the Amended Complaint.

438.   The sexual harassment perpetrated against Plaintiffs by Defendants affected the terms, conditions, and privileges of their employment.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 438 of the Amended Complaint.

439.   As a result of Defendants' discrimination in violation of the New York State Human Rights Law, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, entitling them to injunctive and equitable monetary relief, and they have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life due to Defendants' actions, entitling them to compensatory damages.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 439 of the Amended Complaint.

440.   In their gender-based discriminatory actions and sexual harassment alleged in violation of the New York State Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling them to an award of punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 440 of the Amended Complaint.

441.  Under the New York State Human Rights Law, N.Y. Exec. Law § 297.10, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

**ANSWER:** Defendants deny the allegations contained in Paragraph 441 of the Amended Complaint.

**ELEVENTH CLAIM FOR RELIEF**
**N.Y. Exec. Law § 296 – Failure to Accommodate Pregnancy**
**and Retaliation for Reasonable Accommodation Requests in Violation of**
**the New York State Human Rights Law**
**(By Plaintiff Walton Against Defendants Reid,**
**Ortiz, Timberlake, Feeney, and Allied)**

442.  Ms. Walton repeats and realleges the allegations set forth above as if fully set forth herein.

**ANSWER:** Defendants repeat and reaver their responses to Paragraphs 1 through 441 as if fully set forth herein.

443.  The Pregnancy Defendants failed to provide Ms. Walton with reasonable accommodations for her pregnancy in violation of N.Y. Exec. Law § 296 and 9 N.Y.C.R.R. § 466.11(j) and (k).

**ANSWER:** Defendants deny the allegations contained in Paragraph 443 of the Amended Complaint.

444.  Ms. Walton requested reasonable accommodations for her pregnancy by requesting (1) appropriately sized uniforms that would fit her during pregnancy, (2) to be assigned to shifts that would not require her to work overnight, (3) to be assigned to posts that would not require her to engage in excessive movement, and (4) during the end of her pregnancy, to be assigned to posts that would not require her to drive Allied vehicles.

**ANSWER:** Defendants deny the allegations contained in Paragraph 444 of the Amended Complaint.

445.  Ms. Walton's accommodations requests were for reasonable work accommodations that would have permitted her to reasonably continue to perform her job duties at Allied. None of these accommodations would have caused the Pregnancy Defendants an undue

hardship.

**ANSWER:** Defendants deny the allegations contained in Paragraph 445 of the Amended Complaint.

446. Ms. Walton provided medical information from her doctor to the Pregnancy Defendants that verified the existence of her pregnancy and the limitations associated with her pregnancy.

**ANSWER:** In response to Paragraph 446 of the Amended Complaint, Defendants admit that Plaintiff provided a Medical Inquiry Form In Response To An Accommodation Request dated July 7, 2016 that states as follows: "Patient cannot be lifting heavy objects, no bending, no standing for a long period of time." The Form also states: "Patient needs to be near a bathroom due to her condition." Except as expressly admitted, Defendants deny the allegations contained in Paragraph 446 of the Amended Complaint.

447. The Pregnancy Defendants denied Ms. Walton's requests for reasonable accommodations during her pregnancy.

**ANSWER:** Defendants deny the allegations contained in Paragraph 447 of the Amended Complaint.

448. The Pregnancy Defendants also retaliated against Ms. Walton in response to her requests for reasonable accommodations during her pregnancy.

**ANSWER:** Defendants deny the allegations contained in Paragraph 448 of the Amended Complaint.

449. Ms. Walton engaged in protected activity by requesting reasonable accommodations and complaining about pregnancy discrimination that she was experiencing.

**ANSWER:** Defendants deny the allegations contained in Paragraph 449 of the Amended Complaint.

450. The Pregnancy Defendants responded to Ms. Walton's protected activity by engaging in retaliatory acts, including by suspending her, issuing her write-ups, assigning her to unfavorable posts, assigning her to unfavorable shifts, and ultimately terminating her.

**ANSWER:** Defendants deny the allegations contained in Paragraph 450 of the Amended Complaint.

451. In their retaliatory acts in violation of the New York State Human Rights Law, the Pregnancy Defendants have acted with malice or deliberate indifference to the rights of Ms. Walton, thereby entitling her to an award of punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 451 of the Amended Complaint.

**TWELFTH CLAIM FOR RELIEF**
**N.Y. Exec. Law § 296 – Retaliation in Violation of the**
**New York State Human Rights Law**
**(All Plaintiffs Against All Defendants)**

452. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants repeat and reaver their responses to Paragraphs 1 through 451 of the Amended Complaint as if fully set forth herein.

453. This claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied.

**ANSWER:** In response to Paragraph 453 of the Amended Complaint, Defendants state that Paragraph 453 is not a factual allegation that requires a response. To the extent it requires a response, Defendants acknowledge that this claim is asserted by Plaintiff Powell against All Defendants; by Plaintiff Irving against Defendants Reid, Diaz, Feeney, and Allied; by Plaintiff Walton against Defendants Reid, Ortiz, Timberlake, Feeney, and Allied; and by Plaintiff Fields against Defendants Ortiz, Timberlake, Feeney, and Allied. Except as expressly acknowledged, Defendants deny the allegations contained in Paragraph 453 of the Amended Complaint.

454.    Plaintiffs engaged in protected activity by making written and oral complaints about the sexual harassment, race discrimination, gender discrimination, and pregnancy discrimination to which Defendants subjected them on account of their membership in various protected classes, and by seeking to be protected against those same discriminatory acts.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 454 of the Amended Complaint.

455.    Defendants knew that Plaintiffs had engaged in protected activity.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 455 of the Amended Complaint.

456.    Defendants subjected Plaintiffs to adverse employment actions, including by reducing the hours that they were eligible to work, subjecting them to worse shifts, terminating them, and subjecting them to a hostile work environment.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 456 of the Amended Complaint.

457.    Plaintiffs' adverse employment actions were a direct and proximate result of Plaintiffs' protected complaints and reports to Defendants regarding their discriminatory conduct.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 457 of the Amended Complaint.

458.    As a result of the illegal conduct perpetrated by Defendants, Plaintiffs have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, as well as lost wages and work opportunities, entitling them to compensatory damages.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 458 of the Amended Complaint.

459.    In their retaliatory acts in violation of the New York State Human Rights Law, Defendants have acted with malice or deliberate indifference to the rights of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

**ANSWER**:    Defendants deny the allegations contained in Paragraph 459 of the Amended Complaint.

460.     Under the New York State Human Rights Law, N.Y. Exec. Law § 297.10, Plaintiffs are entitled to recover reasonable attorneys' fees and costs of this action.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 460 of the Amended Complaint.

**THIRTEENTH CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII of the**
**Civil Rights Act of 1964, 42 U.S.C. § 2000e**
**(By Plaintiff Irving Against Defendants Reid, Diaz, and Allied)**

461.     Plaintiff Irving repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:**  Defendants repeat and reaver their responses to Paragraphs 1 through 460 of the Amended Complaint as if fully set forth herein.

462.     Defendants Reid, Diaz, and Allied (the "Title VII Defendants") retaliated against Ms. Irving in violation of Title VII of the Civil Rights Act of 1964.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 462 of the Amended Complaint.

463.     In or around February 2017, Ms. Irving filed a timely Charge of Discrimination alleging gender discrimination with the New York Division of Human Rights and Equal Employment Opportunity Commission ("EEOC").

**ANSWER:**  In response to Paragraph 463 of the Amended Complaint Defendants admit that Plaintiff Irving filed a charge in or around February 2017 with the NYSDHR.  Except as expressly admitted, Defendants deny the allegations in Paragraph 463 of the Amended Complaint.

464.     The Charge of Discrimination described the incident in which Ms. Irving received a friend request from Defendant Diaz, reported the request because she reasonably believed it to be sexual harassment, and then was subject to retaliation by Defendants. The Charge of Discrimination was limited to the Facebook request incident and accompanying retaliation; it did not include the other incidents of gender discrimination or sexual harassment included in this Amended Complaint.

**ANSWER:**  Defendants deny the allegations in Paragraph 464 of the Amended Complaint.

465. The Title VII Defendants are liable under Title VII for retaliating against Ms. Irving for her complaint that she reasonably believed she was subjected to sexual harassment. Ms. Irving engaged in a protective activity by reporting a Facebook friend request that she reasonably constituted sexual harassment. In response, the Title VII Defendants subjected Ms. Irving to adverse employment actions, including by giving her worse assignments, issuing her to unjustified write-ups, and threatening to terminate her. Ms. Irving's response to and report of Defendant Diaz's friend request was the reason that the Title VII Defendants retaliated against her.

**ANSWER:** Defendants deny the allegations contained in Paragraph 465 of the Amended Complaint.

466. On or about Friday, November 3, 2017, Ms. Irving received a "Dismissal and Notice of Rights" letter from the EEOC for her Charge of Discrimination.

**ANSWER:** Defendants deny the allegations contained in Paragraph 466 of the Amended Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests judgment against Defendants as follows:

a)   Awarding compensatory damages to Plaintiffs;

b)   Awarding punitive damages to Plaintiffs;

c)   Declaring that the Race Defendants have violated the Race Plaintiffs' rights in violation of 42 U.S.C. § 1981;

d)   Declaring that Defendants have violated Plaintiffs' rights under the New York City Human Rights Law and the New York State Human Rights Law;

e)   Declaring that the Title VII Defendants have violated Ms. Irving's rights under 42 U.S.C. 2000e;

e)   Awarding Plaintiffs any and all under-payments that they are entitled to as a result of Defendants' failure to comply with the Federal Fair Labor Standards Act and the N.Y. Labor Law;

f)   Awarding liquidated damages due to Plaintiffs under the Fair Labor Standards Act and/or the N.Y. Labor Law;

g)   Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

h)   Awarding injunctive relief appropriate to remedy the unlawful conduct and conditions described herein; and

i)   Granting Plaintiffs all such other relief as may be just and proper.

**ANSWER TO PRAYER FOR RELIEF:**  Specifically responding to the "Prayer for Relief" paragraph following Paragraph 466 of the Amended Complaint, Defendants state that no response is necessary.  To the extent a response is necessary, however, Defendants specifically deny that Plaintiff is entitled to any relief from Defendants, including, but not limited to, that specific relief requested and enumerated in the Amended Complaint.

Defendants hereby state that any and all allegations in Plaintiffs' Amended Complaint that have not been expressly admitted hereinabove are hereby denied.  Defendants further request that this Court deny Plaintiff the relief sought and dismiss the Complaint in its entirety.

Defendants hereby assert the following separate and distinct defenses without conceding that they necessarily bear the burden of proof or persuasion on any of the defenses:

## FIRST DEFENSE

Plaintiffs' Amended Complaint, and each cause of action therein, fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute(s) of limitations.

## THIRD DEFENSE

Defendants at all times acted in good faith to comply with all applicable laws and with reasonable grounds to believe that Defendants' actions did not violate the statutes cited in the Amended Complaint.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of compromise and settlement, waiver and/or accord and satisfaction.

## FIFTH DEFENSE

Plaintiffs Amended Complaint is barred, in whole or in part, because at all relevant times Defendants acted lawfully pursuant to the Fair Labor Standards Act and New York Labor Law.

## SIXTH DEFENSE

Plaintiffs are not entitled to recover attorneys' fees.

## SEVENTH DEFENSE

Plaintiffs' claims are barred in whole or in part because actions taken in connection with Plaintiffs' compensation were done in good faith and in conformity with and reliance upon written administrative regulations, orders, rulings, approvals, interpretations, and written and unwritten administrative practices or enforcement policies of the Administrator of the Wage and Hour Division of the United States Department of Labor and/or the New York Department of Labor.

## EIGHTH DEFENSE

Plaintiffs' claims are barred in whole or in part by any exemptions, exclusions, exceptions, or credits provided in Section 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207.

## NINTH DEFENSE

Assuming, *arguendo*, that Plaintiff Walton requested accommodations for her pregnancy, any such accommodations were not reasonable and/or would have resulted in an undue hardship.

## TENTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the provisions of Section 4 of the Portal-to-Portal Act, 29 U.S.C. § 254, as to all hours during which Plaintiffs were engaged in activities which were preliminary or postliminary to their principal activities.

## ELEVENTH DEFENSE

To the extent that discovery reveals that Plaintiffs falsely reported their hours and there is no evidence that Defendants required the false reporting of hours; no evidence that Defendants encouraged Plaintiffs to falsely report hours; and no evidence that Defendants knew or should have known that they were providing false information as to their hours, Defendants hereby invoke the doctrine of estoppel to bar the claims asserted by the Plaintiffs.  See Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972).

## TWELFTH DEFENSE

Plaintiffs are not entitled to recover punitive damages from Defendants for the acts alleged in the Amended Complaint on the grounds that none of the corporate Defendants' officers, directors or managing agents committed the alleged acts, nor authorized them, nor ratified them, nor did the corporate Defendants or their officers, directors or managing agents have advance knowledge of the unfitness, if any, of the employees who allegedly committed said acts, nor did the corporate Defendants employ said employees with a conscious disregard of the rights or safety of others.

## THIRTEENTH DEFENSE

Assuming, arguendo, that Plaintiffs have stated a case for discrimination, harassment and/or hostile work environment, Defendants exercised reasonable care to prevent and promptly correct any alleged harassing behavior, and Plaintiffs unreasonably failed to take advantage of the preventative and corrective opportunities offered by Defendants to avoid harm or otherwise.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of unclean hands, laches, waiver, avoidable consequences, after-acquired evidence, estoppel and or other principles of

equity.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because no action was taken toward Plaintiffs based on their gender, race, national origin, or pregnancy status, or because they allegedly engaged in alleged protected activity, but instead, all actions taken by Defendants with respect to Plaintiffs were taken in good faith and for legitimate, non-discriminatory and non-retaliatory reasons.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, on the grounds that some or all of the damages claimed by Plaintiffs were a result of Plaintiffs' own acts, actions, omissions, or negligence.

## SEVENTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because at all time Plaintiffs' employment was at-will.

## EIGHTEENTH DEFENSE

Plaintiffs' Amended Complaint, and each cause of action therein, is barred, in whole or in part, due to Plaintiffs' failure to mitigate the alleged damages, if any, they claim to have suffered as a result of the allegations in the Amended Complaint. In the alternative, to the extent Plaintiffs have mitigated any alleged damages, Defendants are entitled to a set-off for any interim earnings, benefits, or other income.

## NINETEENTH DEFENSE

Plaintiffs' Amended Complaint, in whole or in part, does not allege facts sufficient to support claims for violations of the laws cited therein.

### TWENTIETH DEFENSE

Plaintiffs' Amended Complaint must be dismissed to the extent they have failed to fully exhaust their administrative remedies.

### TWENTY-FIRST DEFENSE

Plaintiffs' Amended Complaint, and each cause of action therein, is barred, in whole or in part, because the losses, if any, purportedly suffered by Plaintiffs, were caused, if at all, by factors unrelated to the conduct or lack thereof on the part of Defendants.

### TWENTY-SECOND DEFENSE

Plaintiffs' claims for retaliation must be dismissed, in whole or in part, because Plaintiffs never engaged in any protected activity.

### TWENTY-THIRD DEFENSE

Plaintiffs' Amended Complaint is barred, in whole or in part, by the exclusivity of remedies provision of the New York Workers' Compensation Law.

### TWENTY-FOURTH DEFENSE

To the extent Plaintiffs' claims are based upon alleged intentional misconduct of specific employees and/or non-employees, neither AlliedBarton Security Services LLC nor Universal Protection Service, LLC can be held liable for such conduct based upon theories of *respondeat superior* or vicarious liability or any other manner of imputing liability.

### TWENTY-FIFTH DEFENSE

Plaintiffs' Amended Complaint fails to allege actions that rise to the level of a hostile work environment as defined under applicable law.

### TWENTY-SIXTH DEFENSE

Plaintiffs' Amended Complaint fails to state a claim for punitive damages.

## TWENTY-SEVENTH DEFENSE

Any claim for liquidated damages is barred as (1) AlliedBarton Security Services LLC and/or Universal Protection Service, LLC and all of their officers, directors, and agents acted in good faith and did not commit a willful violation of applicable law; (2) AlliedBarton Security Services LLC and/or Universal Protection Service, LLC and their officers, directors, managers, and agents did not authorize any such willful violation with respect to Plaintiffs; and (3) Plaintiffs failed to plead facts sufficient to support recovery of such damages.

## TWENTY-EIGHTH DEFENSE

Plaintiffs are not entitled to recover any punitive damages as prayed for in the Amended Complaint on the grounds that any award of punitive damages would violate the constitutional rights of Defendants, including, but not limited to, Defendants' rights under the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution.

## TWENTY-NINTH DEFENSE

Even if certain employee(s) acted improperly toward Plaintiffs, which Defendants deny, neither AlliedBarton Security Services LLC nor Universal Protection Service, LLC can be held liable for such conduct because neither knew of such conduct, acquiesced in such conduct, nor condoned such conduct.

## THIRTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, under the avoidable consequences doctrine because (1) Defendants took reasonable steps to prevent and correct workplace discrimination, retaliation, and harassment; (2) Plaintiffs unreasonably failed to use the preventative and corrective measures that Defendants provided; and (3) the reasonable use of Defendants' procedures would have prevented the alleged harm that Plaintiffs suffered.

### THIRTY-FIRST DEFENSE

Plaintiffs' Amended Complaint, and each cause of action set forth therein, is barred, in whole or in part, as at the time of the alleged events set forth in Plaintiffs' Amended Complaint, AlliedBarton Security Services LLC and/or Universal Protection Service, LLC had in place policies against the conduct alleged and Plaintiffs failed to avail themselves of the remedial measures therein.

### THIRTY-SECOND DEFENSE

With respect to Plaintiffs' demand for punitive damages, Defendants specifically incorporate by reference all standards of limitations regarding the determination and enforceability of punitive damages awards, including but not limited to, those standards of limitation that arose in *BMW of North America v. Gore*, 517 U.S. 559 (1996), *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003) and *Philip Morris USA v. Williams*, 549 U.S. 346 (2007).

### THIRTY-THIRD DEFENSE

Plaintiffs' Amended Complaint fails to state facts sufficient to state a claim for mental and emotional distress damages. If Plaintiffs have suffered any emotional distress, which Defendants deny, such emotional distress was proximately caused by factors other than Plaintiffs' employment, the actions of Defendants, or anyone acting on their behalf. To the extent Plaintiffs suffered any emotional distress, Plaintiffs contributed to their own distress and, by reason of their contribution, any remedy to which they might otherwise be entitled must be denied or reduced accordingly.

### THIRTY-FOURTH DEFENSE

Plaintiffs' Amended Complaint fails to state facts sufficient to entitle Plaintiffs to prejudgment interest.

## THIRTY-FIFTH DEFENSE

Plaintiffs are precluded from recovering any amounts from Defendants for failure to pay compensation for hours worked because any such time was worked without knowledge or approval from management.

## THIRTY-SIXTH DEFENSE

Because the Amended Complaint is couched in conclusory terms, Defendants cannot fully anticipate all defenses that might be applicable to the within action. Accordingly, Defendants reserve the right to allege additional defenses as they become known during discovery, and to amend their Answer accordingly.

WHEREFORE, having fully answered the Amended Complaint, Defendants pray that Plaintiffs' Amended Complaint be dismissed in its entirety with prejudice, that judgment be entered in favor of Defendants, that costs, including attorneys' fees, be awarded to Defendants, and that such other and further relief as the Court deems just and proper be granted to Defendants.

Respectfully submitted this 15th day of February, 2018.

/s/ Evan S. Weiss_____
**MARTENSON, HASBROUCK & SIMON LLP**
Evan S. Weiss, Esq.
David Hamilton, Esq. (*Pro hac vice pending*)
Wes McCart, Esq. *(Pro hac vice application forthcoming)*
3379 Peachtree Road, N.E., Suite 400
Atlanta, Georgia 30326
(404) 909-8100
(404) 909-8120 (facsimile)

**ECKERT SEAMANS**
Riyaz G. Bhimani, Esq.
10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 949-2909

*Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 15, 2018, the foregoing was served by ECF Filing Portal upon the following: Elizabeth Saylor, Esq., Alanna Kaufman, Esq., and David Lebowitz, Emery Celli Brinckerhoff & Abady LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020.

/s/  Evan S. Weiss\
**MARTENSON, HASBROUCK & SIMON LLP**\
Evan S. Weiss, Esq.\
3379 Peachtree Road, N.E., Suite 400\
Atlanta, Georgia 30326\
(404) 909-8100\
(404) 909-8120 (facsimile)